UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------x
Cesar MUNOZ,

                    Petitioner,

                                   MEMORANDUM AND ORDER
      -against-                       07-CV-2080 (ILG)

UNITED STATES OF AMERICA,

                    Respondent.
-----------------------------------------------x

## <u>**TABLE OF CONTENTS**</u>

BACKGROUND ........................................................................................................... 3

    I.   Money Laundering Transaction and Arrest ............................................................ 3

       A.  Contact with Agent Herrera ............................................................................ 3

       B.  Contact with Detective Cruz and Arrest ........................................................ 8

    II.  Trial and Sentencing ........................................................................................... 11

    III. Appeal and Section 2255 Petition...................................................................... 14

DISCUSSION .......................................................................................................... 15

    I.   Pizzi's Alleged Ineffective Assistance ............................................................... 18

       A.  Ineffectiveness Prior to Trial ........................................................................ 18

       B.  Ineffectiveness at Trial and at Sentencing ................................................... 33

           1.  Agents' Testimony Regarding Code Words ....................................... 33

              a.  Rule 701 ...................................................................................... 35

                  i.   The Government did not Establish That the Agents' Testimony was Rationally Based Exclusively on Their Firsthand Perception ................. 36

                  ii.  The Testimony was not Helpful to the Jury in Determining the Facts...... 42

                  iii. The Testimony was Based on Technical or Specialized Knowledge........ 45

               b.  Rule 702 ...................................................................................... 50

               c.  Harmless Error Analysis ............................................................. 54

           2.  Radwanski's Testimony Regarding the Ion Scan Device ..................... 58

           3.  Government's "Misrepresentations" in Summation and at Sentencing................ 59

    II.  Alleged Defects in Appellate Proceedings ........................................................ 64

A. Alleged Violations of Munoz's Right to Appellate Counsel ...................................... 64

    1. The Court's Allegedly Defective Instruction Regarding Munoz's Right to Appointed Counsel................................................................................................ 65

        a. The Obligation of Federal District Courts to Inform Defendants of the Right to Court-Appointed Appellate Counsel........................................................... 66

        b. Analysis of This Court's Instruction to Munoz at Sentencing....................... 77

        c. Harmless Error Analysis ............................................................................ 80

    2. Alleged Representation on Appeal by Non-Lawyer............................................. 83

B. Palomares's Alleged Ineffective Assistance ................................................................ 85

    1. The Batson Issue .............................................................................................. 88

    2. Admissibility and Use of Agent Ammirati's Expert Testimony.......................... 93

        a. Ammirati's Testimony and the Government's Summation ........................... 94

        b. Analysis of Munoz's Ineffective Assistance Claims..................................... 99

            i. Admissibility of Agent Ammirati's Testimony ....................................... 99

            ii. Government's Use of Agent Ammirati's Testimony in Summation ....... 101

    3. Admission of Ion Scan Evidence ..................................................................... 108

III. Appointment of Counsel ................................................................................................ 115

IV. A Certificate of Appealability Shall Be Granted .......................................................... 116

CONCLUSION..................................................................................................................... 117

GLASSER, United States District Judge:

Petitioner Cesar Munoz has moved pursuant to 28 U.S.C. § 2255 ("Section 2255") for an order vacating his conviction and sentence in the underlying criminal action, <u>United States v. Munoz</u>, 04-CR-473(ILG), for a new appeal, and for other relief.  Mr. Munoz argues that his right to effective counsel was violated at trial and on direct appeal from his conviction, and that his right to appellate counsel was effectively denied.  For the reasons stated below, Mr. Munoz's petition is dismissed in part.  An evidentiary hearing shall subsequently be scheduled at which evidence in support of Mr. Munoz's remaining claims may be presented.

## <u>BACKGROUND</u>

The following statement of the facts underlying the pending petition is drawn from the evidence introduced at trial and, where relevant, from other hearings and the parties' written submissions in the underlying criminal action.  Some testimony introduced at trial that is not relevant to Mr. Munoz's arguments in the pending Section 2255 petition has been omitted from the Court's summary.

## I.      Money Laundering Transaction and Arrest

### A.      Contact with Agent Herrera

On the evening of December 26, 2002, Special Agent Miguel Herrera of the Department of Homeland Security, Immigration and Customs Enforcement, a member of the El Dorado Task Force which investigates narcotics trafficking and money laundering in the New York metropolitan area, received a call on a cellular telephone that he used in his undercover capacity from an individual later identified as the petitioner, Cesar Munoz.[1]  Mr. Munoz did not give his

_____

[1]      This conversation, like all of the subsequently recorded conversations between the petitioner and his co-conspirators and El Dorado Task Force members, was in Spanish.  The petitioner is not fluent in English and

name, but informed Agent Herrera that he was calling "on behalf of Jorge," and asked for "Angel," which was Agent Herrera's undercover name. (Munoz Ex. G ("Tr.") at 167.)[2] Agent Herrera acknowledged that he was "Angel," and the petitioner stated that he had "five hundred," which the agent took to mean $500,000 in cash, to transfer. Agent Herrera suggested that Mr. Munoz call back the next day. At approximately 9:30 A.M. on the following morning, Friday, December 27, 2002, Mr. Munoz contacted the agent for the second time, using the introduction "on behalf of Jota." (See Munoz Ex. H (transcript of recorded call introduced as Government Exhibit 2A at trial).) Agent Herrera and Mr. Munoz discussed a location for the money transfer in the area of Northern Boulevard between 70th and 90th Streets in Queens at approximately 10:30; the agent explained at trial that he preferred that neighborhood because it is "surveillance friendly." (Tr. at 197.) The petitioner was initially reluctant to agree to that location, saying several times that he did not know Queens and asking Agent Herrera if the meeting could take place on 94th Street rather than between 70th and 90th. Eventually, however, he deferred to the agent's preference.

Approximately one hour later, Mr. Munoz contacted Agent Herrera again. (See Munoz Ex. I (transcript of recorded call introduced as Government Exhibit 3A at trial).) The agent directed him to the corner of 70th Street and Northern Boulevard, and asked him to describe the automobile he was driving. The petitioner stated that he was driving a gold Jeep, and subsequently arrived at the agreed-upon location in a gold Jeep with Rhode Island license plates, which Agent Herrera later determined was registered to Mr. Munoz. When he arrived, Mr.

---

was provided with a translator during all proceedings in the underlying criminal action.

[2] The exhibits submitted in support of Mr. Munoz's petition and the government's opposition shall herein be cited as "Munoz Ex." and "Gov. Ex.," respectively.

Munoz telephoned Agent Herrera again and told him to walk across the street to where the Jeep was parked. When Agent Herrera arrived at the Jeep, expecting to complete the money transfer, the petitioner informed him that he did not have the money with him, but had been instructed to meet with the agent in person for the purpose of agreeing upon another meeting location where the transfer could be made. Agent Herrera was upset by the fact that Mr. Munoz had come to the meeting without the money and informed the petitioner that he, Agent Herrera, would have to call his bosses "down South," which he explained at trial was a reference to the narcotics trafficking organization in Colombia for which Agent Herrera supposedly worked, to let them know what had happened. (Tr. at 201-02.) The petitioner explained that he had wanted to meet in person so as to avoid discussing the details of the transaction over the phone, and proposed a future meeting in the Bronx to complete the transaction. Agent Herrera testified that he was reluctant to let Mr. Munoz dictate the location of the later meeting, but ultimately agreed to meet in the Bronx provided that the meeting took place in the vicinity of a restaurant called Jimmy's Bronx Cafe, which he testified at trial is a surveillance friendly location. Mr. Munoz wanted to schedule the subsequent meeting for 3:00, saying that he needed time to obtain the money, but Agent Herrera informed him that that was too late because the agent was leaving for Miami later in the day, and instructed Mr. Munoz to call within half an hour so that they could complete the transaction by 12:30 or 1:00. Agent Herrera also testified that Mr. Munoz proposed transferring the money at their next meeting by exchanging cars—i.e., Mr. Munoz would leave the money in his car and would leave the keys inside that vehicle for Agent Herrera, while the agent would leave the keys to his car for Mr. Munoz. Agent Herrera informed Mr. Munoz that he was not comfortable with that proposal. (Id. at 200.)

Mr. Munoz did not call back within half an hour of his meeting with Agent Herrera, but approximately one hour later, Agent Herrera received a call from an unknown male. (See Munoz Ex. J (transcript of recorded call introduced as Government Exhibit 4A at trial).) The unknown individual identified himself as calling on behalf of "La Mona," whom Agent Herrera identified at trial as a target of the money laundering investigation based in Colombia. (See Tr. at 206-07.) After having established contact with Agent Herrera, the unidentified male proposed to call the agent again in one or two hours to "decide where we can meet, brother so we can go eat lunch." (Munoz Ex. J at 2.) The agent testified at trial that "go eat lunch" was a coded reference to exchanging money, used because money launderers do not speak explicitly over the telephone in case law enforcement officers are eavesdropping on their conversations. (Tr. at 208.) Agent Herrera agreed with the plan but insisted that he did not want to be "played with again," because he had "other things to do." (Munoz Ex. J at 2.) The unidentified man said that he understood, but when Agent Herrera attempted to schedule a meeting for 12:30, the unidentified man said that that was too early because he was still far away from the agent's location and needed to "get the clothes ready and all so we can travel, brother go to work." (Munoz Ex. J at 3.) Agent Herrera testified that these statements were coded references to preparing the money for transport and exchange. (Tr. at 209.) The conversation ended with the unidentified man promising to call Agent Herrera again at 12:30 to set up a meeting at which to make the transfer.

At 12:38, the unidentified man called Agent Herrera again. (See Munoz Ex. J (transcript of recorded calls introduced as Government Exhibits 5A-7A at trial).)[3] He told Agent Herrera

---

[3]     The call was disconnected twice during the course of the recorded conversation. The government introduced the recordings and transcripts of the three calls as separate exhibits at trial, but the Court shall treat the

that he would have to wait longer for the transfer, and proposed meeting at 3:00 in the afternoon. Agent Herrera explained that he could not make the transfer so late, because the bank closes at 3:00 and he did not want to be stuck with "that"– i.e., the $500,000– over the weekend. (See Tr. at 216.) The unidentified man said that he understood, and the two agreed to wait until the following week to complete the transfer. Shortly after that conversation was completed, Agent Herrera received a call from a second unidentified man, calling from the same telephone number that the petitioner had used to call Agent Herrera earlier in the day. (See Munoz Ex. L (transcript of recorded call introduced as Government Exhibit 8A at trial).) The second unidentified man introduced himself as "Jorge" and handed the phone over to the petitioner, whom he referred to as "Tony." Mr. Munoz reiterated that he was calling "on behalf of Jota," and indicated that he was currently "up there" where he and Agent Herrera had agreed to meet– i.e., at Jimmy's Bronx Cafe in the Bronx. (Tr. at 222.) Agent Herrera responded that he could not "stay with . . . those little papers" over the weekend, and Mr. Munoz reminded him not to talk over the phone. The agent then insisted that he could not wait until 3:00 to complete the transaction because the banks would close and he could not "keep that" for the weekend; Mr. Munoz indicated that he understood and the two agreed to postpone the transaction until the following week.

After December 27, Agent Herrera was out of the city on vacation. He took his undercover cellular phone with him, and on Sunday, December 29, received another call from the petitioner seeking to schedule a meeting at which to consummate the transaction the next day. Agent Herrera informed Mr. Munoz that he was out of town and would be unable to attend the meeting, but that his cousin might be able to meet with the petitioner. After speaking with

conversation which spanned the three calls as a single interaction.

Mr. Munoz, Agent Herrera contacted other agents of the El Dorado Task Force in New York to inquire whether they could arrange for an agent to pose as his cousin in the meeting with Mr. Munoz the following day. The agents confirmed that this could be arranged, and when Mr. Munoz later called Agent Herrera again, the agent informed Munoz that Herrera's cousin would contact him the next day to arrange a meeting.

**B.      Contact with Detective Cruz and Arrest**

The officer designated to assume the role of Agent Herrera's "cousin" was Detective Eric Cruz of the New York City Police Department. Detective Cruz was assigned to the Department's Organized Crime Investigation Division and in that capacity worked with the El Dorado Task Force on money laundering investigations. Detective Cruz testified that on December 29, 2002, he received a call from Agent Herrera regarding the situation with the petitioner. Agent Herrera provided Detective Cruz with the petitioner's telephone number and the phrase "Jota on behalf of Angel" with which to identify himself, and explained that Detective Cruz was to meet the petitioner in the vicinity of Jimmy's Bronx Cafe on Monday, December 30, to complete the transfer of approximately $500,000 in cash. At 11:10 A.M. on December 30, the petitioner contacted Detective Cruz by telephone. (See Munoz Ex. M (transcript of recorded call introduced as Government Exhibit 14A at trial).) Detective Cruz introduced himself by the phrase that Agent Herrera had given him, and Mr. Munoz asked if he was "there yet," to which the detective replied that he was on his way. Detective Cruz then informed Mr. Munoz that he would prefer to meet at the Pathmark supermarket near Jimmy's Bronx Cafe, rather than at the previously agreed upon location. The petitioner initially resisted the change in plans, protesting that he and Agent Herrera had already agreed upon the location, but Detective Cruz assured him

that the supermarket was "quieter," by which he testified he meant that the transfer was less likely to be observed by law enforcement at the supermarket, not that it was literally a quieter or less busy location. (Tr. at 347.) Detective Cruz testified that he did not want to follow the original plan by meeting the petitioner at Jimmy's Bronx Cafe because, since that location had been agreed upon on Friday of the previous week, the petitioner had had too much time to set up countersurveillance or to plan an ambush when the detective arrived, and that he preferred the supermarket because it was a busy area where El Dorado Task Force surveillance team would be difficult for any countersurveillance operatives working with Mr. Munoz to detect. (Id. at 345.) Detective Cruz then told Munoz that he would call him when he had arrived at the supermarket.

The detective and his partner, Inspector Alvarado, then traveled to the supermarket on 207th Street and 9th Avenue for their meeting with Mr. Munoz, as did a surveillance team traveling separately. At 11:40 A.M., Cruz and Alvarado arrived at the Pathmark parking lot, and Cruz called Munoz to inform him of that fact. (See Munoz Ex. N (transcript of recorded call introduced as Government Exhibit 15A at trial).) Munoz again attempted to persuade Cruz to follow the original plan and meet at Jimmy's Bronx Cafe where they could "sit down and eat," but Cruz refused, insisting that Munoz meet him at the supermarket. (Id. at 3.) Munoz ultimately relented, agreeing to travel to the supermarket. After speaking with the petitioner, Detective Cruz exited his car, carrying a concealed mini-cassette recorder, and stood near a Coca-Cola vending machine near the front entrance of the supermarket. Cruz placed two short calls to Munoz to inform him of his location, and a few moments later the petitioner arrived on foot. (See Munoz Ex. N (transcript of recorded call introduced as Government Exhibit 16A at

trial).)[4]  In a face-to-face conversation that was recorded by Detective Cruz's concealed recorder, Munoz directed Cruz's attention across the street, where another man was standing next to a white Lincoln Town Car in a gas station's parking lot.  (See id. (transcript of recorded face-to-face conversation).)  According to Detective Cruz's testimony at trial, Munoz informed the detective that that man had his "five," meaning $500,000, but that portion of the conversation was unintelligible in the recording.  (Tr. at 370.)  Mr. Munoz and the detective then parted.

Detective Cruz returned to his car and drove across the street to the gas station.  Upon exiting the vehicle, he greeted the man standing beside it; the man did not respond verbally, but made eye contact with the detective and then looked across the street to a parked automobile in which the surveillance team was located.  The driver then entered the Town Car and drove away, after which Detective Cruz returned to his car and departed the gas station.  A moment later, the petitioner called Detective Cruz again and explained that the car that the man had indicated looked "strange," which Detective Cruz took to mean that the petitioner was concerned that the car contained law enforcement agents.  (Tr. at 372.)  Although Detective Cruz had lost track of the white Town Car, Mr. Munoz gave him specific directions over the telephone, including details about the detective's surroundings and precise location which indicated that, although neither Detective Cruz nor the surveillance team were aware of where Mr. Munoz was at the time, he was nearby and was able to see the detective's car.  (See Munoz Ex. N.)  Mr. Munoz directed Detective Cruz to park on the corner of 207th Street and 10th Avenue, at which point the white Town Car drove up behind the detective's car and stopped in the street.  Detective Cruz

_____

[4]        This transcript includes recordings of two brief telephone calls from Cruz to Munoz that took place as Cruz was standing in front of the supermarket, the subsequent conversation that took place in person and was recorded by Cruz's microcassette recorder, and the two later telephone conversations in which Munoz directed Cruz toward the co-conspirator in the white Town Car, which are discussed below.

exited his vehicle and approached the Town Car, noticing that the trunk was ajar. Opening the trunk, he found and removed a single piece of luggage, then closed the trunk, returned to his car, and drove away. Later examination revealed that the bag contained approximately $490,000 in cash, separated into bundles of approximately $2,000 wrapped in rubber bands. An ion spectrometry analysis of the bag later performed by Detective Curtis Cabell of the New York City Police Department ("NYPD") registered positive for "cocaine high," indicating that the bag was contaminated with levels of microscopic cocaine residue sufficiently high to suggest that it had been in direct contact with the drug.

A criminal complaint was filed against Mr. Munoz on April 29, 2004, an indictment was returned on May 18, 2004, and a superseding indictment charging Mr. Munoz with one count of conspiracy to commit money laundering in violation of 18 U.S.C. § 1956(h) and one count of money laundering in violation of 18 U.S.C. § 1956(a)(1)(B) was filed on September 9, 2004. A warrant for the petitioner's arrest was issued on May 3, 2004. Mr. Munoz was not at his home when agents appeared there to execute the warrant, and his wife, Maribel Lopez, informed the agents that the petitioner was in Florida at the time. Shortly thereafter, Michael Pizzi, a Miami-based attorney who had been retained by Mr. Munoz to represent him in the criminal action, contacted the government to inform it that Mr. Munoz was aware of the charges against him and wished to self-surrender in New York. The government agreed to this arrangement, and on the morning of May 5, 2004, Mr. Munoz appeared in New York and was taken into federal custody.

## II.    Trial and Sentencing

Prior to trial, Mr. Pizzi attempted unsuccessfully on several occasions to obtain release on bail for Mr. Munoz, efforts which were thwarted by the government's allegations that Mrs.

Lopez and other relatives had obstructed justice by removing evidence from several safe deposit boxes shortly after becoming aware of the warrant for Mr. Munoz's arrest. During the pretrial proceedings, Mr. Munoz was notified by the government pursuant to Federal Rule of Criminal Procedure 16 ("Rule 16") of its intention to call two expert witnesses at trial– Detective Cabell of the NYPD and Paul Radwanski of Smiths Detection– to discuss the operation and significance of the ion scan test which had been performed on the bag recovered from the Town Car, and another expert witness– Special Agent Christopher Ammirati of the Department of Homeland Security, Immigration and Customs Enforcement– who would testify as to the general operation of narcotics money laundering organizations. Mr. Pizzi made motions in limine to exclude those witnesses, which were denied.

Mr. Munoz's trial commenced before this Court on October 18, 2004. The government called Agent Herrera and Detective Cruz, who testified to their interactions with the petitioner on December 26-30, 2002, as described above. It also called Agent Ammirati, who testified as an expert on the basis of his experience with other money laundering investigations,[5] and Cabell and Radwanski. Mr. Radwanski, a chemist employed by the manufacturer of the ion scan device, explained the scientific principles underlying the operation of the device, while Detective Cabell discussed the results of that test and their evidentiary significance.[6] On the basis of Cabell and Radwanski's testimony, the government argued that the bag that Detective Cruz had obtained from Mr. Munoz's associate had been in direct contact with cocaine, which established the necessary element of Mr. Munoz's knowledge that the cash he transferred to Detective Cruz

---

[5]     See Discussion Part II(B)(2), infra.

[6]     See Discussion Part II(B)(3), infra.

was derived from the sale of illegal narcotics.[7]  Mr. Pizzi presented two principal arguments in

Mr. Munoz's defense at the trial:  first, that because neither drugs nor money were explicitly

mentioned in any of the conversations that Munoz had with the undercover officers, the

government could not establish beyond a reasonable doubt that he was aware that the bag

contained cash, or that the cash discovered therein came from the sale of illegal drugs; and

second, that because the majority of currency in circulation in the United States is contaminated

with trace amounts of cocaine that the ion spectrometer used to scan the bag would detect, the

results of the ion scan test were not a reliable indicator of whether the bag had been used in

cocaine trafficking.  Mr. Pizzi did not call any witnesses for the defense.

The jury found Mr. Munoz guilty on both counts on October 21, 2004.  On November 3,

Mr. Pizzi filed on Mr. Munoz's behalf a motion for a judgment of acquittal pursuant to Federal

Rule of Criminal Procedure 29 ("Rule 29") and a motion for a new trial pursuant to Federal Rule

of Criminal Procedure 33 ("Rule 33").  The Court denied both motions in a written order issued

on January 5, 2005, and scheduled Mr. Munoz's sentencing hearing for February 4, 2005.  Prior

to that hearing, Mr. Pizzi submitted a presentencing memorandum and a set of objections to the

Sentencing Guidelines calculation contained in Mr. Munoz's Presentence Investigation Report.

Mr. Pizzi's submissions argued that Mr. Munoz's offense level should not be enhanced by six

levels pursuant to U.S.S.G. § 2S1.1.1(b)(1)(A) & (B)(i) on the ground that he knew that the

money at issue in the case was derived from the sale of narcotics; that he should receive a three-

level reduction to his offense level pursuant to U.S.S.G. § 3B1.2 for his purportedly minor role in

---

[7]        The government also introduced the testimony of several other members of the El Dorado Task
Force who had been involved in surveillance of Mr. Munoz during the period at issue; none of that testimony is
directly relevant to the issues raised in the present petition.

the offense; and that applying the sentencing factors articulated by 18 U.S.C. § 3553(a), Mr. Munoz should be sentenced to a term of home confinement rather than continued incarceration. At sentencing, the Court rejected all of Mr. Pizzi's arguments. It applied the 6-level enhancement pursuant to U.S.S.G. § 2S1.1(b)(1)(A) & (B)(i) to Mr. Munoz's base offense level of 22, added two additional levels pursuant to U.S.S.G. § 2D1.1(b)(2)(B), and denied the requested 3-level reduction pursuant to U.S.S.G. § 3B1.2, resulting in an adjusted offense level of 30 and a Guidelines range of 97-121 months. The Court then sentenced Mr. Munoz to the bottom of that range, imposing a term of incarceration of 97 months.

## III.    Appeal and Section 2255 Petition

On February 14, 2005, Mr. Pizzi filed a timely notice of appeal of Mr. Munoz's sentence and conviction. Mr. Munoz subsequently terminated Mr. Pizzi and was represented on appeal by Lorenzo Palomares, an attorney based in Puerto Rico. However, Munoz now contends that Palomares's representation was only nominal, and that his appellate briefs were actually prepared by Dennis Deters, a paralegal based in Minnesota who then passed the briefs along to Palomares to be filed in Palomares's name, since Deters is not a licensed attorney. Munoz's appellate brief raised three issues, all of which challenged the sufficiency of the evidence as to various elements of the charged offenses and the base offense level enhancement applied at sentencing.[8] In an unpublished summary order issued on February 16, 2006, the Second Circuit affirmed Mr. Munoz's conviction and sentence in all respects. See United States v. Munoz, 167 Fed. App'x 850 (2d Cir. 2006). In a letter dated February 21, 2006, Mr. Deters sent Munoz a copy of the Second Circuit's order and urged him to consider filing either a petition for certiorari with the United States Supreme Court or a Section 2255 petition alleging ineffective assistance by Mr.

---

[8]        See Discussion Part II, infra.

Pizzi.  (See Munoz Ex. CC.)  Mr. Deters's letter also claimed that the company by which he is employed, Paralegal Research Associates, "regularly win[s]" cases before the Supreme Court and won 11 cases in that Court in the previous year.  (Id. at 1.)[9]

On May 17, 2007, Mr. Munoz filed the currently pending Section 2255 petition, in which he alleges that his constitutional rights were violated in the underlying criminal action by ineffective assistance of counsel at trial and on appeal and by the effective denial of his constitutional right to counsel on direct appeal.[10]  It is to those arguments that the Court now turns.

## DISCUSSION

The principal question facing the Court at this stage of the proceeding is whether Mr. Munoz is entitled to an evidentiary hearing or other further proceedings as to any of the claims asserted in his petition for relief.  Section 2255(b) instructs that

> [u]nless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief, the court shall cause notice thereof to be served upon the United States attorney, grant a prompt hearing thereon, determine the issues and make findings of fact and conclusions of law with respect thereto.

Although the district court may summarily dismiss a Section 2255 claim on the basis of the

---

[9] Though not dispositive on this point, the Court notes that its review of the Supreme Court's website, http://www.supremecourtus.gov, uncovered not a single case pending before the Court during the one-year period prior to February 21, 2006, in which Dennis Deters or Paralegal Research Associates was identified as a representative of any party.

[10] In accordance with the Second Circuit's instruction in Sparman v. Edwards, 154 F.3d 51, 52 (2d Cir. 1998) (per curiam), the Court sent letters to Messrs. Pizzi and Palomares on February 11, 2008, notifying them of the allegations contained in Mr. Munoz's petition and inviting them to respond to those allegations by March 10, 2008.  Neither attorney chose to respond to the Court's correspondence.  Although Munoz submitted a declaration from Mr. Pizzi when he initially filed the pending Section 2255 petition (see Munoz Ex. EE ("Pizzi Decl.")), that declaration does not make clear that Mr. Pizzi was aware of the accusations of ineffectiveness that Munoz would make against him in this case, and in any event, Pizzi's declaration does not respond to all of the allegations of ineffectiveness contained in Mr. Munoz's petition, though he does assert that he reviewed the Sentencing Guidelines with Mr. Munoz prior to trial and concedes that he "did not have a strategic reason not to object" to the agents' testimony regarding drug codes.  (Pizzi Decl. ¶ 4.)

petition alone only where the files and records of the underlying criminal case conclusively demonstrate that the alleged errors asserted in the Section 2255 petition are patently "bereft of merit," United States v. Chang, 250 F.3d 79, 85 (2d Cir. 2001), the court "may employ a variety of measures in an effort to avoid the need for an evidentiary hearing." Blackledge v. Allison, 431 U.S. 63, 81 (1977). The Second Circuit has indicated that "in order to warrant an evidentiary hearing in the district court on a first § 2255 petition, the 'application must contain assertions of fact that a petitioner is in a position to establish by competent evidence. . . . Airy generalities, conclusory assertions and hearsay statements will not suffice.'" Haouari v. United States, 510 F.3d 350, 354 (2d Cir. 2007) (quoting United States v. Aiello, 814 F.2d 109, 113 (2d Cir.1987)). In Chang, the Second Circuit held that, in lieu of an evidentiary hearing at which live testimony is taken, the Court may supplement the record with affidavits from the petitioner's purportedly ineffective trial counsel (or, presumably, other persons whose testimony would be relevant), and may dismiss the petition without taking live testimony if the written submissions demonstrate that the petitioner's claims lack merit. 250 F.3d at 85 (affirming order of this Court dismissing Section 2255 petition where "[a]t the request of the court, the record was supplemented by a detailed affidavit from trial counsel credibly describing the circumstances concerning appellant's failure to testify," and concluding that "with that submission the record was sufficient to support dismissal of the petition."); see also Pham v. United States, 317 F.3d 178, 184 (2d Cir. 2003) ("Our precedent disapproves of summary dismissal of petitions where factual issues exists, but it permits a 'middle road' of deciding disputed facts on the basis of written submissions." (citing Chang, 250 F.3d at 86)).[11]

---

[11] These procedures are reflected in the Rules Governing Section 2255 Proceedings for the United States District Courts ("Section 2255 Rules"). Section 2255 Rule 7 states that "[i]f the motion is not dismissed, the

Aside from his contention that he was deprived of the Sixth Amendment right to counsel on appeal, all of the arguments that Munoz asserts in his Section 2255 petition involve claims that he was denied effective assistance of counsel during the pretrial and trial phases of the underlying criminal action and on direct appeal from his conviction.  Under the law as articulated by the United States Supreme Court and the Second Circuit, "in order to prevail on an ineffective-assistance-of-counsel claim, a defendant must show (1) that his attorney's performance fell below an objective standard of reasonableness, and (2) that as a result he suffered prejudice."  United States  v. Jones, 482 F.3d 60, 60 (2d Cir. 2006) (citing Strickland v. Washington, 466 U.S. 668, 687 (1984)).[12]  When evaluating the objective reasonableness of defense counsel's actions, the court must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance . . . [and] every effort [must] be made to eliminate the distorting effects of hindsight."  Strickland, 466 U.S. at 689.  An informed decision to pursue a litigation strategy, even if that strategy turns out badly for the defendant or seems unwise in retrospect, does not constitute ineffective assistance of counsel so long as it is a "conscious, reasonably informed decision made by an attorney with an eye to benefitting his client."  Pavel v. Hollins, 261 F.3d 210, 218 (2d Cir. 2001); see also Yushuvayev v. United States, 532 F. Supp. 2d 455, 471 (E.D.N.Y. 2008) (Glasser, J.); Miranda v. United States, No.

---

judge may direct the parties to expand the record by submitting additional materials relating to the motion,"  which may include "letters predating the filing of the motion, documents, exhibits, and answers under oath to written interrogatories propounded by the judge.  Affidavits also may be submitted and considered as part of the record."  Section 2255 Rule 8 states that, after having expanded the record in accordance with Section 2255 Rule 7, the judge must review all of the materials in the expanded record "to determine whether an evidentiary hearing is warranted."

[12]        This standard applies to Munoz's claims of ineffective assistance as to both his trial and appellate counsel.  The Second Circuit has recognized that "[a]lthough the Strickland test was formulated in the context of evaluating a claim of ineffective assistance of trial counsel, the same test is used with respect to appellate counsel." Mayo v. Henderson, 13 F.3d 528, 533 (2d Cir. 1994) (citing Claudio v. Scully, 982 F.2d 798, 803 (2d Cir. 1992); see also Abdurrahman v. Henderson, 897 F.2d 71, 74 (2d Cir. 1990).

98-CV-1490 (ILG), 2008 WL 2561990, at *7 (E.D.N.Y. June 25, 2008) (Glasser, J.).

To demonstrate prejudice, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694. The government argues that the second prong of the Strickland test was altered by the Supreme Court's decision in Lockhart v. Fretwell, 506 U.S. 364, 369 (1993), and that the dispositive inquiry for prejudice is not whether the alleged ineffective assistance was merely "outcome determinative," but whether it rendered the underlying criminal proceeding "fundamentally unfair or unreliable." As Mr. Munoz points out, the Supreme Court rejected this interpretation of Lockhart in Williams v. Taylor, 529 U.S. 362 (2000). Williams reversed the Virginia Supreme Court's holding that Lockhart "modified or in some way supplanted the rule set down in Strickland," and concluded that its holding in Lockhart "do[es] not justify a departure from a straightforward application of Strickland when the ineffectiveness of counsel [deprives] the defendant of a substantive or procedural right to which the law entitles him." Id. at 393. The standard of prejudice articulated in Strickland shall therefore control the Court's inquiry in this case.

## I.     Pizzi's Alleged Ineffective Assistance

### A.     Ineffectiveness Prior to Trial

Mr. Munoz's petition asserts that during the pretrial phase of the underlying criminal action, Mr. Pizzi's unwarranted overconfidence regarding the strength of the petitioner's case caused him to fail to adequately advise Munoz with respect to his available options and the likely consequences of the strategic decisions he faced. He alleges that Pizzi refused to consider the

possibility of a guilty plea or to counsel Munoz with respect to that possibility even when asked

to do so by Munoz and his relatives, and also that Pizzi refused to discuss the possible sentence

that Munoz would face under the United States Sentencing Guidelines if convicted at trial.  In

support of the allegations set forth in his petition, Mr. Munoz submitted several sworn

declarations from himself[13] and four other individuals:  his wife Maribel Lopez,[14] Maribel's

brother Amaury Lopez,[15] Amaury's fiancee Teressa Flynn,[16] and Marisol Vicente, a friend of

Maribel and Cesar.[17]  Munoz and his fellow declarants describe Pizzi as irrationally

overconfident regarding Munoz's chances of prevailing at trial and generally non-responsive to

his repeated requests for information about his case.  Munoz asserts that Pizzi and an interpreter

visited him at the Metropolitan Detention Center ("MDC") only once prior to his trial (see 1st

Munoz Decl. ¶ 2), and that Pizzi did not discuss the possibility of pleading guilty[18] and did not

review the Sentencing Guidelines with Munoz during that meeting or at any other time prior to

trial.[19]  (2d Munoz Decl. ¶¶ 1-2.)  He also states that at some point prior to trial, Pizzi's

---

[13]        (See Munoz Ex. V ("1st Munoz Decl."); Munoz Ex. GG ("2d Munoz Decl.").)

[14]        (See Munoz Ex. W ("1st M. Lopez Decl."); Munoz Ex. GG ("2d M. Lopez Decl.").)

[15]        (See Munoz Ex. DD ("A. Lopez Decl.").)

[16]        (See Munoz Ex. DD ("1st Flynn Decl."); Munoz Ex. II ("2d Flynn Decl.").)

[17]        (See Munoz Ex. W ("1st Vicente Decl."); Munoz Ex. GG ("2d Vicente Decl.").)

[18]        Munoz concedes that Pizzi relayed to him the government's request for cooperation, but asserts
that he was unable to cooperate because he did not know anything about the money laundering ring with which he
was allegedly involved.  (1st Munoz Decl. ¶ 4.)  He asserts that Pizzi never discussed the possibility of a guilty plea
outside the context of a cooperation agreement.  (Id. ¶ 5.)

[19]        Pizzi asserts in his declaration that he, along with an interpreter, visited Munoz in prison prior to
his trial on two occasions, where he reviewed the Sentencing Guidelines and explained to Munoz the possibility of a
three-point reduction in his Guidelines calculation for acceptance of responsibility if he chose to plead guilty.  (Pizzi
Decl. ¶ 2.)  In response, Munoz submitted a page from the MDC's visiting attorney log book and a letter from Adam
M. Johnson, Senior Staff Attorney of the MDC, which indicate that Pizzi visited Munoz only once before his trial,
on August 14, 2004, and that this visit lasted approximately two hours (Munoz Ex. JJ.)  The log indicates that Pizzi

secretary removed Pizzi's office number from Munoz's calling list at the MDC, rendering him unable to call Pizzi from the prison. (1st Munoz Decl. ¶ 7.) Finally, Munoz alleges that when he asked Pizzi on three occasions what sort of sentence he would face if convicted, Pizzi always responded that the maximum sentence he faced was two or three years. (Id. ¶ 3.) In his own declaration, Pizzi asserts that he did discuss the potential sentence and the possibility of pleading guilty, but that Munoz refused to accept that option, adamantly insisting on his own innocence and stating that he could not plead guilty because of his religion and because he did not want to be embarrassed in front of his children by pleading guilty. (Pizzi Decl. ¶ 2.) In reply, Munoz denies that he and Pizzi ever discussed Munoz's children or his religious beliefs, and again asserts that Pizzi never discussed the benefits of pleading guilty or reviewed the Sentencing Guidelines with him prior to trial. (2d Munoz Decl. ¶¶ 2-4.)

The declarations of Maribel and Amaury Lopez, Teressa Flynn, and Marisol Vicente corroborate Munoz's assertions. Amaury Lopez and Teressa Flynn both assert that Pizzi was unshakably certain that Munoz would be acquitted at trial, guaranteeing such a result as either "99%" (A. Lopez Decl. ¶ 7) or "98%" likely. (1st Flynn Decl. ¶ 2.) Amaury states that he repeatedly sought to discuss the sentence that Munoz might face under the Sentencing Guidelines with Pizzi, but that Pizzi refused to do so, insisting that the government would be unable to prove that Munoz was aware that the money in the bag came from the sale of narcotics. (A. Lopez Decl. ¶¶ 4, 6-7.) Amaury also states that although he refused to discuss the Guidelines specifically and insisted that Munoz would be acquitted, Pizzi stated in response to

_____

was accompanied on that visit by an interpreter named Ana M. Silverio. (Id.) Munoz argues that, allowing time for him to be retrieved from his cell and brought to the conference area, Pizzi could not have spent more than about an hour and a half discussing the case with him on that occasion. (See Reply Mem. at 14.)

his questions about Munoz's potential sentencing exposure that he faced at most "three or four years" if convicted. (A. Lopez Decl. ¶ 11.) After Munoz was convicted and Amaury had reviewed Munoz's Presentence Investigation Report, which calculated his Sentencing Guidelines range at 97-120 months, Amaury alleges that Pizzi assured him that "he felt very confident that he could get Cesar 'house arrest' and probation" because "[h]e was going to argue something that would drop Cesar's Guidelines level down."[20] (Id. ¶ 11.) Maribel Lopez states that she also urged Pizzi to encourage Munoz to plead guilty, but that he refused to do so. (M. Lopez Decl. ¶ 3.) She adds that Pizzi visited Munoz only once prior to trial, that he refused to review the Sentencing Guidelines with him, and that he often answered Munoz's and Lopez's questions about the case simply by saying "[d]on't worry about it." (Id. ¶ 2; see also 1st Vicente Decl. at 1.) In her second declaration, Mrs. Lopez asserts that she does not recall hearing anything about a possible 97-month sentence at any of Munoz's pretrial appearances, and that in any event, Pizzi's statements outside of the courtroom often contradicted the positions he took in court. (2d M. Lopez Decl. ¶ 5.) In response to Mr. Pizzi's assertion that Mr. Munoz refused to plead guilty because of his religious beliefs, Mrs. Lopez adds that Munoz is not religious. (Id. ¶ 6; see also 2d Vicente Decl. ¶ 2.)

---

[20] Pizzi did in fact argue to the Court that Munoz should be sentenced to a period of "community supervision and a special period of home detention," rather than further incarceration (Munoz Ex. S ("Sentencing Memorandum") at 1), an argument which Munoz now characterizes as "absurd" and which he presents as further evidence that Pizzi grossly underestimated the gravity of the charges and the likelihood that the Court would impose a substantial term of incarceration on Munoz. (Munoz Mem. at 5.) While the Court need take no position at this time on the purported absurdity of Pizzi's proposed sentence and what relevance, if any, it may have to Munoz's allegations of ineffectiveness, it does note that the Sentencing Memorandum was submitted to the Court on February 1, 2005, less than one month after the Supreme Court's landmark decision in United States v. Booker, 543 U.S. 220 (2005), at a time when federal sentencing jurisprudence was in a state of substantial confusion and defense attorneys' hopes that courts might prove receptive to creative arguments for substantial variances below the Guidelines range were at perhaps their highest point. See generally James R. Dillon, Doubting Demaree: The Application of Ex Post Facto Principles to the United States Sentencing Guidelines After United States v. Booker, 110 W. Va. L. Rev. 1033, 1038-45 (2008).

There is little question that Mr. Munoz would prevail on his ineffective assistance claim if he is ultimately able to prove that Mr. Pizzi refused to discuss the Sentencing Guidelines range that Munoz would likely face if convicted at trial, substantially understated the likely sentence that Mr. Munoz would face if convicted, refused to assist Mr. Munoz in entering a guilty plea despite his wish to do so, or failed to adequately advise Mr. Munoz of the risks of going to trial. See, e.g., Boria v. Keane, 99 F.3d 492, 495 (2d Cir. 1996) (directing discharge of petitioner where defense counsel failed to advise petitioner that refusal to accept plea agreement would be "suicidal"); Roccisano v. Menifee, 293 F.3d 51, 60 (2d Cir. 2002) (recognizing "the principle that defense counsel in a criminal case must advise his client of the merits of the government's case, of what plea counsel recommends, and of the likely results of a trial."). On the basis of Pizzi's declaration, the government argues that any failure on Pizzi's part to advise Munoz as to the gravity of the situation or to encourage him to accept the plea agreement was harmless error, because Munoz would have refused to plead guilty in any event and thus was not prejudiced by Pizzi's alleged failure to advise him of the consequences of that decision.[21] Even if Mr. Munoz would have been reluctant to accept advice to plead guilty– and thus far the government has offered only the barest speculation in support of that contention– the Second Circuit's decision in Boria demonstrates that the failure to provide the professional advice necessary to enable him to make an informed decision would nevertheless constitute ineffective assistance of counsel if Mr. Munoz's allegations are ultimately validated. In Boria, the petitioner was arrested by state

---

[21] This is a paraphrase of the government's actual argument, which asserts that "[a]lthough the Petitioner persisted in his plea of innocence, he now claims that Trial Counsel should have somehow obtained a plea offer from the government. Trial Counsel reports that Munoz repeatedly claimed he was innocent, that he could not plead guilty because he did not know the money was illicit money, and that he could not bear to be a convicted felon in the eyes of his children." (Gov. Mem. at 29.) Mr. Munoz's argument is not that Pizzi was ineffective in failing to procure a plea agreement, but rather that he was ineffective in failing to adequately advise Mr. Munoz of the risks involved in going to trial as opposed to pleading guilty regardless of the availability of a plea agreement.

authorities after selling four bags of cocaine to a police informant and was charged with a Class A-II felony. Shortly thereafter, the prosecutor conveyed to Boria's attorney, Gary Greenwald, a plea offer that would result in a sentence of 1 to 3 years in exchange for a guilty plea, but warned Greenwald that should Boria reject the offer, the state would issue a superseding indictment charging him with a Class A-I felony which would carry a potential sentence of 20 years to life. As Greenwald subsequently testified, he informed Boria of the state's offer but did "not in any way or at any time discuss . . . with the petitioner the advisability of accepting or rejecting the offered plea," despite Greenwald's "own view that his client's decision to reject the plea offer was suicidal." Id. at 495. Greenwald subsequently explained his decision not to urge Boria to accept the plea, notwithstanding his recognition "that his client– like any other person– was capable of changing his mind," by noting that Boria "would be very upset about the plea. He was upset about how he would be embarrassed in front of his children. And he would bring up the subject in a context often about his upset about his children." Id. at 496. In a decision vacating the district court's order denying Boria's habeas corpus petition and reducing his sentence to time served, the Second Circuit concluded that despite Boria's reservations about pleading guilty, "it would be impossible to imagine a clearer case of a lawyer depriving a client of constitutionally required advice." Id. at 497. Clearly, then, the fact that Munoz may have been reluctant to plead guilty or face his children as a convicted felon would in no way excuse Pizzi's failure to competently advise him of the risks involved in going to trial.[22] Moreover, the

---

[22]     The government also argues that Pizzi's failure to adequately advise Munoz with respect to the options he faced would, if established, not be ineffective assistance because "[e]ven if one were to accept Munoz's account that he actually did wish to plead guilty, it was ultimately the Petitioner's decision to make." (Gov. Mem. at 30.) The argument that the failure to advise a defendant with respect to his options is not ineffective assistance where the final decision rests with the client would eviscerate the constitutional right to counsel if accepted by the Court, and has in any event been rejected by the Second Circuit. See Purdy v. United States, 208 F.3d 41, 45 (2d

Second Circuit has recognized that the right to effective assistance is violated not only when an attorney fails to provide advice about whether to plead guilty or go to trial, but also "where trial counsel was ineffective by giving defendant substandard advice about his sentence exposure under the Sentencing Guidelines during plea negotiations." <u>Gordon</u>, 156 F.3d at 380 (citing <u>United States v. Day</u>, 969 F.2d 39, 44 (3d Cir.1992)). <u>Gordon</u> recognized that the prejudice required under the second <u>Strickland</u> prong may be established by "[t]he fact that there is a great disparity between the actual maximum sentencing exposure under the Sentencing Guidelines and the sentence exposure represented by defendant's attorney . . . combined with a petitioner's statement concerning his intentions [to plead guilty if he had been properly advised of the Sentencing Guidelines range]." 156 F.3d at 381 (internal quotation marks omitted). Thus, if the Court were to find that Pizzi actually informed Munoz that he faced a sentence of only two to four years when his actual exposure under the Guidelines was 97-120 months, it is quite likely that the first and second prongs of the <u>Strickland</u> test would be met.

The government raises several arguments in support of its position that Mr. Munoz's Section 2255 petition fails to raise factual issues sufficient to warrant an evidentiary hearing on the issue of Mr. Pizzi's alleged pretrial ineffectiveness. All of the government's arguments, however, simply highlight need for an evidentiary hearing to resolve the disputed issues of fact regarding Mr. Pizzi's representation of Munoz in the underlying action. First, the government contends that transcripts of certain pretrial hearings in the criminal proceeding against Mr. Munoz refute the petitioner's assertion that Mr. Pizzi never reviewed the Sentencing Guidelines

---

Cir. 2000) (recognizing that while "the ultimate decision whether to plead guilty must be made by the defendant," the Sixth Amendment requires defense counsel to "inform the defendant of the strengths and weaknesses of the case against him, as well as the alternative sentences to which he will most likely be exposed." (citing <u>United States v. Gordon</u>, 156 F.3d 376, 380 (2d Cir.1998)).

with him and that Pizzi consistently underestimated the amount of time Munoz would face if incarcerated.  However, the portions of the record to which the government cites are not as conclusive as it suggests, and in some cases actually support the petitioner's version of events. The government cites statements by Mr. Pizzi in three bail hearings before Magistrate Judges Azrack and Bloom and before this Court on May 10 and 18, 2004, and June 1, 2004, respectively.  At the May 10 hearing before Judge Azrack, Mr. Pizzi stated that when he initially met with Mr. Munoz to arrange his surrender in New York, he advised the petitioner "as to what the guidelines would be and what all the issues were." (Gov. Ex. A ("5/10/04 Tr.") at 3.)  He subsequently made a similar representation to Judge Bloom, stating that when he spoke with Mr. Munoz in Miami prior to his surrender, he advised him that he could face "upwards of somewhere between ten to twenty years in federal prison." (Gov. Ex. E ("5/18/04 Tr.") at 16.) While these claims are certainly inconsistent with the allegations made by the petitioner and the individuals who submitted declarations on his behalf, they cannot resolve the dispute without a hearing at which credibility determinations can be made.

As Mr. Munoz points out, the government stated to the court at the May 18 hearing that it did not provide a copy of the complaint to Mr. Pizzi until after he entered an appearance on behalf of Mr. Munoz, and that the proffer session which had been originally scheduled for immediately after Mr. Munoz's surrender on May 5 was cancelled when Mr. Pizzi advised the government that "now that he understood the seriousness of the crime . . .  he did not wish to bring his client in" to the proffer session. (5/18/04 Tr. at 13.)  Assuming the veracity of the government's statements to Judge Bloom, Mr. Pizzi's statement suggests that he had been under the impression prior to seeing the complaint that the charges against Mr. Munoz were less

serious than actually proved to be the case; it is therefore difficult to conceive how he might have competently advised Mr. Munoz with respect to the individualized Guidelines calculation that the petitioner would face if convicted at trial.  Moreover, if Mr. Pizzi did inform Munoz in Miami that he could face ten to twenty years, that statement could have been based simply on the statutory maximum for a conviction under 18 U.S.C. § 1956(a) rather than an individualized calculation of Mr. Munoz's Guidelines range.  Even under the government's Guidelines calculation, the maximum term of incarceration that Mr. Munoz faced was 121 months, so it is unclear how Mr. Pizzi might have concluded that Munoz could face 20 years under the then-mandatory Guidelines.  At the June 4 hearing before this Court, Mr. Pizzi offered a more precise statement of his view of the appropriate Guidelines calculation.  He predicted that the petitioner would "certainly" get a downward adjustment for a minor or minimal role in the offense pursuant to U.S.S.G. § 3B1.2, which would result in a Guidelines range of "at least half of the 97 months enforced by the government."  (Gov. Ex. G ("6/4/04 Tr.") at 27.)  Moreover, at a subsequent hearing on July 15, 2004, which the government's opposition brief curiously neglects to acknowledge, Mr. Pizzi argued to this Court that on the basis of his personal calculations, "the low end [of Mr. Munoz's Guidelines range] would be something like forty-one months."  (Gov. Ex. D ("7/15/04 Tr.") at 36-37.)  These later, more precise estimations of the sentence Mr. Munoz faced if convicted corroborate Amaury Lopez's recollection that Pizzi insisted that Munoz faced only three or four years if convicted (A. Lopez. Decl. ¶ 11), and are not substantially greater than the "two or three years" that Mr. Munoz and Maribel Lopez say that Pizzi assured them would be the maximum term of incarceration to which Mr. Munoz might be exposed if convicted.  (1st Munoz Decl. ¶ 3; 1st M. Lopez ¶ 3.)  Thus, the passages cited by the

government are insufficient to rebut the petitioner's allegations without further proceedings.

The government also argues that any effort by Mr. Pizzi to persuade Mr. Munoz to plead guilty would have been futile because Munoz was immovably persistent in professing his innocence, and that even if Pizzi's failure to adequately advise Munoz of his options with respect to a guilty plea or to pursue plea negotiations with the government did fall below an objective standard of reasonableness, Munoz is unable to establish that he suffered prejudice as a result of Pizzi's failures because there is no indication that he would have been willing to plead guilty. (See Gov. Mem. at 25-26 (citing Aeid v. Bennett, 296 F.3d 58 (2d Cir. 2002); Bicaksiz v. United States, 234 F. Supp. 2d 202 (E.D.N.Y. 2002) (Gershon, J.); Johnson v. Duckworth, 793 F.2d 898 (7th Cir. 1986)).) The principal parts of the record upon which the government relies in support of the proposition that Munoz insisted on going to trial and refused to consider a guilty plea are the fact that he cancelled the proffer session to which Mr. Pizzi and the government had tentatively agreed prior to Mr. Munoz's surrender, and a statement made by Mr. Pizzi to this court at a hearing held on June 1, 2004, that by voluntarily surrendering and returning to New York when he learned of the warrant for his arrest, Mr. Munoz was effectively saying, "I want to fight these charges, I'm not going anywhere, take me into custody and let's proceed." (Gov. Ex. B ("6/1/04 Tr.") at 16.) These facts are hardly demonstrative of an unshakeable resolve on Mr. Munoz's part to take his case to trial. As noted above, the government represented to Judge Bloom at the May 18, 2004, hearing that the proffer session was cancelled by Mr. Pizzi, not Mr. Munoz, when he received a copy of the complaint against his client and realized the gravity of the charges. In any event, a refusal to attend a proffer session on the day of his arrest hardly implies that a defendant is unwilling to consider a guilty plea. Likewise, the statement by Mr.

Pizzi on which the government relies was made in the context of a bail hearing, and its purpose was to persuade the Court that Mr. Munoz was not a flight risk. Mr. Pizzi was saying, in other words, that having made the decision to return voluntarily from Miami when he could easily have fled to his native Dominican Republic, Mr. Munoz demonstrated that he was not a flight risk and was entitled to bail. Taken in context, the statement had nothing whatsoever to do with Mr. Munoz's ultimate willingness to consider a guilty plea.

The legal authorities on which the government relies in support of its contention that Munoz cannot establish prejudice are similarly unpersuasive. Aeid was a state habeas case arising under 28 U.S.C. § 2254 which involved the failure of counsel to recommend that the defendant accept a plea agreement that would have resulted in the imposition of an illegally low sentence under the state sentencing scheme; the court noted that if the defendant's counsel had possessed "the knowledge of the correct law[,] he could not ethically have advanced [the] plea agreement" that the defendant argued he was ineffective for failing to recommend. 296 F.3d at 63. Moreover, the Second Circuit found that the second prong of the Strickland test was not satisfied in Aeid because "Aeid has never . . . asserted that he would have accepted an offer of 7 1/2 to 15 years of imprisonment," which would have been the best sentence the prosecution could legally offer. Id. at 64. Here, Munoz's declaration strongly implies that he would have pleaded guilty had he been fully advised of the risks of going to trial. (See 1st Munoz Decl. ¶ 3; 2d Munoz Decl. ¶¶ 2-4.) While his declaration does not explicitly state that he would have pleaded guilty if fully informed, this question can be addressed via live testimony at the evidentiary hearing. Bicaksiz is likewise unhelpful to the government because in that case, the district court denied the Section 2255 motion only after holding an evidentiary hearing. Judge

Gershon's conclusion that the petitioner had failed to establish either prong of the Strickland test was based on "the credible evidence at the hearing, and the objective circumstances surrounding Bicaksiz's allegations." 234 F. Supp. 2d at 204. If this Court ultimately concludes, as did Judge Gershon in Bicaksiz, that Munoz was adamant in proclaiming his innocence and would have insisted on going to trial regardless of the sentence he faced, then the government is correct that he will have failed to establish the prejudice necessary for relief under Strickland. However, such a determination requires a credibility analysis that can be accomplished only after an evidentiary hearing has been held. Finally, the Court simply does not find the Seventh Circuit's 22 year old dicta in Johnson, another state habeas case, to be particularly relevant to its application of the Second Circuit's controlling precedent in Gordon. In any event, the petitioner's argument in Johnson was that, but for his counsel's decision to reject a proffered plea agreement which he had discussed with the petitioner, the petitioner would have been able to avoid the 30-year sentence that was ultimately imposed by accepting the plea agreement, not that he necessarily would have done so. For the reasons noted above with respect to Aeid, the situation presented in this case is distinguishable. Moreover, the Court finds that the Second Circuit's holding in Gordon that a substantial disparity between the sentence that a petitioner was informed by counsel that he faced if convicted and the sentence he actually faced under the Sentencing Guidelines constitutes objective evidence of prejudice under the second Strickland prong to be more analogous to the situation presented here than Aeid, Bicaksiz, or Johnson.

In addition to its arguments that Munoz's contentions are either implausible or would not indicate ineffective assistance even if true, the government suggests several reasons why the Court should disregard the sworn statements of Vicente, Flynn, and Amaury and Maribel Lopez

and dismiss this portion of Mr. Munoz's petition without further proceedings, none of which are persuasive.  First, the government argues that the declarations submitted in support of the pending petition repeat Munoz's allegations "in hace [sic] verba, and should be disregarded." (Gov. Mem. at 29.)  The government's use of the Latin phrase "in haec verba" appears to define that term as meaning nothing more than "consistent," a definition that is not supported by the relevant authorities.  Black's Law Dictionary defines the phrase as meaning "[i]n these same words; verbatim."  Black's Law Dictionary 798 (8th ed. 2004).  But the government cites no passages from any of the declaration submitted on Munoz's behalf that reproduces verbatim a passage from any other declaration, nor does any such passage exist.  While the declarations are more or less consistent in their agreement as to the broad points underlying Munoz's petition, they are not written in identical language but speak individually to the knowledge and observations of each declarant.  The government's apparent position is that the Court should disregard the declarations simply because their allegations are generally consistent.  The fallacy of that argument is self-evident.

The government also argues that the court should disregard the declarations because of several of the declarants' "serious credibility problems."  (Gov. Mem. at 27-28.)  According to the government, "Amaury Lopez is a convicted felon who was, at the time of Munoz's case, under criminal investigation himself in the Southern District of New York," (id. at 27), and Munoz's wife Maribel Lopez "was the target of a money-laundering investigation."  (Id. at 28.) The government further asserts in the vaguest conceivable terms that Teresa Flynn "was apparently herself associated with the Southern District's criminal investigation" of Amaury, though the government does not elaborate on the capacity or extent of Ms. Flynn's

"associat[ion]."  (Id.)  Munoz responds to the government in his reply brief and by supplemental declarations from several declarants explaining the details of the incidents to which the government refers, but the Court need not elaborate on those details beyond noting that Amaury Lopez's conviction was on "drug charges" in Florida and apparently did not involve fraud or deception,[23] because they are irrelevant.  As Mr. Munoz aptly notes in reply, the United States government routinely relies on the self-interested testimony of confessed felons as cooperating witnesses to secure convictions.  For the government to now take the position that the declarants' assertions in support of Munoz should be cast aside simply because some of those individuals have drug convictions or have been investigated by law enforcement in the past is disingenuous.  (See Reply Mem. at 10 ("The government frequently relies on witnesses who are guilty of criminal conduct, indeed in the very case in which, by testifying, they pit their interests against the defendant's.  But that does not stop the government from arguing that these witnesses' testimony is credible beyond a reasonable doubt."))  The Court therefore shall decline the government's invitation to view the declarations as presumptively suspect simply because the declarants have been investigated or, in one case, convicted of prior criminal activity.

Having carefully reviewed the parties' submissions regarding Mr. Pizzi's alleged

---

[23]        (See Reply Mem. at 10 (explaining that Amaury Lopez's prior conviction was on "drug charges.")) Amaury Lopez's declaration does not state the nature of the crime for which he was convicted, but only notes the fact of the conviction and the five-year sentence that he served in Florida.  (A. Lopez Decl. ¶ 1.)

The Court does not mean to suggest that evidence of Amaury's prior conviction would be inadmissible under Federal Rule of Evidence 609(a)(1), which permits introduction of evidence that a witness other than a criminal defendant has been convicted of a crime punishable by death or by imprisonment in excess of one year regardless of whether the crime involved "dishonesty or false statement," as is required by Rule 609(a)(2) for introduction of any crime that does not meet the criteria stated under 609(a)(1).  Evidence of Amaury's prior conviction is admissible and will be taken into account in the Court's assessment of his credibility at the evidentiary hearing; however, the fact of the conviction is insufficient to warrant dismissing Mr. Munoz's petition without the benefit of such a hearing.

ineffective assistance, the Court finds that it cannot resolve this question without the benefit of an evidentiary hearing at which credibility determinations can be made on the basis of live testimony.  Although this Court has in some previous cases dismissed a Section 2255 petition solely on the basis of an attorney's affidavit denying the essential allegations underlying the petitioner's claim of ineffective assistance, see, e.g., Chang v. United States, No. 98-CV-7354 (ILG), 1999 WL 439097 (E.D.N.Y. May 3, 1999), aff'd 250 F.3d 79 (2d Cir. 2001), this situation is distinguishable on the basis of the weight of the evidence that Munoz has submitted in support of his contentions.  In Chang, the Court dismissed the petition where "the only evidence offered by Chang in support of his claim is his own statement that [his trial attorney] forbade him from taking the stand." Id. at *2 (emphasis added).  Similarly, in Reyes v. United States, No. 07-CV-1614 (JG), 2007 WL 2973591, at *6 (E.D.N.Y. October 10, 2007) (citing Chang, 250 F.3d at 85-86), Judge Gleeson denied a Section 2255 petition without a hearing in essentially identical circumstances, concluding that "I credit [the defense attorney's] detailed and consistent affirmation over [the petitioner's] self-serving and generic assertions regarding [the defense attorney's] alleged failure to consult with him regarding trial strategy and to inform him of his right not to testify."  In this case, however, Mr. Munoz has provided the Court with the declarations of four individuals, in addition to himself, all of whom attest under penalty of perjury to the accuracy of Munoz's version of events.  Each of the declarants' statements are reasonably detailed, generally consistent, corroborated to some extent by the record, and at least superficially credible.  The Court can conceive of little more than Munoz could do at this stage of the proceedings to support his allegations; indeed, if the submission of four individuals' declarations in support of his own sworn statement alleging facts which, if proven, would give

the appearance of ineffective assistance of counsel were not sufficient to advance Mr. Munoz's case beyond this preliminary phase, it is difficult to imagine under what circumstances any petitioner might hope to prevail on such a claim. It shall therefore be necessary to hold an evidentiary hearing at which testimony can be heard and credibility determinations made of the participants in the underlying events.

### B. Ineffectiveness at Trial and at Sentencing

In addition to his alleged ineffectiveness prior to trial, Mr. Munoz also argues that Mr. Pizzi offered ineffective assistance during the trial and subsequent sentencing. Specifically, he raises three points of purported ineffectiveness: first, Pizzi's failure to object to the Court's admission of testimony from Agent Herrera and Detective Cruz which interpreted certain ambiguous and facially innocent words or phrases as coded references to money laundering as lay opinion testimony admissible under Federal Rule of Evidence 701 ("Rule 701"), rather than as expert testimony to which the more stringent standards of admissibility applied by Federal Rule of Evidence 702 ("Rule 702") and the Supreme Court's decision in Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579 (1993), would apply; second, Pizzi's failure to object to the introduction of the testimony of Paul Radwanski as lay opinion testimony pursuant to Rule 701 rather than as expert testimony pursuant to Rule 702; and third, Mr. Pizzi's failure to correct certain purported "misrepresentations" made by the government during its summation and at Mr. Munoz's sentencing proceeding. The Court shall address each instance of alleged ineffective assistance in turn.

### 1. Agents' Testimony Regarding Code Words

Throughout their testimony, Herrera and Cruz stated that many of the facially innocent

words and phrases employed by Munoz and the two unidentified males with whom the agents[24] spoke over the telephone were not intended literally, but were coded references to money laundering activity employed by the conspirators to avoid detection by law enforcement and to grant some degree of deniability in the event that their illicit activities were detected. For example, both agents testified that the introduction used by Munoz and the unidentified co-conspirators, "on behalf of Jota [or Jorge]," or, when contacting Detective Cruz, "Jota on behalf of Angel," were pre-arranged identification codes by which members of the conspiracy who did not know each other personally could identify themselves. (Tr. at 167-68, 192 (Agent Herrera understood defendant's introduction "on behalf of Jota" to mean "[t]hat he was abbreviating the name Jorge and just using the letter J. Jota in Spanish is the letter J."), 220, 342.) Detective Cruz testified that the reference to "Jorge" or "Jota" was a code "predetermined down in South America, Colombia." (Id. at 342.) The agents also interpreted such superficially innocent phrases as "eat lunch," "get the clothes ready," "travel," "go to work," "do some errands," and "sit down to eat," as coded references to money laundering. (Id. at 208-09, 301, 360, 390, 397.) Finally, Agent Herrera testified several times that when the two unidentified males made reference to "they" or "them" as the source of the unidentified males' orders, they referred to Mr. Munoz and/or an individual named "La Mona," whom Agent Herrera identified as "a target of the money laundering investigation" located in Colombia. (Id. at 206-07; see also id. at 208-10, 218, 296.) Although Mr. Pizzi objected occasionally to this testimony on the ground that it called for speculation, at no point did he object categorically to the introduction of the agents' testimony regarding the purported code words pursuant to Rule 701. Mr. Munoz argues that Mr. Pizzi's

[24] For the sake of brevity, the Court shall refer to Herrera and Cruz collectively as the "agents," notwithstanding the fact that Cruz's title is "Detective."

failure to do so constituted ineffective assistance because the agents' testimony interpreting the code words was admissible neither under Rule 701 nor Rule 702 and Mr. Munoz was prejudiced by the fact that the government relied on this testimony extensively in the presentation of its case and in summation. Reviewing the criteria for the admissibility of opinion testimony under Rules 701 and 702, the Court finds that much of the agents' testimony was inadmissible– for lack of a proper foundation if for no other reason– but that, although the government did rely somewhat heavily on this testimony during its summation, the admission of the agents' opinion testimony was harmless because the admissible evidence of Mr. Munoz's guilt was overwhelming and because reasonable jurors would have arrived at the same interpretation of the code words employed by the conspirators even without the benefit of the agents' translations. Because the admission of the agents' testimony was harmless error, Mr. Munoz is unable to establish prejudice as required for relief under <u>Strickland</u>.

### a. Rule 701

While it is indisputable that "courts may allow witnesses to 'decipher' the codes drug dealers [and, presumably, drug money launderers] use and testify to the true meaning of the conversations" conducted in code, a review of recent Second Circuit precedent indicates that the testimony of Herrera and Cruz regarding alleged code words and their understanding of certain ambiguous words and phrases used by the defendant should have been introduced, if at all, as expert testimony pursuant to Rule 702 rather than as lay opinion testimony pursuant to Rule 701. <u>United States v. Carlos Garcia</u>, 291 F.3d 127 (2d Cir. 2002). Rule 701 states that

> [i]f the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness, (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue, and

(c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.

The proponent of lay opinion testimony, in this case the government, must satisfy these foundational elements in order to establish the admissibility of the evidence. <u>United States v. Yuri Garcia</u>, 413 F.3d 201, 211 (2d Cir. 2005). In this case, the government made little effort to establish any of these foundational elements prior to introducing the agents' testimony. A number of recent Second Circuit decisions indicate that the admission of Herrera's and Cruz's opinion testimony was problematic under each of the Rule 701 subsections, and therefore suggest that Pizzi's failure to object to that testimony may have fallen below the objective standard of reasonableness prescribed by the first <u>Strickland</u> prong.

### i. The Government did not Establish That the Agents' Testimony was Rationally Based Exclusively on Their Firsthand Perception

Rule 701(a) contains two sub-elements: admissible lay opinion must be "<u>both</u> (a) based on the witness's first-hand perceptions <u>and</u> (b) rationally derived from those first-hand perceptions." <u>United States v. Kaplan</u>, 490 F.3d 110, 119 (2d Cir. 2007). Judge Weinstein has observed that lay opinion testimony "amounts to little more than a shorthand rendition of facts that the witness personally perceived," and that the "witness's personal perception [is] a fundamental prerequisite to admissibility" under Rule 701. 4 <u>Weinstein's Federal Evidence</u> § 701.03[1] (2d ed. 2008). Rule 701(a)'s requirement that lay opinion testimony be based on the witness's personal perceptions overlaps to a degree with Rule 701(c)'s requirement that such testimony not be based on scientific, technical, or other specialized knowledge. The unifying theme running through the Second Circuit's jurisprudence under Rule 701(a) is that, where an investigator's opinion is based on training and experience obtained outside of and often prior to

the investigation of the specific case on trial, that opinion is not based on the investigator's personal perceptions within the meaning of Rule 701(a).

In factual contexts quite similar to that presented here, the Second Circuit has held that a witness's testimony interpreting allegedly coded communications is inadmissible under Rule 701(a) where the government fails to lay a foundation establishing that the defendant shared the same understanding of the allegedly coded statements that the witness did. For example, in Carlos Garcia, the Second Circuit held that the district court erred in admitting the testimony of Ariel Toro Balcarcel, a cooperating witness and purported co-conspirator with the defendant in a cocaine distribution operation, as lay opinion testimony pursuant to Rule 701. 291 F.3d at 145. The disputed testimony involved Toro Balcarcel's interpretation of a recorded conversation between himself and the defendant, which on the surface appeared to be about the defendant's asbestos removal business, as being in actuality a coded conversation about cocaine distribution. Id. at 132-35. The Second Circuit vacated the defendant's conviction, holding that the cooperating witness's testimony regarding the meaning of the recorded conversation was not admissible under Rule 701, primarily because the government failed to establish a rational basis for imputing knowledge of the allegedly coded meanings to the defendant. The court noted that "[c]learly, Toro Balcarcel had personal knowledge of what he meant when he spoke to Garcia, and his status as a participant in the conversation is sufficient to demonstrate the basis of this opinion," but went on to conclude that this testimony failed to establish a foundation for permitting Toro Balcarcel to opine as to Garcia's mental state or his understanding of the hidden meaning behind their facially innocent conversation. Id. at 140-41. The court observed that

> Toro Balcarcel did not offer any explanation for how Garcia could know that they
> were speaking in code. For example, he did not testify that they had spoken in

> code before; he did not testify that the code he used was a common one; and he did not testify that Garcia and he had a prior agreement to speak in code or that they had discussed this possibility.

Id. at 141.  Such a foundation was "crucial" in this case, the court noted, because, since both Garcia and Toro Balcarcel worked in the asbestos removal industry, "[t]here existed a real possibility that Garcia believed they spoke about asbestos, not drugs."  Id.  Summarizing its holding, the court wrote that "[w]hen a conversation has a legitimate purpose understandable to a lay person, testimony about a code without some evidence of prearrangement or some other foundation is inappropriate."  Id.

The Second Circuit's decision in Kaplan reinforces the necessity of establishing a factual foundation based on the witness's perceptions from which an opinion can be rationally derived.  In that case, the defendant, an attorney, was convicted on five counts of conspiracy, making false statements, and health care fraud in connection with an alleged scheme to defraud health insurers by fabricating or exaggerating injuries sustained in automobile accidents in which Kaplan participated with Josef and Yevgeny Sherman, two Brooklyn physicians who were the principal architects of the scheme.  The government's principal evidence against Kaplan at trial came from the testimony of cooperating witness Alexander Galkovich, an attorney who operated the law office which represented the majority of fraudulent claims that the Shermans' health clinic manufactured.  After Galkovich was arrested, he and the Shermans arranged a transfer of the law office to Kaplan, allegedly with the intent that Kaplan would continue to aid the Shermans in the fraud.  At trial, the district court permitted Galkovich to testify pursuant to Rule 701 regarding the meaning of certain ambiguous statements that purportedly indicated Kaplan's awareness of the conspiracy.  Galkovich testified that on the day Kaplan bought the law office

from him, he stated to Galkovich that he had "handled cases like this before," and that he "had

experience with these kinds of cases." 490 F.3d at 117 (quoting trial transcript). When asked by

the prosecutor what he understood Kaplan to mean by "these kinds of cases," Galkovich stated

that he understood the words to mean

> [t]hat he understood that these were car accident cases where people exaggerated
> their injuries, where it was crucial to have a narrative report that exaggerated the
> injuries, that these reports were bought for the best of prices to get the best of
> reports and that you could settle these cases for very good money in a short period
> of time.

Id. (quoting trial transcript). On redirect, Galkovich described a similar colloquy that he had

with Kaplan, interpreting Kaplan's assurance that "he knew how to handle these cases" as

indicating that "he knew exactly what he was getting into" with respect to the conspiracy. Id.

(quoting trial transcript). In reviewing the district court's decision to admit this testimony as lay

opinion evidence, the Second Circuit found itself "unable to conclude, as we must under rule

701, that the opinion [Galkovich] offered was rationally based on his own perceptions," because

the government established no sufficient basis from which Galkovich might rationally infer

Kaplan's knowledge of the fraud from his ambiguous statements about having experience with

prior automobile accident cases. Id. at 119. The court explained that

> lay opinion testimony regarding a defendant's knowledge will, in most cases, only
> satisfy the rationally-based requirement if the witness has personal knowledge of
> one or more "objective factual bases from which it is possible to infer with some
> confidence that a person knows a given fact . . . includ[ing] what the person was
> told directly, what he was in a position to see or hear, what statements he himself
> made to others, conduct in which he engaged, and what his background and
> experience were."

Id. (quoting United States v. Rea, 958 F.3d 1206, 1216 (2d Cir. 1992)). Because no such

foundation was established for Galkovich's opinion testimony about Kaplan's statements, the

court held that testimony inadmissible and ultimately vacated Kaplan's convictions on the first five counts.

Other Second Circuit authority echoes <u>Carlos Garcia</u> and <u>Kaplan</u>'s holdings while adding the proposition that, where the foundation upon which the government relies to establish a rational basis for a witness's opinion or inference relies in part upon a witness's specialized knowledge derived from training or the results of an investigation involving multiple participants, the testimony is not based solely on the witness's personal perceptions and therefore is inadmissible under Rule 701.  For example, in <u>Bank of China, New York Branch v. NBM LLC</u>, 359 F.3d 171, 180 (2d Cir. 2004), the Second Circuit vacated a civil judgment in favor of the plaintiff where the district court improperly admitted lay opinion testimony based in part upon the witness's "many years of experience in international banking and trade."  The witness, Huang Yangxin, was an employee of the plaintiff who had undertaken an investigation of the issues surrounding the case.  The Second Circuit noted that "[t]he fact that Huang has specialized knowledge, or that he carried out the investigation because of that knowledge, does not preclude him from testifying pursuant to Rule 701," but emphasized that such testimony must be limited to knowledge and opinions "grounded in the investigation he undertook in his role as a Bank of China employee," excluding opinions grounded in "specialized knowledge he has because of his extensive experience in commercial banking," because only the former are "based on his perceptions," as required by Rule 701(a).  <u>Id.</u> at 181-82.  Likewise, <u>Yuri Garcia</u> recognized that "when an agent relies on the 'entirety' or 'totality' of information gathered in an investigation to offer a 'lay opinion' as to a person's culpable role in a charged crime, he is not presenting the jury with the unique insights of an eyewitness's personal perceptions."  413 F.3d at 212 (quoting

United States v. Grinage, 390 F.3d 746, 750-51) (2d Cir. 2004)); see also id. at 213 ("Precisely because Rule 701 limits the admissibility of lay opinions at trial to those based only on personal perceptions, an opinion such as Agent Klemick's, which appears to have been based on the totality of the information gathered by various persons in the course of an investigation, was not admissible before a jury.").

Although the trial transcript does not rule out the possibility that much of the agents' testimony regarding the meaning of the alleged code words and phrases used by Mr. Munoz in the recorded conversations was grounded in their own perceptions rather than in specialized knowledge or experience, that question is impossible to determine with confidence precisely because the government failed to lay the foundation for admissibility that is required by Rule 701(a). For example, Agent Herrera's "understanding" that La Mona was a target in the money laundering investigation might have been based on his own participation in that investigation, but the government made no effort to establish the foundation for his knowledge. (Tr. at 206-07.) Likewise, the government elicited no basis for Detective Cruz's testimony that the code phrase he provided to the defendant over the telephone, "Jota on behalf of Angel," was "predetermined down in South America, Colombia." (Id. at 342.) More generally, the government established no foundation, other than the agents' specialized training and experience with money laundering operations and the objective suspiciousness of the defendant's behavior, for the fundamental proposition that any of the co-conspirators' statements had a coded meaning that was understood as such by Mr. Munoz and his co-conspirators.[25] As discussed at greater length in Part

_____

[25] The government's response to this portion of Mr. Munoz's petition argues simply that "[t]he officers' testimony with respect to the codes employed by the Petitioner was clearly based on their first hand perceptions, since the agents were engaged in direct conversations with the Petitioner, and Agent Herrera had had a face-to-face encounter with him before the agent's last phone call to the Petitioner. The statements that 'get the

I(B)(1)(a)(iii), <u>infra</u>, the true basis for these opinions most likely rested on the agents' specialized

training and experience, placing their testimony firmly within the scope of Rule 702 rather than

Rule 701.

**ii.      The Testimony was not Helpful to the Jury in Determining the Facts**

Opinion testimony is not helpful to the jury in determining the facts when it attempts to

usurp the jury's role by dictating the inferences the jurors should draw from the objective facts of

the case, as the Second Circuit recognized in <u>United States v. Grinage</u>, 390 F.3d 746 (2d Cir.

2004).  In that case, the defendant Sidney Osman was convicted of conspiracy to distribute and

possess with intent to distribute one hundred grams or more of phencyclidine ("PCP").  Central

to the government's evidence at trial was the lay opinion testimony of DEA Agent Scott Seeley-

Hacker, introduced pursuant to Rule 701, which interpreted certain ambiguous phrases in several

recorded telephone conversations between the defendant and his alleged co-conspirators.  The

agent testified that telephone conversation between drug dealers "is very cautious and often

coded," <u>id.</u> at 747, and interpreted a recorded call between a co-conspirator and an alleged

customer in which the customer asked for "about two" and "one and a half" as "requests for

quantities, by ounce, of PCP."  <u>Id.</u> at 748.  The agent also offered interpretations of two calls

between Osman and alleged co-conspirator Raymond Grinage.  In the first call, in which Osman

and Grinage were heard arguing about money owed by Osman to Grinage, Agent Seeley-Hacker

---

clothes ready' and 'sit down to eat' were referencing the impending money transfer were rationally derived from
these first-hand perceptions."  (Gov. Mem. at 33-34.)  The government's response ignores the key logical gap
between the agents' personal interactions with Mr. Munoz and the unidentified males and their conclusion that the
various words and phrases were in actuality coded references to money laundering:  that is, it provides no basis upon
which the agents' conclusions could have been rationally derived simply from their face-to-face contact with the
defendant.  Moreover, aside from a single conclusory statement that "[t]he testimony was also helpful in assisting
the jury to understand the evidence," the government's response makes no effort whatsoever to address the second
and third criteria of admissibility under Rule 701.

42

testified that "[b]ased on my knowledge of Raymond Grinage and his operation and the context of this call, I believe that this is a call where money is owed him over a drug debt, and he's demanding his money to be paid." Id. The Second Circuit noted that despite the fact that the nature of the debt was not expressly stated in the call, Agent Seeley-Hacker "specifically identified the debt as being over a PCP deal." Id. In the second call, which the government described as the "key" to its case against Osman, the appellant told Grinage that "I need something bad, bad, bad," and that "I need about nearly four." Id. Grinage initially responded, "I'm not up with the bullshit," but eventually agreed to meet with Osman in person. Id. The Second Circuit summarized the agent's interpretation of that call as follows:

> [i]n sum, the agent testified that Osman did not want to be in a situation where he owed Grinage money, as reflected in the earlier conversation, but that he badly needed four ounces of PCP; when Grinage rebuffed him, it was because of his failure to pay a prior drug debt and unwillingness to do a PCP deal with Osman without getting his money at the same time. When Osman said he would come to Grinage in person, the agent testified that they were confirming to meet in person at the end of the call.

Id. The court noted that "[o]n cross-examination, the agent adhered to his interpretations, while acknowledging them to be 'subjective.'" Id. The agent also conceded that he assumed that Osman's conversations with Grinage were about drugs because of his knowledge that Grinage was a drug dealer, despite lacking any personal knowledge that Osman was involved in drug dealing. Id. at 749.

The Second Circuit panel unanimously vacated Osman's conviction, holding that "the agent's testimony as to his interpretations of the calls went beyond permissible lay opinion testimony under Rule 701(b) because, rather than being helpful to the jury, it usurped the jury's function," and that this error was not harmless. Id. at 751. The court noted that it "is not the

43

point of lay opinion evidence" to "not only tell [the jurors] what was in the evidence but tell them what inferences to draw from it," and found that the agent's testimony interpreting the calls to involve PCP transactions "usurped the function of the jury to decide what to infer from the content of the calls and in particular what to infer from the calls involving Osman as to Osman's participation in the drug ring." Id. at 750.  It further noted that, although the agent was not qualified or presented to the jury as an expert in narcotics trafficking, "the risk that he was testifying based upon information not before the jury, including hearsay, or at the least, that the jury would think he had knowledge beyond what was before them, is clear," and noted its decision in United States v. Dukagjini, 326 F.3d 45 (2d Cir. 2003), which "addressed at length our concerns about a case agent testifying as an expert as to coded language and then going 'beyond interpreting code words and summariz[ing] his beliefs about the defendant's conduct based upon his knowledge of the case.'" 390 F.3d at 750-51 (quoting Dukagjini, 326 F.3d at 53). The court then applied a harmless error analysis, concluding that "[w]here the erroneously admitted evidence goes to the heart of the case against the defendant, and the other evidence against the defendant is weak, we cannot conclude that the evidence was unimportant or was not a substantial factor in the jury's verdict." Id. at 751.  The court noted that "[s]ince the calls required the drawing of inferences before they could be seen as inculpatory, the improper interpretations from the agent were central to the Government's case," id. at 751-52, and observed that absent the case agent's opinion testimony, "the evidence that Osman's conversations related to drug dealing was thin," because "[t]here was no reference to PCP or drugs on the calls, nor was there any evidence that the calls were in code.  There was also no evidence that in fact Grinage and Osman had met after the August 7th call or that they had

exchanged anything." Id. at 752.  Because the case was a close one and the evidence against

Osman was not unequivocally inculpatory absent Agent Seeley-Hacker's interpretation of it, the

court concluded that the district court's error in admitting the testimony was not harmless.

The agents' testimony in this case similarly sought to usurp the role of the jury by

dictating to it what inferences to draw from the ambiguous and facially innocent statements made

by Mr. Munoz and the unidentified males in the recorded conversations.  As Herrera and Cruz

readily conceded at trial, the recorded calls contain no reference to drugs or money; the

inculpatory nature of those recordings is derived entirely from the agents' interpretations of them

and from the objectively suspicious circumstances in which the conversations took place.  There

can be no doubt that the sole purpose of the agents' opinion testimony was to "usurp" the role of

the jury by dictating to it which inferences to draw from the ambiguous statements contained in

the recordings.  Like Grinage, that concern is heightened in this case by the fact that, although

the agents were not formally recognized by the Court as experts in money laundering, it is

conceivable, indeed probable, that the jury afforded unusual weight to the testimony of the

agents on the basis of their perceived authority and access to information not available to the

jury.  In such circumstances, Mr. Munoz was entitled to demand that the agents' qualifications be

examined by this Court pursuant to Rule 702.

### iii.    The Testimony was Based on Technical or Specialized Knowledge

The final prong of Rule 701, which was added to the rule by amendment in 2000,

contains the most categorical impediment under the Rule 701 analysis to the admissibility of the

agents' testimony as lay opinion.  Under Rule 701(c), "a lay opinion must be the product of

reasoning processes familiar to the average person in everyday life."  Yuri Garcia, 413 F.3d at

215; <u>see also</u> Advisory Committee Notes to 2000 Amendments to Rule 701 ("lay testimony 'results from a process of reasoning familiar in everyday life,' while expert testimony 'results from a process of reasoning which can be mastered only by specialists in the field.'" (quoting <u>Tennessee v. Brown</u>, 836 S.W.2d 530, 549 (Tenn. 1992)). "If the opinion rests 'in any way' upon scientific, technical, or other specialized knowledge, its admissibility must be determined by reference to Rule 702, not Rule 701." <u>Yuri Garcia</u>, 413 F.3d at 215 (quoting 4 <u>Weinstein's Federal Evidence</u> § 701.03[1]). The Advisory Committee Notes to the 2000 Amendments to Rule 701 state that the purpose of subsection (c) was "to eliminate the risk that the reliability requirements set forth in Rule 702 will be evaded through the simple expedient of proffering an expert in lay witness clothing," as appears to have occurred in this case.

Although the Second Circuit held that under the pre-2000 version of Rule 701, "[t]estimony about the meaning of alleged code is admissible as lay opinion testimony under Fed.R.Evid. 701, or as expert testimony under Fed.R.Evid. 702," <u>Carlos Garcia</u>, 291 F.3d at 139, and stated in dicta that its analysis "applie[d] equally to cases subject to the new Rule 701 as to the 2000 version," <u>id.</u> at 139 n. 8,[26] the court subsequently rejected that dicta in its 2005 decision in <u>Yuri Garcia</u>. In that case, the district court permitted the government to introduce the testimony of case agent Paul Klemick pursuant to Rule 701. Agent Klemick testified, inter alia, to the meaning of recorded conversations featuring the defendant and his co-conspirators, and explained to the jury that "he did not expect to overhear explicit references to drugs on the

---

[26] Even <u>Carlos Garcia</u> recognized that testimony purporting to interpret ambiguous phrases as drug code, if based upon the witness's past experience and expertise, is admissible only under Rule 702. <u>See id.</u> at 139 n. 9 ("In order to offer opinion testimony based on [a cooperating witness's] knowledge as a drug dealer, the government needed to qualify [the cooperating witness] as an expert and comply with all of the pretrial disclosure rules. Because the government did not qualify [the cooperating witness] as an expert, any opinion testimony based on his expertise and knowledge as a drug dealer was improper.").

intercepted tapes; his experience taught him that drug dealers generally used code words when referring to their illicit transactions." 413 F.3d at 216. He also testified on the basis of his investigation that the appellant was a "partner" in a cocaine distribution scheme. Id. at 209. The Second Circuit concluded that Agent Klemick's testimony had been improperly admitted under Rule 701, "hold[ing] that the foundation requirements of Rule 701 do not permit a law enforcement agent to testify to an opinion so based and formed if the agent's reasoning process depended, in whole or in part, on his specialized training and experience." Id. Thus, in reaching his conclusion that Garcia was a member of a cocaine distribution conspiracy, Agent Klemick's "reasoning process was not that of an average person in everyday life; rather, it was that of a law enforcement officer with considerable specialized training and experience in narcotics trafficking," and therefore "his opinion testimony was not admissible under Rule 701. The government was obliged to demonstrate its admissibility under Rule 702 or forego its use." Id. at 217; see also United States v. Cruz, 363 F.3d 187, 192 (2d Cir. 2004) ("The principles pertaining to expert testimony apply with full force where law enforcement officials are called upon to provide scientific, technical, or other specialized knowledge to the trier of fact.").

Rule 701(c), as interpreted by the Second Circuit in Yuri Garcia, categorically precludes the admission of law enforcement opinion testimony when that testimony is based at least in part on an agent's specialized expertise and training. Although, as noted above, the government solicited relatively little foundational evidence regarding the source of Herrera and Cruz's understanding that the facially ambiguous or innocent words used by Munoz were actually money laundering code words, their testimony makes clear that their interpretations of Munoz's words relied at least in part upon their law enforcement training and their experiences in other

money laundering investigations. For example, in support of his testimony that "based upon [his] experience," code words are used in money laundering transactions to identify the participants to each other and to mask the illicit nature of their activities from law enforcement, Agent Herrera emphasized that he had been involved in about 50 money laundering investigations, 20 of which were in an undercover capacity, and that he received "specialized training in money laundering operations" at the Federal Law Enforcement Training Center. (Tr. at 165-66.) Likewise, when asked how he knew that Mr. Munoz's reference to "500" meant five hundred thousand dollars, Agent Herrera responded that "[w]hen I'm talking on the phone with individuals who want me to do this, they never say exclusively [sic] that they have $500,000 or half a million dollars is going to be delivered. It's basically code." (Id. at 169.) This response reveals that in interpreting Mr. Munoz's statement, Agent Herrera was drawing upon his experiences as an undercover agent in other cases in which unknown individuals had contacted him to arrange the transfer of hundreds of thousands of dollars in cash– experiences, it is perhaps needless to say, that are manifestly outside the ken of the average juror's experience in everyday life. Other examples of Agent Herrera's responses which demonstrate that his understanding of Mr. Munoz's statements were based at least in part on his training and prior experiences in money laundering investigations are set out in the margin.[27] Likewise, Detective Cruz testified that he had been involved in "well over a hundred" money laundering investigations, many of

---

[27]    In response to the government's inquiry how he knew that the unidentified male's reference to "get[ting] the clothes ready" in fact referred to preparing the money for transportation, Agent Herrera responded in part that "when it comes to these types of transactions, you don't speak verbatim, like that." (Tr. at 209.) On re-direct, in response to Mr. Pizzi's line of questions on cross-examination which brought out the fact that no reference to a specific amount of money was made in any of the recorded conversations, Agent Herrera testified that in his experience, specific amounts are very rarely discussed among money laundering conspirators. (Tr. at 288.) Agent Herrera also testified that it was his "understanding" that La Mona was a target of the money laundering investigation and was located in Colombia; the record does not reveal whether this understanding was based on his personal perceptions or on his training and experience in other money laundering cases. (Tr. at 206-07.)

them in an undercover capacity, including 25 "money pickups" such as the one involving Mr.

Munoz. (Id. at 331-32.) He also testified that he had been specifically trained in undercover

operations through the New York City Police Department's Narcotics Division and the Federal

Law Enforcement Training Center in Georgia. (Id. at 333.) Detective Cruz's testimony that the

code phrase "Jota on behalf of Angel" was "predetermined down in South America, Colombia,"

suggests, but does not state explicitly, that this information was gleaned from the detective's

general familiarity with the operation of money laundering conspiracies; the record in any event

provides no indication of any good-faith basis that the detective could have had for making that

assertion other than his training and expertise. (Id. at 342.) Moreover, on cross-examination,

Detective Cruz explained to Mr. Pizzi that he recognized some of the words that Mr. Munoz used

as common code words in the money laundering world, stating that "[t]here's not a special code

book, but in doing numerous operations I have done in the past, currently am involved with,

these are words commonly used, code words." (Id. at 390.) In short, both agents' testimony

indicated that they were relying extensively on their training and experience in other money

laundering cases in interpreting Mr. Munoz's statements in this case. This is precisely the sort of

"technical or specialized knowledge" that Yuri Garcia held cannot form the basis of lay opinion

testimony admissible under Rule 701.

For all these reasons, it is therefore evident that the admission of Agent Herrera's and

Detective Cruz's opinion testimony pursuant to Rule 701 was erroneous. The Court should have

required the government to go through the process of qualifying the agents as expert witnesses in

money laundering before permitting them to opine on the meaning of the alleged code words or

to make any other statements based on facts outside the scope of their perceptions in this case.

Mr. Pizzi's failure to object to the introduction of this evidence as lay opinion testimony would therefore appear to fall below the objective standard of reasonableness under the first prong of Strickland.[28]  However, as discussed in subsection (c) below, this error was harmless and did not prejudice the outcome of Mr. Munoz's trial.

### b.    Rule 702

Rule 702 states that

> [i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

If all of the agents' statements regarding alleged code words and phrases were clearly admissible under Rule 702, the Court would hold that the failure to observe the formality of qualifying Herrera and Cruz as expert witnesses prior to accepting their testimony was harmless error because the agents were obviously qualified to testify as experts regarding money laundering investigations and the operations of money laundering enterprises, the government substantially complied with the obligation it would have had under Rule 16 to advise the defendant of the substance of the agents' anticipated expert testimony in that it did in fact inform Mr. Pizzi of its intention to call the agents and of the general content of their anticipated testimony, and Rule 16 does not require the government to produce a case agent's expert report or other documentary evidence on which the agent's expert opinion is based.  See Rule 16(a)(2).  The Ninth Circuit

---

[28]    In his declaration, Mr. Pizzi asserts that he did not give any thought to the agents' testimony regarding the code words and did not have a strategic reason not to object.  (Pizzi Decl. ¶ 4.)  Because the Court finds that the introduction of the agents' testimony pursuant to Rule 701 was harmless error in any event, this issue need not be explored at the evidentiary hearing.

reached a similar conclusion in United States v. Figueroa-Lopez, 125 F.3d 1241 (9th Cir. 1997). In that case, the district court erroneously admitted the testimony of a DEA agent involved in the defendant's case, who opined that the defendant's behavior was "consistent with [that] of an experienced drug trafficker," as lay opinion testimony pursuant to Rule 701. Id. at 1244-46. The Ninth Circuit held, however, that the error in admitting the testimony pursuant to Rule 701 was harmless because the agent, a five-year DEA veteran who had participated in over 200 investigations, was clearly qualified to testify as an expert on drug trafficking investigations pursuant to Rule 702, and "the failure formally to go through the usual process [of expert witness qualification]— although an error— was clearly harmless." Id. at 1247; see also United States v. Cruz, No. 06-10639, 2008 WL 194710, at *2 (9th Cir. January 23, 2008) (law enforcement agent "was qualified to testify as an expert witness [regarding the modus operandi of drug dealers], and the failure to go through the formal procedure to qualify him was harmless error." (citing Figueroa-Lopez, 125 F.3d at 1247)).

The Figueroa-Lopez harmless error rule might not apply here, however, because at least some of the agents' testimony was likely inadmissible even under Rule 702, which the Second Circuit has interpreted to permit testimony regarding the interpretation of coded phrases pertaining to drug transactions only where those phrases have a "fixed meaning either within the narcotics world or within [a] particular conspiracy." United States v. Dukagjini, 326 F.3d 45, 55 (2d Cir. 2003). The Second Circuit has held that "[a]n expert witness called on to testify about the meaning of narcotics codes strays from the scope of his expertise when he interprets ambiguous words or phrases and there is no evidence that these terms were drug codes." United States v. Cruz, 363 F.3d 187, 196 (2d Cir. 2004). In Dukagjini, a drug conspiracy case, the court

held that the district court properly admitted the case agent's expert testimony under Rule 702 when that testimony was limited to interpreting "words of the [drug] trade, jargon," and explained, for example, that "dry" referred in drug jargon to "being out of drugs," and that "B-licks referred to heroin." Id. at 50. The court ruled that the agent exceeded the scope of his expertise, however, when he interpreted the defendants' statements "what's left over there in that can," "[not to give] him . . . no more than one or two," "make sure you get your thing, your new one," "tell 'em to bring . . . the six or whatever," and ""tell him to come with the ten" as referring to heroin. The court held that these statements were "plainly not drug code" but were merely "ambiguous" statements that lacked "fixed meaning," id. at 55, and that permitting the agent to opine upon their meaning violated the hearsay rule and the Confrontation Clause because the agent "conceded [his interpretations of the ambiguous phrases] to have been at least partially the product of his out-of-court interviews with co-conspirators." Id. at 59; see also Cruz, 363 F.3d at 196 (vacating conviction for aiding and abetting narcotics trafficking and holding that case agent's testimony pursuant to Rule 702 exceeded the scope of his expertise; defendant's statement that his job was to "watch [co-conspirator's] back" was "an ambiguous phrase that, without more, may refer to any number of situations that are not related to narcotics transactions."); United States v. Londono-Tabarez, 121 Fed. App'x 882 (2d Cir. 2005) (DEA agent's testimony improperly admitted under Rule 702 where agent interpreted phrases "tickets," "receipt," "bring it up here," "organize this," "pain in the neck," and "make us this loan" as pertaining to cocaine trafficking, but "[t]here was no showing that these ordinary words and phrases had any accepted meaning in the narcotics trade.").

The Court must confess that it finds the Dukagjini rule difficult to reconcile with the

realities of drug and money laundering litigation. The line of authority discussed above seems to presume the existence of a finite lexicon of drug phrases from which drug couriers and money launderers select their code words. Certainly that is true of some words, for example the use of the slang term "B-licks" to refer to heroin that was discussed in Dukagjini. However, it has been the experience of this Court in trying innumerable such cases over the course of nearly three decades that the presumption underlying Dukagjini and the other cases cited above flies in the face of the reality of these transactions, during which phrases designed to conceal their true meaning are spontaneously conceived as the circumstances require and their coded understanding is manifested by an implicit understanding of what is said or asked. There can be no question in this case that the petitioner shared the same understanding of the allegedly coded statements that the agents did. For example, it is entirely obvious from the context in which the conversation occurred that Mr. Munoz had not the slightest intention of sitting down to lunch with Agent Cruz, and that the unidentified man with whom Agent Herrera spoke did not actually intend to make a delivery of clothing to the agent; nor did Mr. Munoz show any confusion about what Detective Cruz was talking about when he introduced himself over the telephone as "Jota on behalf of Angel." Although there was no evidence that the words at issue had a fixed meaning within the world of money laundering in general or within the specific conspiracy of which Mr. Munoz was a member, common sense would compel the conclusion that the words were coded, given the ambiguity of the words used and their Jabberwocky character in the context in which they were used. During the course of recorded conversations phrases such as "get the clothes ready," "go to work," or "told to go to work with the guy" may have no fixed meaning within the money laundering community, but neither party to the conversation given the

context of the conversation in its entirety was heard to ask "What clothes?"; "I don't know what you are talking about"; "What guy are you referring to?"  The conversation flowed uninterruptedly with each party to the conversation obviously understanding what would to one overhearing it be unintelligible.  Res ipsa loquitur may be borrowed from the law of torts as being exquisitely applicable here.

c.      <strong>Harmless Error Analysis</strong>

Even if Mr. Pizzi's failure to object to the introduction of the agents' testimony fell below the objective standard of reasonableness applied by <u>Strickland</u>, Mr. Munoz cannot establish the second prong of the <u>Strickland</u> test– that he was prejudiced by Mr. Pizzi's failure– if the admission of the agents' testimony at trial was harmless error.  A review of the trial record and the relevant Second Circuit precedent concerning harmless error review presents a close question, because the government placed considerable weight on the agents' testimony regarding the meaning of various ambiguous terms in its summation, but the Court ultimately concludes that the error in admitting such evidence was harmless because the weight of the admissible evidence against the defendant was substantial and the jury would likely have interpreted the coded phrases as oblique references to criminal activity even in the absence of the agents' testimony.

The Second Circuit has recently "distilled" the Supreme Court's rulings on harmless error review into four relevant factors:

> (1)  the overall strength of the prosecution's case;
> (2) the prosecutor's conduct with respect to the improperly admitted evidence;
> (3)  the importance of the wrongly admitted testimony; and
> (4) whether such evidence was cumulative of other properly admitted evidence.

<u>Yuri Garcia</u>, 413 F.3d at 217 (quoting <u>Zappulla v. New York</u>, 391 F.3d 462, 468 (2d Cir. 2004)).

Addressing the second prong first, the government relied somewhat heavily upon the agents' opinion testimony in its summation. The Second Circuit in Yuri Garcia held that the second prong of the Zappulla harmless error analysis supported a finding that the improperly introduced testimony was harmless where "the prosecution, after eliciting the opinion, never referenced it again throughout the case," including in its summation. 413 F.3d at 217. In this case, the prosecution did refer to the opinion testimony regarding the code phrases in its summation and rebuttal to a substantial degree. The government referred to the agents' testimony pertaining to the alleged codes at several times during its summation (see Tr. at 649, 654, 655, 668-70, 673) and rebuttal (see id. at 714, 718-21, 723, 726-27), and argued to the jurors that the element of the defendant's knowledge was proven by "the defendant's and his co-conspirators' use of code during the course of the conversations." (Id. at 668.) Thus the government's reliance on the agents' opinion testimony was greater than that found to be negligible and harmless in Yuri Garcia.

Turning to the first, third, and fourth factors, which the Court will discuss together, the government's evidence against Mr. Munoz was overwhelming even without the improperly admitted opinion testimony, and while the agents' testimony was not technically cumulative of any other evidence admitted, the gist of that testimony– i.e., the fact that Munoz and his co-conspirators were speaking in oblique terms about a criminal transaction for the purpose of avoiding detection by law enforcement– could easily have been inferred by the jury from other evidence about the defendant's actions and statements that was properly introduced at trial. That testimony thus was not especially important because the jury would have reached the same interpretation of the code words employed by Mr. Munoz and his unidentified co-conspirators

even without the agents' assistance.  Unlike <u>Grinage</u>, in which the erroneous admission of the case agent's testimony was held not to be harmless error because "[t]here was no evidence that Grinage and Osman had met after the August 7th call or that they had exchanged anything," the evidence introduced at trial demonstrated that the defendant was willfully involved in a conspiracy to launder $500,000 in drug proceeds.  390 F.3d at 752.  As the defendant's brother-in-law Amaury Lopez emphasizes in his declaration in support of the pending petition, Munoz "gave half a million dollars to a federal agent!"  (A. Lopez Decl. ¶ 3.)  The evidence established that on December 26, 2002, the defendant called Agent Herrera, with whom he had no previous acquaintance, on a cellular telephone that the agent used exclusively in his undercover capacity posing as a drug money launderer and made an appointment to transfer "500" to the agent the next day.  At that meeting, the defendant informed Agent Herrera that he did not have the money but had been instructed to meet with the agent to set up a subsequent meeting for the exchange; he also proposed a method of making the transfer in which he and the agent would exchange automobiles, with Agent Herrera taking the defendant's car with the money in the trunk. Telephoning a complete stranger and proposing to exchange automobiles with that person is, to say the least, hardly indicative of an innocent state of mind.  Later on the 27th, the agent received another telephone call from an unidentified male and the defendant.  During that conversation, the agent informed the defendant that he would be unable to "keep that this weekend" because "they will close the bank at three," to which the defendant responded "that's fine, perfect."  (<u>Id.</u> at 224.)  Even without the benefit of the agent's improperly admitted interpretive statements, a juror could have found beyond a reasonable doubt on the basis of these facts that Mr. Munoz intended to transfer $500,000 in cash to Agent Herrera and that he was aware of the illegal nature of the

transaction.

Detective Cruz's testimony provided even more evidence of Mr. Munoz's guilt. Mr. Munoz and Detective Cruz originally planned to meet in the parking lot of Jimmy's Bronx Cafe, but the detective changed the location at the last minute to a supermarket parking lot in Manhattan; Mr. Munoz then urged the detective to travel to the original meeting place so they could "sit down and eat." Taken in context and with consideration given to Detective Cruz's testimony that he had no intention of sharing a meal with Mr. Munoz and that, when the two of them actually met, no suggestion of sitting down and eating together was ever made, the jury did not need the detective's testimony to infer the obvious: that Mr. Munoz was using the phrase "sit down and eat" as a circumlocution to convey the idea of consummating the transfer without making explicit reference to illegal conduct.[29] When the defendant finally did appear at the supermarket, he pointed Detective Cruz toward another individual driving a white Town Car parked across the street in a gas station parking lot. After Detective Cruz crossed the street and the driver of the white car drove away without speaking, the defendant called Detective Cruz to explain that another car in the supermarket parking lot looked "strange"– again, a reasonable jury needs no expert testimony to infer that the defendant meant to express concern that the car contained a law enforcement surveillance team– and then gave Detective Cruz step-by-step directions which culminated in the transfer of a bag containing nearly $500,000 in cash from the

---

[29]  As the government aptly argued in its summation, "[h]ow do we know beyond using our own common sense here that the defendant never intended to sit down and have a meal? Because he didn't, ladies and gentlemen. Remember when the defendant met Detective Cruz in the parking lot, did he seem like a man who wanted to sit down and share a meal? No. He wanted to get out of there as fast as he could." (Tr. at 674.) This type of reasoning, relying on common sense, context, and the defendant's actions in comparison with his words was both legitimate and open to the government even in the absence of the agents' improperly admitted opinion testimony, and would itself have been sufficient to demonstrate that another meaning lurked below the surface of the defendant's words.

open trunk of the white Town Car to the detective. In conjunction with the fact that a subsequent ion scan test of the bag revealed a high concentration of cocaine contamination, there is more than enough evidence even in this abridged version of the government's case to establish the defendant's guilt beyond a reasonable doubt. Cf. Yuri Garcia, 413 F.3d at 218 (erroneous admission of case agent's testimony was harmless error where "the admissible evidence of Garcia's guilt was overwhelming."). Thus, the introduction of the agents' testimony at trial was harmless error, and while Mr. Pizzi should nevertheless have objected to it, his failure to do so under these circumstances did not prejudice Mr. Munoz's case, as is required for the relief that Mr. Munoz now seeks under Section 2255 by the second prong of Strickland.

### 2. Radwanski's Testimony Regarding the Ion Scan Device

Mr. Munoz also argues that Pizzi was ineffective in failing to object to the admission pursuant to Rule 701 of Mr. Radwanski's testimony regarding the operation of the ion scan device. The Court concluded that Radwanski need not be qualified as an expert witness on the basis of its understanding that he would not be offering opinion testimony, but would simply be explaining the physical and chemical principles underlying the operation of the ion scan machine, a conclusion that was not altered by the government's statement that it intended to ask Radwanski a hypothetical question intended to elicit the response that a "cocaine high" reading would indicate that the item scanned had been in direct contact with cocaine. (See Tr. at 525.) Munoz argues that Mr. Pizzi was ineffective in failing to object to the introduction of Radwanski's answer to that hypothetical as lay opinion testimony rather than insisting that the Court exercise its gatekeeping role under Rule 702 and Daubert by assessing the reliability of Radwanski's testimony before permitting the jury to hear it. However, as the government points

out, Mr. Pizzi <u>did</u> object to the Court's decision to accept Radwanski's testimony under Rule 701.[30] Mr. Pizzi was therefore obviously not ineffective in his handling of the Radwanski issue as he made every effort available to him to prevent the introduction of that testimony pursuant to Rule 701. His actions can hardly be said to have fallen below an objective standard of reasonableness simply because the Court overruled his objection.

### 3. Government's "Misrepresentations" in Summation and at Sentencing

Finally, Mr. Munoz argues that in its presentations at summation and at sentencing, the government "misdescribed what occurred or left out countervailing facts," and that Mr. Pizzi was ineffective in failing to rebut the government's mischaracterization of the evidence. (Munoz Mem. at 12.) He identifies six instances in the government's summation or its presentation at sentencing in which he argues that the government misrepresented the evidence in a manner that falsely increased the appearance of Mr. Munoz's culpability: 1) the government argued that Munoz exercised authority in the conspiracy by unilaterally changing the plan upon which he and Agent Herrera had agreed by arriving to their meeting without the money, but neglected to acknowledge that Munoz informed Herrera that his superiors had ordered him to do so; 2) the government argued that Munoz chose Jimmy's Bronx Cafe as the location for his meeting with Cruz, but ignored the fact that it was Agent Herrera who initially proposed that location for the meeting; 3) the government argued that the "numerous coded references" to Colombia in the

---

[30] <u>See</u> Tr. at 526-27 ("The other thing is we would have very, very serious concerns about the extent to which he's going to offer an opinion. One thing is saying that I conclude from looking at the report that this tested for cocaine high. Another thing would be for him to draw inferences about exactly what was in that bag or not in that bag."). Moreover, at the close of Mr. Radwanski's testimony, Mr. Pizzi moved for a mistrial on the grounds that Radwanski was "not qualified" to answer the government's hypothetical question regarding the inference to be drawn from a "high cocaine" hit with an amplitude of 1180. (<u>Id.</u> at 550). Though not phrased explicitly in terms of Rule 702, Mr. Pizzi's assertion that Radwanski "was [not] qualified to make that determination" and that he had "no basis" for his opinion that such a result would indicate that the item tested had been in direct contact with cocaine was tantamount to an objection to the Court's failure to qualify Radwanski as an expert witness. <u>Id.</u>)

recorded conversations demonstrated Munoz's knowledge of the drug money laundering conspiracy, but omitted the fact that the only purported references to Colombia were made by the agents themselves rather than by any of the conspirators; 4) although one of the unidentified males made reference to La Mona in a recorded conversation, the government's agents lacked any foundation for their testimony that La Mona is located in or associated with Colombia; 5) the government argued that Munoz's saying "exactly" and "perfect" after Agent Herrera explained that he could not make the exchange at 3:00 on December 27 because the banks would be closed indicated Munoz's understanding of the nature of the intended exchange, whereas those words were ambiguous and could have signified nothing more than Munoz's nervousness; and 6) the government argued against an offense level reduction in Munoz's Sentencing Guidelines calculation pursuant to U.S.S.G. § 3B1.2 for Munoz's allegedly minor or minimal role in the offense by arguing that Munoz had "attempt[ed] to take control of the transaction" by resisting Agent Herrera's initial suggestion that the transfer be consummated between 70th and 90th Streets in Queens and attempting to move the meeting elsewhere, but neglected to mention that Munoz "plaintively" told Herrera during the conversation that he did not know the area of Queens in which Herrera wanted to meet.  (Munoz Mem. at 13.)  The government responds to these arguments by raising several points:  first, most of the statements that the petitioner identifies were grounded in the evidence, and the government's arguments were not misstatements of the facts but rather were premised on the assumption that Munoz's innocent explanations, "like so much of his conduct and statements, [were] deceptive."  (Gov. Mem. at 35.)  Second, the government argues that Mr. Pizzi may have had strategic reasons for not objecting to the government's characterization of certain evidence; for example, he may have

refrained from disputing the government's argument that Mr. Munoz's decision to appear at the first meeting with Agent Herrera without the money demonstrated his authority in the conspiracy because he realized that "to remind the jury of the Petitioner's comments to Agent Herrera about the drug money and his criminal superiors may not have served the petitioner well."  (Id.) Finally, the government argues that even if the prosecutor "misspoke" on some occasions during summation and sentencing, such minor errors were harmless in comparison to the overwhelming weight of the evidence against Mr. Munoz.  (Id.)

The Second Circuit has recognized that "although the government has 'broad latitude in the inferences it may reasonably suggest to the jury during summation,' '[t]he prosecutor has a special duty not to mislead; the government should . . . never make affirmative statements contrary to what it knows to be the truth.'"  United States v. Salameh, 152 F.3d 88, 133 (2d Cir. 1998) (quoting United States v. Zackson, 12 F.3d 1178, 1183 (2d Cir.1993); United States v. Myerson, 18 F.3d 153, 162 n. 10 (2d Cir.1994)). However, Salameh cautioned that the requisite showing necessary to prevail on appeal on the basis of a prosecutor's mischaracterization of the evidence is a heavy one:  "'[a] prosecutor's statements during summation, if improper, will result in a denial of due process rights only if, in the context of the entire summation, they cause the defendant substantial prejudice,'" an analysis which must be undertaken in light of "'the severity of the misconduct, the curative measures taken by the court, and the certainty of conviction absent the misconduct.'"  152 F.3d at 133-34 (quoting United States v. Rivera, 22 F.3d 430, 437 (2d Cir.1994)).  The Court is also reminded of the words of Judge Learned Hand in Di Carlo v. United States, 6 F.2d 364, 368 (2d Cir. 1925), in which he wrote that

> [w]hile, of course, we recognize that the prosecution is by custom more rigidly limited than the defense, we must decline to assimilate its position to that of either

judge or or [sic] jury, to confine a prosecuting attorney to an impartial statement of the evidence. He is an advocate, and it is entirely proper for him to be as earnestly as he can to persuade the jury of the truth of his side, of which he ought to be thoroughly convinced before he begins at all. To shear him of all oratorical emphasis, while leaving wide latitude to the defense, is to load the scales of justice; it is to deny what has always been an accepted incident of jury trials, except in those jurisdictions where any serious execution of the criminal law has yielded to a ghostly phantom of the innocent man falsely convicted.

In this case, most of the purported "misstatements" that Mr. Munoz identifies fall well within the scope of the "oratorical emphasis" recognized by Judge Hand as legitimate prosecutorial advocacy. Most of the government's statements were well-grounded in the evidence introduced at trial and were simply areas in which Mr. Munoz and the government drew different inferences from the same facts. The totality of the evidence was available to the jury and, at sentencing, to this Court; there is thus no substantial harm or prejudice to Mr. Munoz in Mr. Pizzi's failure to respond to each and every inference that the government invited the jury to draw from the available facts. One exception to this general characterization warrants further discussion. In its opposition to Mr. Munoz's request for a downward adjustment to his Guidelines range for a minimal or minor role in the offense, the government repeatedly mischaracterized the nature of the evidence introduced at trial, suggesting that the defendant had personally made references to La Mona and to a Colombian drug organization.[31] Yet a review of the trial transcript reveals that the only purported references to Colombia or "down South" were

---

[31]    (See Gov. Ex. C ("Sentencing Tr.") at 39 ("In particular, Judge, there is one conversation in which there is discussion about reference to folks down south. There is also reference to LaMona who is a target of the money laundering organization, the organization that is down in Colombia."), 40 ("There is no other explanation, Judge, for those reference [sic] to Colombia, other than the defendant was well aware that the money was being returned to narcotics traffickers in Colombia."), 41 ("With respect to the defendant's knowledge of the scope of this organization, there were conversations introduced into evidence about the money being sent down to folks in Colombia.").)

made by the agents themselves rather than by Mr. Munoz.[32]  None of the petitioner's words were alleged to refer to a Colombian drug organization, nor did the agents assert any basis for the conclusion that Mr. Munoz interpreted their words as referring to such an organization; Herrera and Cruz testified only as to what <u>they</u> meant by the words they used.  As noted above, the government failed to lay a proper foundation for the agents' testimony associating the transaction between Detective Cruz and the driver of the white Town Car with a Colombian drug organization, either under Rule 701 or 702.  The government's misstatement of the trial record as to this issue was therefore surely unintentional, but it was nevertheless harmless, because the sentencing transcript reveals that the Court did not take the defendant's alleged awareness of a Colombian drug cartel into account in its decision to deny Mr. Munoz's requested offense level reduction.  Indeed, the Court appeared to reject the government's characterization of the evidence, observing that "[t]here wasn't a shred of evidence at the trial that suggested that the defendant was an employee in quotes or that he had any other involvement with any drug cartel or organization.  The defendant on a single occasion following unknown directions from others, directed an agent to a vehicle that contained cash."  (Sentencing Tr. at 45.)  The Court nevertheless denied the requested downward adjustment on the basis of its finding that the evidence introduced at trial demonstrated that Mr. Munoz exercised authority and played more than a minor role in the offense, and its observation that "without the courier, these transactions could never be completed.  They are critical players in the narcotics trafficking business, which

---

[32]     (<u>See</u> Tr. at 201 (Agent Herrera informed defendant that he "needed to call [his] bosses down South to let them know what was going on."), 202 (Agent Herrera's reference to contacting people "down South" was a representation "that [his] bosses are people down South in Colombia."), 206-07 (Agent Herrera's "understanding" was that La Mona "was a target in the money laundering investigation" and was located "[i]n Colombia."), 226 (Herrera's reference to "people down there" referred to people in Colombia), 342 (testimony by Cruz that "Jota on behalf of Angel" was a code phrase "predetermined in Colombia, South America.").)

x

x

x

63

unfortunately has plagued this country." (Id. at 46.) Thus, because the Court expressly refused to accept the government's assertion that Mr. Munoz was knowingly involved with a larger narcotics distribution and money laundering operation based in Colombia, the government's mischaracterization of the evidence at sentencing was necessarily harmless error and did not prejudice the petitioner.

## II. Alleged Defects in Appellate Proceedings

In addition to the alleged violations of his Sixth Amendment rights caused by Mr. Pizzi's ineffectiveness, Mr. Munoz also argues that his rights were violated on appeal. Here he presents two primary arguments: first, that his right to counsel on direct appeal was violated because he was not made aware of his right to court-appointed counsel in the event that he was unable to afford a privately retained attorney and was therefore forced to hire a paralegal, Dennis Deters, to prepare his appellate brief, relying on Lorenzo Palomares, a Puerto Rican attorney licensed to practice in New York, to file the brief after Deters completed it; and second, that even if the Court finds that Mr. Munoz was not deprived of his right to appellate counsel, his right to effective assistance of counsel on appeal was nevertheless violated by Palomares's ineffective performance.

### A. Alleged Violations of Munoz's Right to Appellate Counsel

Though presented as a single point, Munoz raises two related issues with respect to his retention of Deters and Palomares on appeal: first, whether this Court violated his right to equal protection under the law by failing to advise him at sentencing of the availability of court-appointed counsel on appeal, and second, whether the fact that Deters, a paralegal, played the dominant role in drafting and submitting Mr. Munoz's appellate brief was a per se violation of

his Sixth Amendment right to counsel.  The Court shall address each question in turn.

**1.     The Court's Allegedly Defective Instruction Regarding Munoz's Right to Appointed Counsel**

The Court advised Mr. Munoz of his right to appeal his conviction and sentence at the conclusion of his sentencing hearing, stating as follows:

> I should advise you, Mr. Munoz, you have a right to appeal the sentence and if you cannot afford to pay for the cost of an appeal, you can make application or [sic] to have the cost waived.

(Sentencing Tr. at 61.)  This instruction was in conformity with Federal Rule of Criminal Procedure 32(j)(1)(C) ("Rule 32"), which directs the district court to inform the defendant at sentencing of his right "to ask for permission to proceed in forma pauperis" if he is unable to pay the costs of an appeal.  However, Munoz argues that the Court's instruction was constitutionally insufficient because it failed to notify him of his right to obtain court-appointed counsel on appeal in the event that he was unable to afford to retain a private attorney, and that he was injured by this omission in that, being unable to afford to retain an attorney to represent him on appeal and unaware of his right to appointed counsel, he was forced to retain Deters.  (1st Munoz Decl. ¶¶ 8-9; 1st Lopez Decl. ¶¶5-9.)  Mr. Munoz's argument raises three questions:  first, does a federal district court have an obligation to inform a defendant at sentencing of his right to appointed counsel on appeal; second, if such an obligation does exist, did this Court adequately discharge its duty to provide such advice to Mr. Munoz in its instructions to him at sentencing; and third, if the Court did not adequately advise Mr. Munoz of his right to court-appointed counsel, was Mr. Munoz prejudiced by that error?  Having analyzed these questions, the Court concludes that its failure to expressly advise Mr. Munoz of his right to court-appointed counsel on appeal was arguably erroneous, but that because the petitioner retained private counsel and

filed a timely appeal, that error was harmless.

<strong>a.      The Obligation of Federal District Courts to Inform<br>Defendants of the Right to Court-Appointed Appellate Counsel</strong>

The first question to be addressed in resolving this portion of Mr. Munoz's petition is whether a federal district court has any obligation under the federal Constitution to inform a defendant at sentencing of his right to court-appointed counsel on appeal.  The government implies that no such obligation exists, while Mr. Munoz contends that the Court is required by the Constitution and by Second Circuit precedent to inform every defendant of the availability of court-appointed appellate counsel at sentencing.  A review of the controlling Supreme Court and Second Circuit precedent as well as the history of Rule 32 demonstrates that, at least in this Circuit, federal district courts may have an obligation to inform a defendant not only of his right to seek waiver of the filing fees and court costs associated with an appellate proceeding, but also of his right to obtain court-appointed appellate counsel at no cost to himself.

Although the federal constitutional right to court-appointed counsel on direct appeal for all indigent defendants is now well established, the Supreme Court took markedly different analytical approaches toward recognizing that right in state and federal criminal proceedings. The Court first held that the Sixth Amendment bestows a right to court-appointed counsel at trial upon federal defendants in its decision in <u>Johnson v. Zerbst</u>, 304 U.S. 458 (1938).  In <u>Johnson v. United States</u>, 352 U.S. 565 (1957) (per curiam), the Court extended its holding in <u>Zerbst</u> to recognize a Sixth Amendment right to appointed counsel on direct appeal for federal defendants, a decision later implemented by the 1966 amendments to Federal Rule of Criminal Procedure 44. <u>See also</u> <u>Doherty v. United States</u>, 404 U.S. 28, 31 (1971) ("Until <u>Johnson v. United States</u>, it was unclear whether Rule 44 extended [the right to free counsel for indigent defendants] to direct

appeals of convictions arising in the federal courts.  In any event by the last decade the sweep of our decisions involving right to counsel on appeal required revision of Rule 44 to make clear that 'every stage of the proceedings' did, in fact, include appeals.") (citations and footnote omitted).

These rights did not originally apply to defendants in state court.  In <u>Betts v. Brady</u>, 316 U.S. 455 (1942), the Court held that the Sixth Amendment right to appointed counsel was not a "fundamental" one incorporated against the States by the Due Process Clause of the Fourteenth Amendment.  Two decades later, on March 18, 1963, the Supreme Court issued six decisions which "ushered in a new era in criminal procedure for both the federal and state courts."  <u>United States ex rel. Smith v. McMann</u>, 417 F.2d 648, 649-50 (2d Cir. 1969) (citing <u>Townsend v. Sain</u>, 372 U.S. 293 (1963); <u>Gideon v. Wainwright</u>, 372 U.S. 335 (1963); <u>Douglas v. California</u>, 372 U.S. 353 (1963); <u>Fay v. Noia</u>, 372 U.S. 391 (1963); <u>Lane v. Brown</u>, 372 U.S. 477 (1963); <u>Draper v. Washington</u>, 372 U.S. 487 (1963)).  Two of those decisions are pertinent to the issues raised in Mr. Munoz's petition.  In <u>Gideon v. Wainwright</u>, 372 U.S. 335 (1963), the Court overruled <u>Betts</u> and held that the Sixth Amendment right to counsel at trial is a fundamental right made applicable to the states via the Due Process Clause of the Fourteenth Amendment.  <u>See</u> <u>id.</u> at 345 ("[R]eason and reflection require us to recognize that in our adversary system of criminal justice, any person haled into court, who is too poor to hire a lawyer, cannot be assured a fair trial unless counsel is provided for him.").  <u>Gideon</u>, however, did not address the right to appointed counsel on appeal.  That issue was reserved for <u>Douglas v. California</u>, 372 U.S. 353 (1963), in which the Court recognized the right to appointed counsel on direct appeal for indigent state court defendants.  <u>Douglas</u>, however, took a different analytical approach than <u>Gideon</u>:  rather than holding that the right to appellate counsel for indigent state defendants arose under the Sixth

Amendment as applied to the states via the Due Process Clause of the Fourteenth Amendment,

the Court held that the Equal Protection Clause of the Fourteenth Amendment ensures the right

to appointed counsel for indigent criminal appellants. The Court concluded that California's

rules of criminal procedure, which at the time permitted any appellant with privately retained

counsel to enjoy the benefits of professional representation on appeal but restricted court-

appointed counsel for indigent defendants only to those cases deemed potentially meritorious by

the state court of appeals, discriminated against indigent appellants in violation of the Equal

Protection Clause. See id. at 357-58 ("There is lacking that equality demanded by the Fourteenth

Amendment where the rich man . . . enjoys the benefit of counsel's examination into the record,

research of the law, and marshalling of arguments on his behalf, while the indigent . . . is forced

to shift for himself.").

In 1966, the Supreme Court amended Rule 32(a)(2) to state that "[a]fter imposing

sentence in a case which has gone to trial on a plea of not guilty, the court shall advise the

defendant of his right to appeal and of the right of a person who is unable to pay the cost of an

appeal to apply for leave to appeal in forma pauperis."[33] Although the Advisory Committee

Notes to the 1966 Amendments to Rule 32 do not cite the Court's decision in Douglas as the

motivation for this revision, the Second Circuit's decision in United States ex rel. Smith v.

McMann, 417 F.2d 648 (2d Cir. 1969) (en banc), characterized the amendment as implementing

Douglas's holding. Smith, which involved a petition for habeas corpus by a state inmate,

construed Douglas to imply a constitutional obligation on the sentencing court to inform every

---

[33] The current version of that provision, which is now located in subsection (j)(1)(C) of Rule 32, eliminates the contingency of the 1966 version by stating simply that "[t]he court must advise a defendant who is unable to pay appeal costs of the right to ask for permission to appeal in forma pauperis," regardless of whether the defendant pleaded guilty or went to trial.

criminal defendant of the right to court-appointed counsel if unable to afford a privately retained attorney.  The Second Circuit held that "the only practical, logical and fair interpretation to be given to <u>Douglas v. California</u> is that it imposes upon the state a duty to warn every person convicted of crime of his right to appeal and his right to prosecute his appeal without expense to him by counsel appointed by the state, if he is indigent."  417 F.2d at 654.  The court held that this duty would require an "unequivocal statement by the trial judge or by counsel for the convicted defendant sufficiently comprehensive to be applicable to indigents and non-indigents as well."  <u>Id.</u> at 654 n. 7.  The court's subsequent decision in <u>United States ex rel. Williams v. LaVallee</u>, 487 F.2d 1006, 1011 (2d Cir. 1974) recognized that under the <u>Smith</u> rule, "there were three distinct pieces of information that [the petitioner]… needed to effectuate his right to appeal: 1. That he could appeal <u>in forma pauperis</u>[;] 2. That he could obtain appointed appellate counsel[;] 3. That he had to file his appeal within thirty days."

The Court must therefore resolve three threshold questions:  first, whether Rule 32's requirement that the Court advise a defendant of the right to proceed "in forma pauperis" on appeal includes advising the defendant of the right to court-appointed counsel, as opposed to simply the right to seek waiver of court costs and filing fees; second, whether the obligation under Rule 32 to inform a criminal defendant of the right to proceed in forma pauperis is traceable to the federal Constitution, as is necessary to obtain relief for violation of a procedural right pursuant to Section 2255; and finally, whether the Second Circuit's decision in <u>Smith</u> applies to federal courts as well as state courts.  All three questions can be answered in the affirmative by an examination of the Second Circuit's holding in <u>Smith</u>.  A cursory reading of that decision demonstrates that the <u>Smith</u> court, whose interpretation of the Federal Rules of

Criminal Procedure is binding on this Court, quite clearly interpreted the phrase "in forma pauperis" as used in Rule 32 to encompass the right to court-appointed appellate counsel as well as the right to seek waiver of fees, and viewed that obligation as derived from the constitutional right recognized by the Supreme Court in Douglas.  For example, Smith noted that after Douglas was decided in 1963, both New York State as well as the federal government adopted new rules of criminal procedure implementing its holding.  See Smith, 417 F.2d at 652-53 & nn. 5-6 (citing N.Y.C.R.R. § 606.5 (1968); Fed. R. Crim. P. 32(a) (1966)); see also id. at 654 n. 7 (referring to the rules cited in Smith's footnotes 5 and 6 as "implementing rules" which require "an unequivocal statement by the trial judge or by counsel for the convicted defendant" informing the defendant of the right to court-appointed counsel on appeal).  Further support for the proposition that the Smith majority found Rule 32 to impose a duty on the court to inform the defendant of the right to court-appointed counsel is found in Judge Friendly's dissenting opinion, in which he argued against applying the Supreme Court's holding in Douglas retroactively to the petitioner's case.  Judge Friendly's opinion acknowledged that the rules of criminal procedure cited in the majority opinion, including Rule 32, prospectively require sentencing courts to advise a defendant of the right to appeal "in forma pauperis" and, in context, clearly interpreted that phrase to include the right to court-appointed counsel, see 417 F.2d at 657, but wrote that even if New York's failure to advise Smith of his right to appointed counsel violated a constitutional right that was not yet recognized, "I find it especially hard to condemn New York for inaction in 1959, when it was not until 1966 that the Supreme Court brought its own rule governing federal criminal appeals [i.e., Rule 32] in line with what the majority holds to have been constitutionally required all along."  Id. at 659.  Although Judge Friendly's dissenting

opinion is not binding precedent, the majority did not dispute his understanding that Rule 32 imposes a duty on federal courts to advise every defendant of the right to court-appointed counsel for indigent appellants. To the contrary, Judge Friendly's statements demonstrate that the entire en banc court in <u>Smith</u> understood that the duty of a federal court to inform a defendant of his right to appeal in forma pauperis included the duty to inform him of the right to court-appointed counsel on appeal. Likewise, in <u>Williams</u>, the Second Circuit noted that the courts' understanding of the phrase "as a poor person," a linguistic equivalent to "in forma pauperis," was expanded by <u>Douglas</u> to include notification of the right to appointed counsel on appeal as well as the right to waiver of court fees and costs. <u>See</u> 487 F.2d at 1011 (majority opinion), 1019 n. 3 (Mulligan, J., dissenting) (noting that "[w]hile the term '<u>in forma pauperis</u>' initially referred only to the right to sue without liability for costs, the term has assumed a much broader meaning since <u>Douglas</u>," and that although Rule 32(a) "does not mention free counsel," that right is understood as implicit in the Rule's use of the phrase "in forma pauperis." (citation and quotation marks omitted)).

It is also clear that the <u>Smith</u> court viewed its holding that a sentencing court must inform the defendant of his right to court-appointed counsel on appeal as applying to both state and federal courts. As noted above, <u>Smith</u> characterized Rule 32 as an implementation of the Supreme Court's decision in <u>Douglas</u>. The majority opinion commented that even if New York and the Supreme Court had not issued rules implementing that decision, "[t]he sound application of the doctrine of <u>Douglas v. California</u> . . . must be to grant relief irrespective of the existence or non-existence of implementing <u>state or federal</u> procedures." <u>Id.</u> at 655 (emphasis added). The court further opined that although the enactment of the state and federal rules implementing the

<u>Douglas</u> decision should prevent the recurrence of situations in which the defendant was unaware of the right to court-appointed counsel for indigent appellants, "if such or similar <u>federal or state</u> rules should in the future be disregarded by counsel and the trial judge should remain silent, a defendant convicted of a crime would still be deprived of his constitutional right to appeal, if he is indigent and is not informed and does not know that he may take an appeal without expense to himself." <u>Id.</u> (emphasis added). Finally, Judge Friendly's dissent urged the court to "consider the effect of our decision on the two other states in the circuit <u>and on federal convictions</u> prior to the 1966 amendment of F.R.Cr.P.32(a)." <u>Id.</u> at 659 (Friendly, J., dissenting) (emphasis added); <u>accord</u> <u>Johnson v. Norton</u>, 435 F.2d 842, 843 (1st Cir. 1970) (per curiam) (district court's failure to inform defendant "of his right of appeal from his conviction <u>and, if indigent, to court-appointed counsel</u>, as required by Fed.R.Crim.P. 32(a)(2)" was error, and the district court's reliance on counsel to inform defendant of his rights did not justify omission (emphasis added)).

It might be argued that the language in <u>Smith</u> and <u>Williams</u> to the effect that the obligation to inform a defendant of the right to court-appointed appellate counsel applies to federal courts is mere dicta and therefore not binding on this Court. It is indeed the case that both <u>Smith</u> and <u>Williams</u>, like <u>Douglas</u>, involved petitions by state defendants rather than federal defendants, and it is also the case that the Second Circuit has never applied <u>Smith</u> in the context of a federal inmate's Section 2255 petition; in fact, the Second Circuit has not cited <u>Smith</u> at all since 1974, <u>see</u> <u>United States ex rel. Smith v. Montanye</u>, 505 F.2d 1355 (2d Cir. 1974),[34] and has

---

[34]     Even this decision contained no substantive analysis of <u>Smith</u> and did not raise the same issues, but was simply the next chapter in the legal life of Joel Smith, who had been granted a new appeal in state court and had successfully obtained a writ of habeas corpus in federal district court following the denial of that appeal. Unfortunately for Mr. Smith, the Second Circuit reversed the district court's order granting the writ. <u>Id.</u> at 1360.

not cited <u>Williams</u> since 1981, <u>see</u> <u>Solomon v. Smith</u>, 645 F.2d 1179, 1184 n. 2 (2d Cir. 1981).[35]

It is also true that only a relatively few cases from other federal circuits have addressed this issue, though most have followed <u>Smith</u> in holding or stating in dicta that state and federal courts are constitutionally required to advise the defendant at sentencing of his right to court-appointed counsel on appeal if indigent, and that Rule 32's use of the phrase "in forma pauperis" encompasses that obligation. For example, in <u>Chapman v. United States</u>, 469 F.2d 634, 637 (5th Cir. 1972), the Fifth Circuit rejected the government's argument that the fact that the petitioner's retained counsel filed a notice of appeal rendered the district court's failure to advise the defendant of his right to proceed in forma pauperis on appeal harmless error. The <u>Chapman</u> court noted that "Rule 32(a)(2) does not merely inform a defendant of his right to appeal; it also tells him that he has a right to appointed counsel if he cannot afford retained counsel for the appeal," and remanded the matter for an evidentiary hearing on the question whether the petitioner was aware of both his right to appeal <u>and</u> his right to appointed counsel if unable to afford a retained attorney on appeal. <u>See also</u> <u>Lavender v. Hopper</u>, 548 F.2d 1165, 1166 (5th Cir. 1977) (state habeas case, noting approvingly that district court had granted new state appeal to petitioner where state conceded that he was not advised of right to be represented by court-appointed counsel on appeal); <u>Robinson v. Henderson</u>, 316 F. Supp. 1241, 1244 (E.D. La. 1970) (stating in dicta that "Rule 32(a)(2) of the Federal Rules of Criminal Procedure . . . requires a federal trial judge to personally advise criminal defendants, after sentencing, of their right to appeal, and if indigent, to appointment of appellate counsel.").

Although the Second Circuit's statements in <u>Smith</u> that its holding applies to federal as

---

[35]    <u>Solomon</u> did not cite <u>Williams</u> for any issue relevant here, but for its discussion of the degree of deference owed to a state court's findings of fact when reviewing a habeas corpus petition filed by a state prisoner.

well as state courts are technically dicta, it is the general practice of this Court to follow the dicta of the Second Circuit in the absence of clear countervailing authority. Cf. Lewis v. Sava, 602 F. Supp. 571, 573 (S.D.N.Y. 1984) ("This court need not decide whether the [Supreme Court's] statement . . . is dicta. Even if it is, in the absence of any clear authority to the contrary, the court is obliged to follow it."). Moreover, regardless of its non-binding nature, the Second Circuit's conclusion in Smith that the obligation to inform criminal defendants of their right to appointed counsel on appeal if indigent applies to federal as well as state courts is highly persuasive on the merits. The only remotely plausible argument of which the Court can conceive in support of the position that federal courts should be exempted from the Smith rule is premised on the fact that Smith relies on Douglas v. California, which derived the right of an indigent state court defendant to court-appointed counsel on direct appeal from the Equal Protection Clause of the Fourteenth Amendment. Because the Fourteenth Amendment does not apply directly to the federal government, it might be argued that federal courts are not subject to the holdings of Douglas and Smith. However, it is well established that although the text of the Fourteenth Amendment refers only to the States, the Equal Protection Clause is applicable to the federal government via incorporation through the Due Process Clause of the Fifth Amendment. Bolling v. Sharpe, 347 U.S. 497, 499 (1954); Skelly v. Immigration & Naturalization Serv., 168 F.3d 88, 91 (2d Cir. 1999). As the Second Circuit recognized, there is thus no constitutionally defensible reason to exclude the federal judiciary from the rule announced in Smith. Thus, if this Court failed to properly advise Mr. Munoz of his right to court-appointed counsel at sentencing, it would appear that his rights under the Fifth and Fourteenth Amendments were thereby violated.

In light of the foregoing, some explanation is appropriate for having written that the

Court's "failure to expressly advise Mr. Munoz of his right to court-appointed counsel on appeal was <u>arguably</u> erroneous," and that "at least in this Circuit, federal district courts <u>may</u> have an obligation to inform a defendant . . . of his right to obtain court-appointed appellate counsel at no cost to himself." <u>Supra</u> (emphasis added). The Court is troubled by the conclusion that the notification to the defendant as required by Rule 32(j)(1)(B) of the Federal Rules of Criminal Procedure was constitutionally infirm and notes that, <u>Smith</u> notwithstanding, there is a basis for concluding that it was not.

<u>Douglas v. California</u>, regarded as the genesis of the requirement that an indigent defendant be advised of his right to court-appointed appellate counsel, did not confront that issue at all. The requirement that he be thus advised was, <u>Smith</u> decided, "the only practical, logical and fair interpretation to be given to <u>Douglas v. California</u>." 417 F.2d at 654. It is interesting to note that the <u>Smith</u> court makes reference to rules adopted by the four Appellate Divisions of the New York Supreme Court in 1968, <u>id.</u> at 653 n. 5 (citing 22 N.Y.C.R.R. §§ 606.5; 671.3; 671.5; 821.2; 821.3; 1022.13 (1968)), and to Rule 32 of the Federal Rules of Criminal Procedure as amended in 1966, <u>id.</u> at 653 n. 6, all ostensibly enacted in response to <u>Douglas</u>, decided in 1963, yet none of which explicitly requires the indigent defendant to be notified at sentencing of his right to court-appointed appellate counsel. The relevant part of 22 N.Y.C.R.R. § 606.5(b) directs assigned or retained counsel, immediately after sentence is pronounced, to advise the defendant in writing of his right to appeal, to obtain a transcript of the testimony, and for the right of a person unable to pay the cost of appeal to apply for leave to appeal as a poor person, while section 606.5(c) directs the court to advise a defendant who has appeared <u>pro se</u> of his right to appeal and if unable to pay the cost of an appeal to apply for leave to appeal as a poor person.

Rule 32, as previously noted, requires the court to advise the defendant of his right to appeal and of the right to apply for leave to appeal in forma pauperis if he is unable to pay the cost of an appeal. Notwithstanding <u>Smith</u>'s suggestion to the contrary, none of these rules contain any explicit reference to advising a defendant of the right to obtain court-appointed counsel on appeal.

In light of these observations, two questions beg to be answered:

1.  Why, given <u>Douglas</u> and given <u>Smith</u>, has Rule 32 of the Federal Rules of Criminal procedure not been amended to instruct district court judges to advise indigent defendants at the time of sentencing that they have the right to appeal in forma pauperis and have the costs of an appeal waived <u>and</u> that they have the right to court appointed counsel?

2.  Why hasn't <u>Smith</u> even been cited by the Court of Appeals for the Second Circuit since 1974?

Perhaps the answer to both questions is in footnote 3 in Judge Mulligan's dissent in <u>Williams</u>, which reads in part:

> While the term *"<u>in forma pauperis</u>"* initially referred only to the right to sue "without liability for costs" (Black's Law Dictionary 895 (Rev. 4th ed. 1968)), the term has assumed a much broader meaning since <u>Douglas</u>. Rule 32(a)(2) of our own Rules of Criminal Procedure provides that the court "shall advise the defendant of his right to appeal and of the right of a person who is unable to pay the cost of an appeal to apply for leave to appeal <u>in forma pauperis</u>." The rule does not mention free counsel.

487 F.2d at 1019 n. 3 (Mulligan, J., dissenting). <u>Williams</u> raises yet another question—was this Court's advice that "if you cannot afford to pay for the cost of an appeal" the "linguistic equivalent" of an instruction that Mr. Munoz had the right to appeal "as a poor person" and therefore "in forma pauperis," which as noted above, <u>Williams</u> held to include the right to court-

appointed counsel?  See id. at 1013 ("it must be noted that an appeal 'as a poor person' is roughly the linguistic equivalent of an appeal in forma pauperis.") (majority opinion).  If so, an argument might be made that the Court's instruction properly advised Mr. Munoz of his rights under Rule 32 and the Constitution.  Nevertheless, the Court will presume on the basis of Smith that it is obliged to inform criminal defendants at sentencing of the right to court-appointed counsel on appeal.

### b.    Analysis of This Court's Instruction to Munoz at Sentencing

Having concluded that the obligation to inform every criminal defendant of the availability of court-appointed counsel to indigent appellants applies to federal district courts within the Second Circuit, the Court must now determine whether its statement to Mr. Munoz at sentencing adequately discharged that obligation.  The Second Circuit's decision in Smith identified two "critical findings" which must be made in order to determine whether the petitioner's constitutional rights were violated:  "[w]as [the petitioner] indigent at the time he was sentenced by the New York State court?  And, was [the petitioner] informed or did he know prior to the expiration of his time to appeal that he could appeal without cost to himself and with counsel appointed by the state?"  Id. at 655.

In its brief response in opposition Mr. Munoz's petition, the Government argues, first, that there is no evidence that Mr. Munoz was actually indigent at the time of his sentencing, and second, that this Court's statement at Mr. Munoz's sentencing regarding his right to appeal was sufficiently clear to satisfy its obligation to advise him of his right to appointed appellate counsel.  These arguments are unpersuasive.  First, while the evidence in the record is inconclusive, it does offer some support for the conclusion that Mr. Munoz may have been

indigent at the time he was sentenced. As the petitioner points out, the government's assertion that "there is no support for the suggestion that [Mr. Munoz] is indigent" (Gov. Mem. at 40) at the time of sentencing overlooks the fact that the Probation Department calculated Mr. Munoz's net worth to be negative $11,442 in his Presentence Investigation Report (see Gov. Ex. L ("PSR") ¶ 54), and advised the Court on the basis of that conclusion that the petitioner would be unable to pay a fine. (Id. ¶ 57.) The government took no exception to the Probation Department's calculation of Mr. Munoz's net worth, and the petitioner argues that the government is now barred by the doctrine of judicial estoppel from denying his indigence; he also argues in the alternative that this Court's acceptance of the PSR's conclusions constitutes the law of the case on the issue of indigence. The Court need not resolve those arguments because it ultimately concludes that any error inherent in its instructions to Mr. Munoz was harmless. It is sufficient to note at this point that the financial investigation undertaken by the Probation Department in preparing Mr. Munoz's PSR offers support for his contention that he was in fact indigent at the time of his sentencing, such that the matter would need to be resolved at an evidentiary hearing if the Court found Mr. Munoz to be potentially entitled to relief on this claim.[36]

The record likewise suggests that Munoz was unaware of the fact that he could obtain court-appointed counsel to represent him on appeal. The government's assertion that the Court's

_____

[36] The Probation Department's assessment of Mr. Munoz's finances and its conclusion that he would be unable to pay a fine were based entirely on what Mr. Munoz reported and not on an independent investigation supported by documentation. It should also be recalled, as noted above, that shortly after learning of the warrant for Mr. Munoz's arrest, Mrs. Lopez removed the contents of several safe deposit boxes before the government agents who had taken the keys to those boxes during their search of Mr. Munoz's apartment could secure them. It is also the case, as noted above, that the docket of the underlying criminal action indicates that Mr. Munoz paid a $255 filing fee to the Second Circuit and did not make any application to have the cost of that appeal waived, despite this Court's clear instruction to him that he was entitled to make such application if he could not afford the cost of an appeal. Thus, while the government overstates the case in asserting that there is no evidence in support of Mr. Munoz's purported indigence, the evidence on that point is far from conclusive.

statement at sentencing was sufficient to clearly advise him of that fact is simply incorrect as a linguistic matter. The Court's reference to "the cost" of the appeal was, at best, ambiguous, and would not necessarily have informed a reasonable lay person that a court-appointed attorney could be obtained to represent him on a direct appeal of his conviction and sentence. This is unsurprising, because at the time of Mr. Munoz's sentence this Court understood Rule 32 to impose a duty only to advise the petitioner of the right to appeal without paying court costs if he were unable to do so, not to advise him of the right to court-appointed counsel for indigent appellants. Given that the Court did not intend to convey to Mr. Munoz the fact that he was entitled to seek court-appointed counsel on appeal in the event that he was unable to afford retained counsel, it is difficult to conclude that a reasonable person would have interpreted the Court's statement to include that information. Moreover, regardless of the objective clarity of the Court's instruction to Munoz that he could apply to have "the cost" of his appeal "waived," Mr. Munoz plausibly claims that he did not actually understand that right at the time, a claim which is lent credibility by Munoz's actions following his sentencing. Mr. Munoz did not request that the court appoint counsel to represent him on appeal, but instead retained Deters and Palomares. Even when his former attorney, Mr. Pizzi, advised him to find a New York lawyer to handle his appeal, Munoz remained with the Minnesota-based paralegal Deters and the Puerto Rico-based attorney Palomares, neither of whom he ever met or spoke to personally but both of whom he paid a remarkably low fee for his appeal.[37] Mr. Munoz's actions are entirely consistent with those of an individual who was unaware of his right to seek court-appointed appellate counsel if he were unable to afford the services of a private attorney.

---

[37] In support of his petition, Mr. Munoz submitted several billing statements and photocopies of money orders which appear to show that he paid Deters $5,000 for his services and Palomares $2,500. (See Munoz Ex. X.)

Notwithstanding the record's apparent corroboration of Mr. Munoz's claim that he was not aware of his right to court-appointed counsel, Ms. Hirsch's declaration informs the Court that Mr. Pizzi told her that he informed Munoz of his right to appointed counsel on appeal.[38] (Declaration of Andrea Hirsch, dated May 17, 2007 ("Hirsch Decl."), at 30.)  Munoz denies this (1st Munoz Decl. ¶ 8; 1st M. Lopez Decl. ¶ 7), and supports that contention with the letter that Pizzi sent to Mrs. Lopez on May 5, 2005.  (<u>See</u> Munoz Ex. Y.)  Pizzi's letter urged Mrs. Lopez to replace Deters and Palomares with "the best lawyer you can find in New York or elsewhere who knows about these issues."  (<u>Id.</u> at 1.)  The letter makes no reference to the right to court-appointed counsel, as might be expected if he had advised Mr. Munoz of that right prior to sending the letter.  If Mr. Pizzi informed Munoz of his right to appointed counsel, that fact would nullify any error committed by this Court in failing to fully advise Mr. Munoz of his appellate rights at sentencing.  <u>See</u> <u>Smith</u>, 718 F.2d 654 (<u>Douglas</u> requires an "unequivocal statement by the trial judge <u>or by counsel for the convicted defendant</u>" regarding right to appellate counsel) (emphasis added).  If the Court's failure to inform Munoz of his right to appointed counsel were not harmless error, an evidentiary hearing would need to be conducted at which the factual dispute between Munoz and Pizzi on this question could be resolved.

c.      **Harmless Error Analysis**

Although the Court may have erred in failing to adequately advise Mr. Munoz of his right to obtain appointed counsel on appeal if he was unable to afford an attorney, the record clearly establishes that any error in failing to advise him of that right was harmless for the obvious reason that Munoz <u>did</u> obtain duly licensed counsel, who filed a timely appeal on Mr. Munoz's

---

[38]      Ms. Hirsch's second-hand paraphrase of her conversation with Mr. Pizzi is clearly hearsay and would need to be supplemented by an affidavit or live testimony from Mr. Pizzi.

behalf.  The First Circuit reached the same conclusion in <u>Norton</u>, holding that although the federal district court's failure to inform the defendant of his right to court-appointed counsel on appeal was error, "the court's failure could not have injured petitioner, for retained counsel duly entered an appeal in this court."  435 F.2d at 843; <u>see also</u> <u>United States v. Chapman</u>, 448 F.2d 1381, 1388 n. 10 (3d Cir. 1971) (defendant was not prejudiced by district court's failure to advise him pursuant to Rule 32 of right to proceed in forma pauperis on appeal where defendant's trial counsel filed a timely notice of appeal and counsel was appointed to represent defendant on appeal).

In analogous circumstances, courts have repeatedly held that the failure to advise a defendant of the right to appeal his conviction or sentence is harmless error if the defendant had actual knowledge of that right.  For example, in <u>Peguero v. United States</u>, 526 U.S. 23, 26 (1999), the Supreme Court recognized that "[t]rial judges must be meticulous and precise in following each of the requirements of Rule 32 in every case."  However, because the petitioner had asked his attorney to file an appeal immediately after being sentenced, the Court affirmed the Third Circuit's dismissal of the petitioner's habeas action, concluding that because "petitioner had full knowledge of his right to appeal . . . the District Court's violation of Rule 32(a)(2) by failing to inform him of that right did not prejudice him.  The fact of the violation, standing alone . . . does not entitle petitioner to collateral relief."  <u>Id.</u> at 28.  Likewise, in <u>Soto v. United States</u>, 185 F.3d 48, 55 (2d Cir. 1999), the Second Circuit recognized that

> a sentencing court's failure to inform a defendant of his right to appeal does not automatically require vacatur of the sentence and remand for resentencing. Rather, if a petitioner actually took an appeal, waived his right to appeal, or had independent knowledge of his appellate right, then the petitioner has suffered no prejudice meriting collateral relief.

Peguero and Soto stand for the principle that where a district court fails to advise a defendant of his legal rights, that error will be held harmless and shall not constitute a basis for a subsequent collateral attack on the proceedings where the defendant has independent knowledge of those rights and either exercises or knowingly waives them. By analogy, a court's failure to advise a defendant of his right to counsel on appeal is harmless error if the defendant actually retains qualified counsel and perfects an appeal. It cannot be said, of course, that Mr. Munoz knowingly waived a right that he may not have been aware he possessed, but given that the purpose of the right to appointed counsel is simply to effectuate the defendant's right to meaningful appellate review of his conviction and sentence, there is no indication that Mr. Munoz was harmed by any constitutional violation inherent in this Court's failure to adequately advise him of his right to appointed counsel where he was ultimately able to obtain licensed counsel who filed a timely appeal on his behalf. This point is made more obvious by the fact that there is no form of relief that would be appropriate for the constitutional violation that Mr. Munoz arguably suffered. In the typical case in which a defendant has not been informed of his right to court-appointed counsel on appeal, the principal remedy ordered by the courts is that the defendant be permitted to take an out-of-time appeal of the underlying conviction and sentence and be granted the opportunity to demonstrate financial eligibility for court-appointed appellate counsel. See, e.g., Smith, 417 F.2d at 655; Williams, 487 F.2d at 1014-15; Lavender, 548 F.2d at 1166; Robinson, 316 F. Supp. at 1245. In this case, however, Mr. Munoz has already taken an appeal while represented by duly licensed counsel. Permitting him a second direct appeal or any other relief would be futile, precisely because he suffered no tangible injury from this Court's failure to advise him of the right to court-appointed counsel for indigent appellants.

Thus, assuming arguendo that Munoz would have qualified for appointed counsel on the basis of his purported indigence, the fact that he was able to obtain licensed counsel to represent him on appeal renders the Court's failure to advise him in unambiguous terms of his right to appointed counsel harmless error. Munoz does not allege that Palomares was not licensed to practice law New York or that he was not properly admitted to the bar of the Court of Appeals for the Second Circuit at the time he represented Munoz before that court. While he does contend that Palomares's representation of him fell below the minimum standard for effective representation imposed by the Sixth Amendment, that contention can be evaluated under the familiar rubric of <u>Strickland v. Washington</u> and is distinct from the issue presented here.[39] He is therefore entitled to no relief on the basis of the Court's error in failing to adequately advise him of the right to court-appointed counsel on appeal.

## 2.    Alleged Representation on Appeal by Non-Lawyer

Munoz also argues that his representation on appeal by Deters, a paralegal who is not licensed to practice law, was a per se violation of Mr. Munoz's Sixth Amendment right to counsel under the rule established by the Second Circuit in <u>Solina v. United States</u>, 709 F.2d 160 (2d Cir. 1983) (Friendly, J.) and its progeny. While he acknowledges that Palomares signed and submitted the appellate brief, Munoz contends that Palomares was paid $2500 to act as a "front" for Deters, who did all of the substantive legal work. Ms. Hirsch's declaration tells a slightly different story, however: according to her, Palomares informed her that he read the trial transcript, discussed the case with Deters, then reviewed and modified Deters's draft brief prior to filing it. (Hirsch Decl. at 27.)[40] Even accepting Mr. Munoz's allegation that Deters did all of

---

[39]    <u>See</u> Discussion Part II(B), <u>infra</u>.
[40]    Like her second-hand representation of her conversations with Mr. Pizzi, this portion of Ms.

the work on his appellate brief as true, that does not constitute a per se violation of Munoz's

Sixth Amendment right to counsel because Munoz was principally represented by Palomares and

was aware that Deters was not a lawyer.

Solina and United States v. Rondon, 204 F.3d 376 (2d Cir. 2000), cited by the petitioner,

stand for the proposition that where, "unbeknown to the defendant, his representative was not

licensed to practice law in any state, and the lack of such authorization stemmed from failure to

seek it or from its denial for a reason going to legal ability, such as failure to pass a bar

examination, or want of moral character," the unlicensed status of defense counsel constitutes a

per se violation of the defendant's Sixth Amendment right to counsel regardless of whether the

Strickland test is satisfied. Solina, 709 F.2d at 167. The Solina rule does not apply to this case

for two reasons. First, and most obviously, Palomares, not Deters, was Munoz's retained

counsel, and Munoz makes no allegation that Palomares is not duly licensed to practice law in

New York and admitted to the bar of the Court of Appeals for the Second Circuit. It is not at all

unusual for a licensed attorney to rely on a paralegal, a law student, or some other unlicensed

individual under his supervision for initial research and drafting of court documents. Second,

Solina makes abundantly clear that the per se rule recognized therein applies only to situations in

which the defendant was not aware of his attorney's unlicensed status. Even if Deters had been

Mr. Munoz's only legal representative, the petitioner waived his right to object to any Sixth

Amendment violation that may have arisen when he knowingly chose to retain Deters as a

provider of appellate legal services.[41]

---

Hirsch's declaration is inadmissible hearsay and would need to be verified by live testimony or a sworn statement from Mr. Palomares.

[41]     Munoz attempts to evade this point by arguing that a defendant cannot legally choose to be represented by a non-attorney; this is true but irrelevant. Although Munoz is correct that he could not legally choose

## B.     Palomares's Alleged Ineffective Assistance

In the alternative to the arguments discussed in Part II(A), Munoz argues that even if the Court holds that his right to appellate counsel was not violated, he should nevertheless be granted a new appeal because Palomares's representation of him fell below the minimum standard of professional competence required of counsel by the Sixth Amendment, as interpreted by Strickland v. Washington.  The Supreme Court has recognized that the right to effective assistance of counsel applies on a defendant's first direct appeal.  Evitts v. Lucey, 469 U.S. 387 (1985).[42]  Moreover, the Second Circuit has held that although appellate counsel need not raise every non-frivolous argument on appeal, a petitioner may prevail on an ineffective assistance of appellate counsel claim "if he shows that counsel omitted significant and obvious issues while pursuing issues that were clearly and significantly weaker."  Mayo v. Henderson, 13 F.3d 528, 533 (2d Cir. 1994); see also Evitts, 469 U.S. at 394 ("[T]he attorney need not advance every argument, regardless of merit, urged by the appellant, [b]ut the attorney must be available to assist in preparing and submitting a brief to the appellate court, and must play the role of an active advocate, rather than a mere friend of the court assisting in a detached evaluation of the appellant's claim.'").

---

to be represented on appeal by Deters or by any other individual who is not licensed to practice law or admitted to the Second Circuit bar, he certainly can waive a Sixth Amendment objection to any defect in the appellate proceedings that may have arisen from his decision to retain Deters as his representative.  See Solina, 709 F.2d at 167 n. 9.

[42]     Evitts involved a state prisoner's habeas corpus petition which alleged a violation of the right to effective assistance of counsel in a state appellate proceeding.  The Supreme Court held that the right to effective assistance of counsel provided by the Sixth Amendment to the federal Constitution, applied to the States via the Due Process Clause of the Fourteenth Amendment, entitles a criminal defendant to effective assistance of counsel on a first appeal as of right in a state appellate court.  Id. at 396 ("A first appeal as of right therefore is not adjudicated in accord with due process of law if the appellant does not have the effective assistance of an attorney.").  Although the question in Evitts arose in the context of a state court proceeding, the Sixth Amendment's right to effective assistance of counsel indubitably applies to federal defendants on direct appeal of their district court convictions as well.  See, e.g., Fleurissaint v. United States, Nos. 03 CR. 0906(RPP), 05 Civ. 9027(RPP), 2007 WL 102112, at *1 (S.D.N.Y. January 12, 2007) (citing Evitts).

The brief submitted by Palomares raised three points on appeal. First, he argued that the evidence introduced at trial was insufficient to prove that the bundles of cash discovered in the bag were the proceeds of narcotics trafficking; second, he argued that the evidence did not demonstrate beyond a reasonable doubt that Mr. Munoz personally knew that the money was derived from illegal activity; and finally, he argued that this Court's 6-level sentence enhancement pursuant to U.S.S.G. § 2S1.1(b)(1)(A) & (B)(i) was not reasonable because the evidence was insufficient to establish that Mr. Munoz was aware that the funds were derived from narcotics trafficking. Each of these arguments was rejected by this Court in response to Mr. Munoz's motions pursuant to Rules 29 and 33 of the Federal Rules of Criminal Procedure, and the Second Circuit affirmed Munoz's conviction and sentence "[s]ubstantially for the reasons given by the district court" in its opinion on those motions. United States v. Munoz, 167 Fed. App'x 850, 851 (2d Cir. 2006). Munoz argues that Palomares acted ineffectively in choosing to raise those relatively weak issues on appeal while failing to raise three other purported defects that Munoz contends would have offered stronger arguments in favor of reversing his conviction: first, that the government improperly exercised its peremptory challenges against prospective jurors on the basis of race, in violation of the Supreme Court's holding in Batson v. Kentucky, 476 U.S. 79 (1986); second, that this Court improperly admitted testimony from Agent Ammirati as an expert in criminal money laundering operations and that the government improperly relied on that testimony in summation; and third, that the Court improperly admitted the ion scan evidence which purportedly showed that the bag in which the money was transferred had been in direct contact with cocaine.

In opposition to this argument, the government cites the Supreme Court's observation that

"[e]xperienced advocates since time beyond memory have emphasized the importance of winnowing out weaker arguments on appeal and focusing on one central issue if possible, or at most on a few key issues," <u>Jones v. Barnes</u>, 463 U.S. 745, 751-52 (1983), and argues that Palomares's failure to raise the additional points noted in Mr. Munoz's Section 2255 petition does not constitute ineffective assistance on appeal because the issues omitted on appeal were no more compelling than the "logical and reasonable arguments advanced in the appellate brief." (Gov. Mem. at 47.)  However, the government's position is inconsistent with its characterization of the evidence against Munoz elsewhere in its memorandum of law and is not entirely responsive to Munoz's argument.[43]  Munoz does not advance the argument rejected by the Court in <u>Jones</u>– that appellate counsel is required to raise every conceivable non-frivolous argument– but rather argues that Palomares acted ineffectively by "winnowing" stronger, more potentially meritorious claims from his appeal in favor of weaker, more difficult ones.  That the three issues raised on appeal were relatively weak is evident both from this Court's disposition of those arguments in its ruling on Munoz's Rule 29 and 33 motions and in the Second Circuit's summary affirmation of Munoz's conviction and sentence for substantially the reasons stated in this

---

[43]     The government's assessment of the weight of the evidence introduced against Mr. Munoz at trial appears to fluctuate conveniently throughout its memorandum of law depending on the context of the discussion. For example, in its initial statement of facts, the government describes the evidence introduced at trial as "overwhelming" (Gov. Mem. at 8), and subsequently argues that Munoz was not prejudiced by any of the alleged errors because "given the suffocating evidence presented, one cannot reasonably say that the result of the proceeding was fundamentally unfair or unreasonable." (<u>Id.</u> at 36.)  However, when arguing that Pizzi's alleged advice to Munoz to go to trial rather than plead guilty was not ineffective assistance even if it occurred, the government asserts that such advice was not objectively unreasonable because it "would have reflected a rational and reasonable judgment that the evidence was not sufficient to prove to a jury the Petitioner's guilt beyond a reasonable doubt," (<u>id.</u> at 31), and, as noted above, disputes Munoz's assertion that his appellate counsel focused on weak issues by describing the arguments in Munoz's appellate brief as "logical and reasonable." (<u>Id.</u> at 47.)  It also argues that "the meritorious claims raised" before the Second Circuit "suggest" that Mr. Munoz was not deprived of qualified counsel even if the work on his appeal was performed primarily by Deters. (<u>Id.</u> at 41.)  The principle underlying the government's assessment of the evidence appears to be that the evidence introduced against Munoz at trial was overwhelming, except in any context in which that fact would be beneficial to the petitioner.

Court's order.  The second step of the analysis, inquiring whether the three issues that were not raised on appeal were substantially stronger than the issues that were raised, requires a closer examination of each of the three omitted issues.

### 1.    The __Batson__ Issue

Munoz argues that Palomares acted ineffectively in failing to raise on appeal the government's alleged violation of the Supreme Court's ruling in Batson v. Kentucky, 476 U.S. 79 (1986), by striking several prospective minority jurors on the basis of their race.  Because the Batson issue is not stronger than the issues that Palomares raised on appeal, he was not ineffective in failing to pursue it before the Second Circuit.

The putative Batson issue to which Munoz refers arose as follows.  During jury selection in Mr. Munoz's trial, one of the first twelve jurors to be called was Sylvia Jones, an African American woman.  (See Tr. at 16.)  During voir dire, Ms. Jones informed the Court that she was employed as a "tech" and had a high school education.  (Id. at 38.)  The government used its first peremptory challenge to strike Ms. Jones, and Mr. Pizzi raised a Batson objection.  (Id. at 52.) The Court overruled the objection, stating "[i]f there's an occasion, Mr. Pizzi, for you to raise a Batson inquiry, do it.  I don't think it's appropriate to do it at this point."  (Id.)  Jury selection proceeded, and several rounds later prospective juror Yudonna Campbell, an African American woman who worked as a home health aide and had just completed her first semester at ASA, a college,[44] was added to the panel.  (Id. at 70-71.)  At one point during the voir dire, Ms. Campbell's voice apparently lowered, prompting the Court to advise her to keep her voice up. (Id. at 71.)  Ms. Campbell initially indicated that she had served on a jury before, but later

---

[44]      Though the record is silent on the matter, the Court's examination of ASA's website at http://www.asa.edu indicates that "ASA" is not an acronym but is the full name of the institution.

clarified that she had been called for service but was not selected to serve.  (Id.)  When the

government exercised a peremptory challenge to strike Ms. Campbell, Mr. Pizzi again raised a

Batson objection, asking for a race-neutral reason for the government's decision to strike Ms.

Campbell and several other minority jurors.  It will be useful to quote the transcript of the

discussion at length:

> MR. PIZZI:  At this point I'm going to ask for a reason under Batson.  There's
> been a pattern of the government striking minorities from the jury, first strike was
> Sylvia Jones, African-American female.  They struck a number of Latinos.  Now
> Ms. Campbell is being struck.  At this point there's a pattern of striking minorities
> from this jury.  I would ask for your inquiry.
> MS. McDERMOTT:  I don't think he's proffered.
> THE COURT:  Do you have some reason?
> MS. McDERMOTT:  For this particular juror, it appears she's having some
> difficulty speaking.  The government felt she's not very bright, part of our
> argument in this case is going to be about why the defendant knew that he was
> involved in a drug conspiracy.  Another aspect of this case is the ion mobility test,
> which would be quite involved, involves a lot of chemistry.  We would like jurors
> who understand.
> MR. PIZZI:  Before the court rules, I think that's not a good reason.  I'm
> concerned about singling out an African American juror who answered one
> question as not being bright enough to serve on the jury.
> THE COURT:  Your objection is denied.  Go on.

(Id. at 72.) [45]

Mr. Munoz offers no credible basis for his assertion that he would have been more likely

to prevail on the Batson claim than on any of the other issues raised on appeal.  As the Supreme

Court has explained, a Batson inquiry proceeds in three stages:

> [f]irst, a defendant must make a prima facie showing that a peremptory challenge
> has been exercised on the basis of race[; s]econd, if that showing has been made,
> the prosecution must offer a race-neutral basis for striking the juror in question[;
> t]hird, in light of the parties' submissions, the trial court must determine whether
> the defendant has shown purposeful discrimination.

---

[45]    The fact that the jurors in question were members of two distinct racial groups is not an
impediment to a successful Batson challenge.  See Green v. Travis, 414 F.3d 288, 298 n. 5 (2d Cir. 2005).

Snyder v. Louisiana, 128 S. Ct. 1203, 1207 (2008) (quoting Miller-El v. Dretke, 545 U.S. 231, 277 (2005) (Thomas, J., dissenting) (alterations in Snyder)); see also United States v. Brown, 352 F.3d 654, 660 (2d Cir. 2003).  As the Court noted in Snyder, deference to the trial court′s determination of a Batson issue is "especially appropriate where a trial judge has made a finding that an attorney credibly relied on demeanor in exercising a strike."  Id. at 1209; see also Batson, 476 U.S. at 98 n.21 ("Since the trial judge's findings in the context under consideration here largely will turn on evaluation of credibility, a reviewing court ordinarily should give those findings great deference."); Jordan v. Lefevre, 206 F.3d 196, 200 (2d Cir. 2000) (citing Batson).

It should be noted as an initial matter that, notwithstanding this Court's direction to the government to provide a race-neutral basis for its decision to strike Ms. Campbell, a review of the record raises a substantial question whether Mr. Pizzi's second Batson objection actually established a prima facie showing that the government was exercising its peremptory challenges on racial grounds.  After denying his Batson objection to the government's challenge to Ms. Campbell, the Court observed that "I would like the record to reflect, Mr. Pizzi, when Ms. Jones . . . was challenged, there were two black jurors on this jury.  If that's a challenge, it was just a matter of gratuity."  (Tr. at 82.)  While the record does not reflect who the other African American juror was, the Court's comment suggests that the government was not exercising its peremptory challenges in a manner calculated to exclude all minority jurors from the panel.  Moreover, although Mr. Pizzi asserted in his objection that the government had struck a number of Latino panel members, the ethnicities of the prospective jurors that the government struck are not indicated in the trial record, making it impossible to determine how many of the three

prospective jurors struck by the government between Jones and Campbell[46] were in fact

Hispanic. However, while the Court might reasonably question in retrospect whether Mr. Pizzi

established even a prima facie appearance of a pattern of racially discriminatory peremptory

challenges on the part of the government, that question is moot for present purposes. In cases

such as this one where the Court demanded a race-neutral explanation from the government for

its decision to strike the juror in question, subsequent review need not examine whether the

defendant established a prima facie showing that the government's peremptory challenge was

based on race. The Supreme Court has recognized that "[o]nce a prosecutor has offered a race-

neutral explanation for the peremptory challenges and the trial court has ruled on the ultimate

question of intentional discrimination, the preliminary issue of whether the defendant had made a

prima facie showing becomes moot." <u>Hernandez v. New York</u>, 500 U.S. 352, 359 (1991); <u>see</u>

<u>also</u> <u>Brown</u>, 352 F.3d at 660 (quoting <u>Hernandez</u>).

Munoz argues that the <u>Batson</u> argument was a strong one for three reasons: first, nothing

in the record indicates that Ms. Campbell was of lower intelligence than several other jurors who

had less education than Campbell, whom the government did not challenge; second, the

government's contention that the case involved "a lot of chemistry" was false; and third, the

Court could have undertaken more questioning of Campbell in order to determine her

intelligence rather than deny Mr. Pizzi's objection outright. None of these arguments would

indicate a likelihood of reversal had the issue been raised on appeal. While Mr. Munoz is correct

---

[46]     In the first five rounds of jury selection, the government used its peremptory challenges to strike
Sylvia Jones (Tr. at 52), Faye Breuer (<u>id.</u> at 57); Robert Ludwig (<u>id.</u> at 62); Ibrahim Georges (<u>id.</u> at 67); and
Yudonna Campbell (<u>id.</u> at 72). During the same five rounds, Mr. Pizzi exercised peremptory challenges against
prospective jurors Kenneth Kearey (<u>id.</u> at 52), Efrain Vigo (<u>id.</u> at 53), Meyer Nelkenbaum (<u>id.</u> at 57), Thomas
Baldante (<u>id.</u>), Jane Steiner (<u>id.</u> at 62), Joseph Ragone (<u>id.</u>), Stephanie Holmes (<u>id.</u> at 67), Rebecca Brill (<u>id.</u>), and
George Orlando (<u>id.</u> at 73).

that Ms. Campbell's purported lack of intelligence is not immediately evident in the trial

transcript, such characteristics may be readily apparent even on the basis of the brief interaction

between the Court and the prospective juror in voir dire, yet impossible to discern on the basis of

a cold transcript alone.  It is for this reason that the authorities cited above prescribe deference to

the trial judge's findings of credibility and demeanor in assessing a <u>Batson</u> objection.  Moreover,

the fact that Ms. Campbell had completed one semester of college does not necessarily indicate

that she was not less intelligent than other jurors with less education, nor does it call into

question the validity of the Court's implicit finding that the government's proffered race-neutral

basis for its peremptory challenge of Ms. Campbell was credible on the basis of her observed

demeanor.  Second, a cursory review of Paul Radwanski's testimony regarding the operation of

the ion mobility spectrometer that was used to test Mr. Munoz's bag for cocaine demonstrates

that the government's case did, as the government stated, involve a substantial amount of

chemistry such that the government might reasonably have been concerned that a juror of below-

average intelligence would be unable to comprehend it.  (<u>See</u> Tr. at 511-52; <u>supra</u> Discussion

Part I(B)(2).)  Finally, while it is true that the Court could have undertaken additional

questioning of Ms. Campbell in order to test the government's assertion that she was not

sufficiently intelligent to serve on the jury, Mr. Munoz cites no authority suggesting that the

Court was under any obligation to do so when its own observation of Ms. Campbell's demeanor

confirmed the government's characterization of her intelligence and therefore the legitimacy of

its proffered race-neutral justification for striking her.[47]  Thus, there is no reason to believe that

---

[47]      A reading of the "cold" transcript at best "through a glass darkly" reveals the prescience of Justice
Marshall, who, although concurring in <u>Batson,</u> advocated "eliminating peremptory challenges entirely."  476 U.S. at
103 (Marshall, J., concurring).  Almost 20 years later, Justice Breyer, concurring in <u>Miller-El v. Dretke</u>, 545 U.S.
231, 268 (2005) (Breyer, J., concurring), echoed Justice Marshall's view, remarking on the "inevitably clumsy fit

the Batson issue would have enjoyed any more success on appeal than the issues that Palomares raised, and Palomares was therefore not ineffective in declining to present the Batson issue for review.

### 2.    Admissibility and Use of Agent Ammirati's Expert Testimony

The second issue that Mr. Munoz alleges was improperly omitted from his direct appeal concerns the purportedly erroneous admission of expert testimony from Agent Christopher Ammirati of the United States Department of Homeland Security's Division of U.S. Immigration and Customs Enforcement, who testified as an expert witness regarding the methods and practices commonly employed in the laundering of drug proceeds, and the government's allegedly improper reliance on that testimony during its summation.  Mr. Munoz's memorandum of law conflates these two points into one, referring to the issue as "[t]he court's allowing Ammirati's testimony."  (Munoz Mem. at 22.)  However, as is apparent below, the legal analysis of the admissibility vel non of Agent Ammirati's expert testimony and of the propriety of the government's reliance on that testimony in its summation are quite different.

The first prong of Mr. Munoz's argument, that Mr. Palomares was ineffective in failing to argue on appeal that Agent Ammirati's testimony was not admissible pursuant to Federal Rule of Evidence 702, is patently meritless and warrants only a brief discussion.  Likewise, the second piece of Mr. Munoz's argument, which asserts that the government's reference to Agent Ammirati's testimony constituted impermissible "mirroring" of that testimony— i.e., arguing that Mr. Munoz was guilty of money laundering because some of his actions resembled the actions of unrelated individuals in other cases that Agent Ammirati described as typical of money

---

between"  objectively measuring the Batson prerequisites and the "substantive decisionmaking" that must necessarily follow.

launderers— fails to raise a colorable claim of ineffective assistance because a review of the relevant Second Circuit precedent demonstrates that the government did not rely on Agent Ammirati's testimony in any impermissible way in its summation.

> **a.**    **Ammirati's Testimony and the Government's Summation**

In a letter dated September 22, 2004, the government informed Mr. Pizzi that it intended to call Agent Ammirati to testify as an expert witness at Munoz's trial.  (See Munoz Ex. A.)  On September 29, 2004, Pizzi submitted a motion in limine to exclude Ammirati's testimony on the basis of Federal Rules of Evidence 702 and 403.[48]  Pizzi argued that Agent Ammirati's proposed testimony could not meet the criteria for admissibility set forth by the Supreme Court in Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579 (1993), and that given the simplicity of the case against Munoz, Agent Ammirati's testimony would be unhelpful to the jury and would "create an appearance that the 'expert' is placing his stamp of approval on the government's case."  (Munoz Ex. B at 4.)  In an unpublished ruling issued on October 1, 2004, the Court denied the motion to preclude Agent Ammirati's testimony, noting that "[e]xpert testimony on overall money laundering schemes and techniques has been recognized as properly admissible pursuant to Fed. R. Evid. 702."  United States v. Munoz, 04-CR-473 (ILG), at 2 (E.D.N.Y. filed October 6,

---

[48]    Federal Rule of Evidence 403 ("Rule 403") states that relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."  Mr. Pizzi's motion in limine also cited Federal Rule of Evidence 703 ("Rule 703"), which states that

> [t]he facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing.  If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence in order for the opinion or inference to be admitted.  Facts or data that are otherwise inadmissible shall not be disclosed to the jury by the proponent of the opinion or inference unless the court determines that their probative value in assisting the jury to evaluate the expert's opinion substantially outweighs their prejudicial effect.

However, it is not entirely clear how Rule 703 is relevant to the arguments set forth in Mr. Pizzi's motion papers.

2004).[49]

After reviewing his qualifications and being received by the Court as an expert on money laundering, Agent Ammirati testified as to the standard characteristics of a narcotics money laundering organization. Among other things, Agent Ammirati described the "stash houses" in which drug proceeds are stored by drug dealers and prepared for laundering (Tr. at 134), usually by being bundled with rubber bands (id. at 144), and explained that after the money is counted and bundled in the stash house, "it is usually put in a box or a duffel bag, a knapsack, a shopping bag or a suitcase" to be moved from the stash house and transferred to the next link in the laundering chain. (Id. at 136.) He also testified that individuals operating in the drug sales side and the money laundering side of the drug trafficking operation will often not know each other, but will recognize each other by code names passed to them from their superiors in the organization.[50] Over an objection from Mr. Pizzi, Agent Ammirati explained that individuals engaged in the laundering of drug money never refer directly to money itself, but "like to say shirts or rent or something like that" as a coded reference to drug money so as to avoid government surveillance and retain deniability in the event of prosecution. (Id. at 139.) He further explained that money launderers typically use prepaid cellular telephones to coordinate their transactions (id.), in addition to public pay phones, calling cards, beepers, and calling centers (id. at 140), and that in making arrangements for a transfer, the parties to a money laundering transaction "will briefly speak on the phone, set up a time, a location, and the amount

---

[49] A copy of the Court's unpublished order was attached to Mr. Munoz's petition as Exhibit F.

[50] (Id. at 137 ("What will happen is once they agree upon a contract, the narcotics trafficker overseas and the money broker overseas will pass a code to the narcotics trafficker, will pass the code to the narcotics organization here in New York. The money broker will pass the same code to the . . . money launderer here in New York. Then they will contact each other. Normally through a prepaid cell phone, and the conversation will occur where they will say, I am calling on behalf of so and so. Then they will know that they are speaking about the same organization.").)

of money that's to be moved and then that's usually the— the entirety of the conversation." (Id. at 141.) When the transfer takes place, Agent Ammirati explained that "[n]ormally what will happen is . . . the narcotics trafficker will go to the trunk of his vehicle . . . and pull out that bag . . . and hand it to the money launderer who will then put it in the trunk of his vehicle and just drive away." (Id. at 143-44.) Agent Ammirati also testified that a scheduled money transfer is sometimes called off or changed when the money launderers arrive at the agreed-upon location, explaining that the parties to the transaction "just might not feel comfortable" with the situation at the arranged location.

> They might pick up surveillance or countersurveillance. They might see other law enforcement in the area. It really just comes down to comfort level. If they don't feel comfortable they won't transfer it there. Normally what we have seen in the past [is] if they see something they don't like, they will normally just move the location a little bit to where they feel more comfortable.

(Id. at 142.)

In its summation, the government referred to Agent Ammirati's testimony several times in a manner clearly calculated to highlight the parallels between Mr. Munoz's conduct and that of the "typical" money laundering operation described in the agent's testimony. For example, after asking rhetorically "how else do we know that the cash here came from the sale of drugs," the government exhorted the jury to "remember the testimony of Agent Ammirati. He testified about how narcotics traffickers often store and count money in the same location where the drugs are, and then they bundle the money using rubberbands or other methods." (Id. at 646.) Commenting upon Munoz's use of prepaid cellular telephones, the government reminded the jury that "as Agent Ammirati testified, these phones are popular among people who are engaged in money laundering activities because you can just walk into a store, you don't have to give any

identifying information or you can lie, and they will give you a phone." (Id. at 660-61.)
Discussing the instances in which Munoz changed the location of the money transfer, the
government reminded the jury that "Agent Ammirati testified that if these individuals who are
moving money are not comfortable, they tend to move the operation a few blocks away. And
that happened in this case." (Id. at 666.) It further noted, in reference to the alleged use of code
names in the telephone conversations between Munoz and the case agents, that Agent Ammirati
"testified that exactly the sort of code is what is sent up from Columbia– South America so that
the individuals working for a money laundering group can identify the individuals who are
working for the drug side of the group."[51] (Id. at 668-69.) In support of its argument that Munoz
was aware that the funds in his possession were the proceeds of illicit drug sales, the government
pointed out that Munoz insisted on meeting the agents in a public place for the transfer, and
reminded the jury that "[a]s Agent Ammirati testified, these individuals who are interested in
laundering drug proceeds meet on street corners and other public places." (Id. at 674.) As
further evidence of Mr. Munoz's knowledge, the government argued that it is unlikely that a drug
cartel would entrust $500,000 to a man who was not aware of the nature of the organization, and
urged the jury to infer that "[s]omeone gave this man, the defendant, the 500,000 dollars and he
was entrusted, just as Agent Ammirati testified, he was entrusted to deliver that cash safely to a
person he thought was one of the co-conspirators so that that cash could be put in the bank." (Id.
at 676.) Shortly thereafter, the government again invoked Agent Ammirati's testimony for the
purpose of placing Mr. Munoz's role within the larger context of the typical money laundering

---

[51] This characterization of Agent Ammirati's testimony was not entirely accurate. Agent Ammirati testified that most of the cocaine in the United States is produced in "South America" (id. at 133), and that the identification codes are agreed upon by the narcotics trafficker and money launderer "overseas" and transmitted to the couriers in New York (id. at 137-38), but he did not specifically identify Colombia as the source of the drugs or the codes.

ring:

> [MS. McDERMOTT:]   Just remember, when Agent Ammirati testified, he
> testified about the fact that after the drugs are sold in New York, in the United
> States, that money needs to get back down to South America.  As that money
> travels along through all the people that were involved in that process, one of
> whom is someone like Mr. Munoz, who transfers the money to another individual
> who in this instance put it in the bank– each one [of] those people, ladies and
> gentlemen, takes a percentage of that money.
> MR. PIZZI:     Objection.
> THE COURT:  Sustained.

(Id. at 677.)

In rebuttal, the government cited Agent Ammirati's testimony several more times.  (See

id. at 714 ("You heard testimony about how these money-pickup meetings happen:  An

identifying code is passed to the caller.  Agent[s] Ammirati, Herrera and Cruz all testified to

that."); 717 ("Just to be clear, this case is about the defendant arranging for the delivery of drug

money.  That's where drug [sic] comes in, drug money, specifically $500,000.  The ion-scan

results demonstrate this to you, and you've heard from witnesses Ammirati, Cruz and Herrera

about how pickups occur for narcotic proceeds."); 718 ("You heard from Special Agent

Christopher Ammirati and the two undercover agents, Herrera and Cruz.  Money launderers fear

having their conversations taped.  They do not want to alert law enforcement that they are

committing crimes.  All of the government's witnesses testified to that.").)  Near the conclusion

of its rebuttal, the government compared the facts of Mr. Munoz's case to the characteristics of a

money laundering ring as described by Agent Ammirati, drawing an objection from defense

counsel which was overruled:

> [MS. MELE:]  Now, the defense also talked about several of the government
> witnesses, and one of them I would like to talk to you about right now, Agent
> Ammirati.  Let's talk about what he said.  He was called as an expert for the
> government, and you heard his qualifications.  He said he investigated thousands

of cases, and he told you about how these narcotic transactions occur. He based his testimony on his very deep understanding of how money-laundering operations work, specifically narcotics money-laundering operations. He told you that he listened to wiretaps and telephone calls during his career, several hundred.
MR. PIZZI: Objection.
THE COURT: Overruled.
MS. MELE: He interviewed hundreds of people involved in money-laundering proceeds. He told you that. That's how he came to testify. And he told you about the codes. The government encourages you to have portions of the testimony read back.

(Id. at 721-22.)

### b.  Analysis of Munoz's Ineffective Assistance Claims

### i.  Admissibility of Agent Ammirati's Testimony

The Court need not discuss at length Mr. Munoz's first argument, that expert testimony regarding money laundering operations was improperly admitted under Rule 702. Such testimony is clearly admissible.

The Second Circuit has held that expert testimony regarding the practices of drug trafficking operations is admissible "where the subject matter of the testimony is beyond the ken of the average juror." United States v. Castillo, 924 F.2d 1227 (2d Cir. 1991). While the general standard for admissibility under Rule 702 as articulated by Castillo is rather vague, ample authority within the Second Circuit demonstrates the admissibility of Agent Ammirati's testimony regarding the practices of money laundering transactions in a drug trafficking operation. For example, in United States v. Ortiz, 112 F.3d 506 (2d Cir. 1997) (Table), the defendant was charged, inter alia, with laundering the proceeds of narcotics transactions. The district court rejected the defendant's challenge to the admission of expert testimony of an IRS agent who testified to

the complex statutory and regulatory requirements imposed by the currency

transaction reporting laws; the meaning of financial structuring, as well as the methods by which it is accomplished; and the common methods of money laundering, including the use of numerous individuals to make multiple, small currency transactions, the purchase, use, and shipment of money orders to overseas black markets, and the use of money remitters and stash houses.

Id. at **5. Affirming the conviction, the court concluded that "[b]ased on the complexity of these subjects, we have no difficulty concluding that [the agent's] testimony covered topics, and described unlawful operations, having 'esoteric aspects reasonably perceived as beyond the ken of the jury.'" Id. (quoting United States v. Cruz, 981 F.2d 659, 664 (2d Cir. 1992)). Likewise, in United States v. Tapia-Ortiz, 23 F.3d 738, 741 (2d Cir. 1994), the court affirmed the admissibility under Rule 702 of a Drug Enforcement Administration agent's expert testimony regarding, inter alia, "the technique of using codes with beepers to signal the identity of the caller, and the use of cash and nicknames or false names by drug traffickers."[52] See also United States v. Nektalov, No. S2 03-CR-828 (PKL), 2004 WL 1469487, at *3 (S.D.N.Y. June 30, 2004) (holding testimony of I.R.S. Special Agent Brendan Clarke admissible under Rule 702 in a money laundering trial where "Agent Clarke would describe the regulatory framework that exists to combat money laundering, and would describe some of the ways money launderers attempt to avoid this framework, including how the purchase and smuggling of gold can be used to launder drug money so as to promote further narcotics trafficking."); United States v. Jobin, 327 F. Supp. 2d 310, 312 (D. Vt. 2004) (In trial of commercial truck driver charged with marijuana smuggling, proffered expert testimony regarding the fact that drug smugglers often pay truck

---

[52] The Tapia-Ortiz court expressed some reservation based on the fact "that the Agent's testimony regarding traffickers' use of cash and nicknames in order to conceal their identities has a common sense aspect to it." Id. In this case, however, the use of code words to avoid explicit reference to cash or money laundering operations is a more "esoteric" practice than the mere use of nicknames, as is the use of pre-arranged code names determined by higher-ranking officers in the drug trafficking operation and passed through the organizational hierarchy.

drivers to carry drugs "is sufficiently esoteric to be beyond the ken of the average juror" and therefore admissible under Rule 702).

Agent Ammirati's testimony, which pertained to the same or similar topics as that of the expert witnesses in the cases cited above, was therefore clearly admissible under Rule 702, and Mr. Palomares was therefore not ineffective in failing to raise the issue of its admissibility on appeal.

### ii.    Government's Use of Agent Ammirati's Testimony in Summation

While the issue of the admissibility of Agent Ammirati's testimony is a simple one, the question whether the government relied on that testimony in an improper manner during its summation requires a more detailed analysis.  Mr. Munoz contends that the testimony was inappropriate under the Second Circuit's rulings in United States v. Castillo, 924 F.2d 1227 (2d Cir. 1991), and United States v. Cruz, 981 F.2d 659 (2d Cir. 1992), both of which stand for the principle that even where expert testimony is admissible under Rule 702, the government is not permitted to "corroborate" the testimony of its fact witnesses by pointing to parallels between their testimony regarding the defendant's conduct and the expert's description of the usual practices of a criminal enterprise, Castillo, 924 F.2d at 1234, or to argue that the defendant is guilty of the crime charged because the behavior described by the government's fact witnesses "mirror[s]" the expert witness's description of the typical practices of criminal organizations. Cruz,  981 F.2d at 664.

In Castillo, the defendants were charged with four counts relating to the possession and distribution of cocaine, one of which involved the illegal use of a firearm in connection with drug trafficking.  At trial, the government introduced the testimony of an expert witness,

Detective Hector Santiago, regarding the practices of cocaine distributors in the Washington Heights neighborhood of Manhattan. Detective Santiago testified "to the typical operating methods of Washington Heights drug dealers, describing their work apartments and the materials typically found within these apartments, including scales, tinfoil, plastic sandwich bags, plastic playing cards and guns." Id. at 1231. He also testified that drug dealers in that neighborhood sometimes forced potential buyers to snort cocaine in the dealer's presence for the purpose of exposing undercover law enforcement officers. In its summation, the prosecution asserted that the similarity between Detective Santiago's description of the common practices of Washington Heights drug dealers and the government's fact witnesses' description of the defendants' conduct corroborated the fact witnesses' accounts and demonstrated the defendants' guilt. The government argued that "the defendants in this case acted the way <u>every</u> good drug dealer in Washington Heights acts in the normal course of events," and also that an undercover officer's testimony that the defendants forced him at gunpoint to snort cocaine as part of a drug transaction "r[ang] true" in light of Detective Santiago's testimony that this practice was common among drug dealers. Id. at 1234. On appeal, the Second Circuit reversed the defendants' convictions, holding that Detective Santiago's testimony regarding the practices of drug dealers was not admissible under Rule 702, and that even if it were admissible, the government's improper reliance on the similarity between the general behavior described by Detective Santiago and the defendants' alleged actions constituted "an improper guilt by alleged association argument." Id. The court took "serious issue with the Government's use of an expert witness to propound the impermissible theory that appellants' guilt could be inferred from the behavior of unrelated persons"– i.e., the actions of the other drug dealers with whom Detective Santiago had

firsthand experience.  Id. at 1234.  The court also concluded that the government's argument that the defendants must have used a gun to force the undercover officer to snort cocaine because Detective Santiago's testimony established that that was a common practice in the Washington Heights drug-dealing community was a "misuse" of Santiago's expert testimony which "improperly tipped the balance against appellants on the firearm charge."  Id. at 1235.

Cruz was a very similar case, again involving expert testimony regarding the practices of drug dealers in Washington Heights.  The defendant Maximilio Bonifacio was allegedly a "broker" based in the Albany area, whose role was to make introductions and otherwise facilitate transactions between cocaine dealers in Washington Heights and purchasers in Albany.  At trial, the government introduced the expert testimony of Special Agent Marano of the Drug Enforcement Administration, who testified, inter alia, about the role of the broker in drug transactions and the fact that dealers often keep their drug stash in a nearby apartment, requiring the broker and the customer to wait in one apartment while the drugs are retrieved from another so as to frustrate efforts by law enforcement agents to locate the drug supply.  Id. at 660-61.  In summation, the government reminded the jury that its cooperating witness Domingo LaBoy, a confessed purchaser of cocaine from Washington Heights and an alleged client of Mr. Bonifacio, testified that Mr. Bonifacio drove him from the Albany area to Washington Heights, made contact with the cocaine dealers in that area, waited with LaBoy in an apartment while the dealer procured the cocaine from another location, and then weighed and examined the dealer's cocaine before approving the deal and returning with LaBoy to the Albany area.  The government argued that the procedure described by the witness is "just how Special Agent Marano described how the operations work."  Id.  The government also argued that Agent Marano's testimony "about how

drug operations are run in this particular area . . . is precisely what Domingo LaBoy described to you as what Mr. Bonifacio was doing." <u>Id.</u> at 663.

The Second Circuit declined to rule on Bonifacio's argument that Agent Marano's expert testimony was improperly admitted under Rule 702, finding that even if the testimony was properly admitted, "[t]he government's principal use of Marano's expert testimony was, as pressed in summation, to bolster LaBoy's version of events," a use which the court "condemned as 'impermissible' in [<u>Castillo</u>]." <u>Id.</u> (quoting <u>Castillo</u>, 924 F.2d at 1231). In vacating the defendant's conviction and remanding for retrial, the <u>Cruz</u> panel "reaffirm[ed] . . . the principle that the credibility of a fact-witness may not be bolstered by arguing that the witness's version of events is consistent with an expert's description of patterns of criminal conduct, at least where the witness's version is not attacked as improbable or ambiguous evidence of such conduct." <u>Id.</u> at 663. In making that reaffirmation, the court noted that expert testimony regarding the operations of narcotics traffickers is admissible under Rule 702, but only to the extent "that the operations in question . . . have esoteric aspects reasonably perceived as beyond the ken of the jury and that expert testimony [is not] used solely to bolster the credibility of the government's fact-witnesses by mirroring their version of events." <u>Id.</u> at 664; <u>cf.</u> <u>United States v. Dinero Express, Inc.</u>, 57 Fed. App'x 456, 460 (2d Cir. 2002) (admission and reliance on expert testimony regarding the money remitting business in general, the operations of legal and illegal money remitters, and the connections between drug trafficking and money laundering not improper because "unlike in <u>Castillo</u> and <u>Cruz</u>, the government in summation never referred to the expert testimony as somehow corroborative of [the defendant's] unlawful state of mind."); <u>United States v. Gentile</u>, 223 Fed. App'x 86, 89 (2d Cir. 2007) (expert testimony regarding

organizational structure of Hell's Angels not unduly prejudicial where the testimony "was not used to suggest criminal conduct by association" or "to corroborate lay witnesses' stories," but was used only to "provide . . . the jurors a framework for interpreting the testimony of other witnesses.").  In <u>United States v. Mulder</u>, 273 F.3d 91, 102 (2d Cir. 2001) (citation omitted), the Second Circuit concisely synthesized and restated the principles underlying Rule 702 and the <u>Castillo</u> and <u>Cruz</u> holdings, explaining that

> [t]he government is free to offer expert testimony both as background for an offense and to assist in proving one or more elements of the offense.  What the government cannot do is to ask the jury to find that because criminals of a certain type classically engage in a certain kind of behavior, the defendant engaged in that behavior.

<u>See also</u> <u>Headley v. Tilghman</u>, 53 F.3d 472, 475 (2d Cir. 1995) ("In [<u>Castillo</u> and <u>Cruz</u>], we held that the government may not strengthen the credibility of a fact witness by arguing that the witness's version of events mirrors an expert's description of patterns of criminal conduct, at least where the witness's account is not assailed as implausible.").

The government's one-paragraph response to Munoz's argument on this issue misses the point.  Citing no case law in support of its position, the government simply asserts in conclusory fashion that Palomares's failure to raise the issue of Agent Ammirati's testimony on appeal was not ineffective because the motion in limine filed by Mr. Pizzi to exclude Ammirati's testimony "was thoroughly contemplated by the trial court and . . . stand [sic] little chance of success." (Gov. Mem. at 46.)  The government's opposition is unavailing for two reasons.  First, the fact that this Court considered Munoz's motion to exclude Agent Ammirati's testimony has no bearing on the question whether the issue should have been raised before the Second Circuit; appellate courts would have little to do if a trial court's "contemplation" of an issue obviated the

need for their own review.  Second, this Court's ruling on the motion in limine pertained only to the admissibility of Ammirati's expert testimony, not to the government's allegedly improper use of that testimony during its summation, which the Court addressed only by summarily denying Mr. Pizzi's various objections during summation.

Notwithstanding the government's response to Mr. Munoz's argument, the Court's own review of the trial record, particularly the portions quoted above, indicates quite clearly that the government's references to Agent Ammirati's testimony in summation did not violate the rule set forth in Castillo and Cruz because the government did not rely on that testimony to corroborate the assertions of its fact witnesses.  At no point in its summation did the government attempt to bolster the credibility of any of its fact witnesses, including Agent Herrera and Detective Cruz, by asserting that their factual allegations were more likely to be true in light of Agent Ammirati's explanation of how drug money laundering operations generally work.  Much of its reliance on Agent Ammirati's testimony was for the purpose of "provid[ing] the jurors a framework for interpreting the testimony," which has consistently been held to be acceptable.  Gentile, 233 Fed. App'x at 89.  Likewise, in Headley, the court found Castillo and Cruz inapposite where the defendant admitted to being present at the alleged drug transaction but denied his involvement; the court noted that "[w]here the accused defense is that he was on the scene but was unaware of any drug transaction, we have held that expert testimony may be admitted to explain the defendant's role in the transaction."  53 F.3d at 475 (citing United States v. Brown, 776 F.2d 397).  The same holds true in this case.  Mr. Munoz never denied meeting with Agent Herrera and Detective Cruz; he simply argued that those meetings were entirely innocent and that his conduct was consistent with someone unaware of the illicit source of the money found in the

bag.  As in <u>Headley</u>, the government was entitled to rely on Agent Ammirati's testimony to explain to the jury that Mr. Munoz's conduct was in fact consistent with the role of a money courier fully aware of the illegal nature of his actions.  Mr. Munoz essentially concedes this point, acknowledging that "the government did not explicitly make the 'mirrored' argument," but argues that the government's summation nevertheless violated the spirit of <u>Castillo</u> and <u>Cruz</u> in that "the parallel between Ammirati's testimony and the facts was obvious."  (Munoz Mem. at 22.)  This argument is unpersuasive.  The fact that Mr. Munoz's conduct paralleled Agent Ammirati's testimony regarding the usual practices of drug money launderers in some respects did not render the introduction of Agent Ammirati's testimony or the government's reliance on it for the purposes stated above improper under <u>Castillo</u> and <u>Cruz</u>.  <u>See</u> <u>United States v. Amuso</u>, 21 F.3d 1251, 1263-64 (2d Cir. 1994) (expert witness's testimony regarding "a broad range of topics including common cosa nostra terminology necessary to explain tape recorded evidence, and the existence and structure of New York Crime families" was admissible, despite overlapping with fact witnesses' testimony, because the testimony "was not . . . used exclusively to bolster the government witnesses' versions of the events.").  Indeed, under Mr. Munoz's interpretation of <u>Castillo</u> and <u>Cruz</u>, the government would never be permitted to introduce expert testimony regarding the operation of criminal organizations where the evidence that the defendant was a participant in such an organization was strong.  Such an interpretation is flawed; the record clearly reflects that the government did not violate the Second Circuit's holdings in <u>Castillo</u> and <u>Cruz</u> in its treatment of Agent Ammirati's testimony in summation, and Mr. Palomares thus was not ineffective in failing to raise the claim on appeal.  This portion of Mr. Munoz's Section 2255 petition is therefore dismissed.

### 3.      Admission of Ion Scan Evidence

The third point of purported ineffectiveness which Munoz asserts against Palomares is

the latter's failure to raise on appeal this Court's admission of testimony regarding the ion scan

test of the bag that was retrieved from the white Town Car by Detective Cruz, the results of

which indicated that traces of cocaine were present inside the bag and were used by the

government to connect the money contained therein to the sale of cocaine.  As noted above, the

bag was scanned by Detective Paul Cabell of the New York City Police Department, using the

NYPD's ion mobility spectrometer.  The bag tested positive for "cocaine high," indicating the

presence of cocaine residue in an amount which could have resulted only from direct contact

with cocaine rather than casual contact with a contaminated object.

Prior to trial, Mr. Pizzi made a motion in limine pursuant to Federal Rules of Evidence

702, 703, and 403 to exclude the ion scan evidence.  In support of that motion, he argued that

government's position that the ion scan device was capable of distinguishing the level of cocaine

contamination that would signify direct contact with narcotics from the trace levels present on

virtually all currency in circulation was insufficiently well-established in the scientific

community to satisfy the criteria for admissibility set forth by the Supreme Court in Daubert v.

Merrell Dow Pharm., 509 U.S. 579 (1993).[53]  In its October 6, 2004, order on this and Mr.

Pizzi's other motions in limine, the Court denied the motion to exclude testimony regarding the

operation of the ion scan machine and the results of the scan of the bag.  United States v. Munoz,

---

[53]      Daubert announced a "flexible" inquiry into the relevance and reliability of proposed expert
evidence, instructing trial courts to consider, inter alia, the testability (or more precisely, falsifiability; see Karl
Popper, The Logic of Scientific Discovery (1934)) of the theory or technique involved, the extent to which the
theory or technique has been subjected to peer review and publication, the potential rate of error, and the "general
acceptance" of the theory or technique within the scientific community.  509 U.S. at 592-95.

04-CR-473 (ILG) (E.D.N.Y. filed October 6, 2004). The Court's order rejected Mr. Pizzi's argument that the ion scan evidence was insufficient as a matter of law to sustain a conviction, and noted that "[w]hether the evidence adduced by the government will be sufficient to justify a reasonable jury to conclude that the defendant's guilt has been proved beyond a reasonable doubt must await the trial and [Munoz's] motion to exclude the results of the Ionscan tests is denied." Id. at 2.

At trial, Cabell and Radwanski both testified about the ion scan machine and the test performed on Mr. Munoz's bag. The government did not seek to qualify Cabell as an expert witness. It originally intended to seek such certification for Radwanski; however, the Court held that because Radwanski would not be offering an expert opinion, but would simply be testifying about the scientific principles underlying the design and function of the mobile ion spectrometer utilized by the NYPD, he did not need to be qualified as an expert. (Tr. at 524.) Cabell testified to the procedure involved in the proper use and maintenance of the mobile ion spectrometer, including the control tests performed prior to each real test in order to ensure that the machine is properly calibrated to detect the presence of narcotic residue, and to the fact that the bag possessed by Munoz tested positive for marijuana and "cocaine high." (Id. at 457-85.) In addition to Radwanski's testimony about the design of the ion scan machine, he also explained that while much of the currency in general circulation in the United States is contaminated with trace amounts of cocaine, the machine is calibrated to register a "hit" only at amplitude levels sufficiently high to exclude minute amounts of cocaine that are not indicative of direct contact with the drug. (Id. at 541-44.) Radwanski also briefly summarized a number of studies, several of which were prepared by the United States government, discussing the accuracy and reliability

of the ion spectrometer in detecting cocaine residue, and noted that, taken together, the studies demonstrate the "overall accuracy" of the device to be "somewhere around 95 percent." (Id. at 522.)  After Radwanski's testimony, the Court reiterated that, although it had admitted Mr. Radwanski's testimony pursuant to Rule 701 rather than Rule 702, it had also "accepted the testimony of [Radwanski] with respect to the ion scan machine because discharging my gate keeping function under Daubert I believe it satisfies at least two, if not three, of the Daubert prerequisites." (Id. at 549-50.)  In response to the Court's statement, Mr. Pizzi renewed for the record his Daubert objection to the admission of Cabell and Radwanski's testimony.  (See id. at 550.)

Munoz now argues that Palomares was ineffective in failing to raise before the Second Circuit the argument that the ion scan evidence should have been excluded on Daubert grounds. He raises two points in support of that argument:  first, that inconsistencies in Cabell's and Radwanski's testimony regarding the operation and calibration of the ion scan machine at Munoz's trial and in other proceedings in which they previously testified reveal "considerable questions . . . regarding the [ion scan] method's reliability and even the way the bag was tested in this case" (Munoz Mem. at 23), and second, that although the Second Circuit has not yet ruled on the admissibility of ion scan evidence, the Third Circuit's decision in United States v. Ten Thousand Seven Hundred Dollars and No Cents in U.S. Currency, 258 F.3d 215 (3d Cir. 2001) (hereinafter "$10,700.00"), would have presented the Second Circuit with a persuasive argument for vacating Munoz's conviction and remanding with instructions to exclude the ion scan evidence on retrial.  Neither argument is persuasive.

Munoz points out that in their testimony in a previous trial before Judge Platt of this

District, Cabell and Radwanski gave testimony regarding the calibration of the ion scan machine and the distinction between the spectrometer's "standard cocaine" and "cocaine high" responses that conflicted both with one another's testimony in that trial and with their own later testimony in Mr. Munoz's trial.  (<u>See</u> Munoz Mem. at 23.)  This is indeed the case.  Both Cabell and Radwanski testified at trial in <u>United States v. Lopez-Zapata</u>, 00-CR-1211(TCP), regarding the design and operation of the mobile ion spectrometer.  Cabell testified that the device was calibrated to give a positive reading for both standard cocaine and cocaine high at "400," and asserted that there was no difference between the two.  (Munoz Mem. Ex. D (hereinafter "<u>Lopez-Zapata</u> Tr.") at 962, 969.)  He also admitted that he did not know what "400" stood for in "chemical terms."  (<u>Id.</u> at 966.)  Radwanski, however, testified that the settings for standard cocaine and cocaine high were different, and that the ion scanning device was set to give a positive reading for standard cocaine at 300 and for cocaine high at 600.  (<u>Id.</u> at 1004-05; <u>see also</u> <u>id.</u> at 1017-18 (explaining the difference between standard cocaine and cocaine high channels).)  He further explained that the numbers 300, 600, and so on were "digital units" on a "relative scale" established by the manufacturer of the device and did not directly correspond to measurements in grams.  (<u>Id.</u> at 1005.)  In Munoz's trial, Cabell recognized the distinction between standard cocaine and cocaine high but still expressed some confusion about the concept, testifying that "cocaine high is more of a pure form that hasn't been cut.  [Standard c]ocaine will be more of a form that has been cut."[54]  (Tr. at 475.)  Radwanski, on the other hand, testified at Munoz's trial that the setting for standard cocaine was set at 50 digital units, substantially lower

---

[54]    Though the question was not posed directly to Radwanski, the Court infers from the totality of his testimony that the distinction between standard cocaine and cocaine high has nothing to do with the purity of the drug or whether it has been cut, but simply reflects the relative number of cocaine particles detected by the ion spectrometer.

than the 300-unit level to which he had testified the machine was set at the Lopez-Zapata trial.

(Id. at 541.) Both Radwanski and Cabell were consistent in their testimony at Munoz's trial that

the device was set to register "cocaine high" at 600 digital units.

Mr. Munoz is obviously correct that the testimony summarized above is inconsistent, but

this provides no basis for calling the reliability of the ion spectrometer or the admissibility of the

ion scan result into doubt. Detective Cabell is not a chemist; he is a police officer whose task is

to follow the established procedure for testing items for narcotics and to record the result. He is

not responsible for manufacturing the ion spectrometer or for training others in its use, and has

neither the need nor the educational background to be fluent in the technical aspects of the

device's operation. That he was confused as to some of these details is therefore irrelevant.

Detective Cabell's testimony established that he was well-trained in the procedure for

maintaining the ion spectrometer and for conducting properly controlled tests with that device,

and that he did so meticulously. The fact that he was unclear as to some technical details of the

ion spectrometer's operation in no way undermines the Court's confidence in Mr. Radwanski's

testimony, which persuasively established the accuracy, reliability, and widespread acceptance of

the device. Nor does the apparent inconsistency in Radwanski's testimony regarding the setting

for standard cocaine undermine the credibility of his testimony. Mr. Radwanski was not

confronted with his testimony in Lopez-Zapata at Mr. Munoz's trial or given any opportunity to

explain why his testimony about the standard cocaine setting was apparently inconsistent; it is

certainly conceivable that the NYPD's ion mobility spectrometer was set to register a hit for

standard cocaine at 300 digital units when the test about which Radwanski testified in Lopez-

Zapata was performed, but had been recalibrated to register a standard cocaine hit at 50 digital

units when Mr. Munoz's bag was tested. Even if Mr. Radwanski misspoke in one of the trials, his testimony was consistent that the machine would register a positive reading for "cocaine high" only upon detecting 600 digital units or more of cocaine. Thus the apparent contradiction in his testimony is immaterial and provides no basis for challenging the admissibility of the ion scan evidence under Daubert.

The Third Circuit's decision in $10,700.00 likewise provides no basis for calling the ion scan evidence into question. In that case, the Third Circuit reversed a forfeiture order entered by the district court, finding that the government had not "satisfied its burden of establishing that it had reasonable grounds to believe that the claimants had committed, or were about to commit, a predicate violation of the drug laws, and that the currency was 'connected' to that drug activity." 258 F.3d at 234. As part of its evidence that the seized currency was connected to a violation of the drug laws, the government submitted charts displaying the results of an ion scan analysis of the seized currency and the claimants' automobile, and an affidavit from an agent of the Drug Enforcement Agency which stated that "the results of this test indicated that the monies showed high levels of cocaine residue, an indication that the monies were involved in drug trafficking." Id. at 220 (quotation marks omitted). However, the Third Circuit concluded that it was unable to ascribe any evidentiary weight to the results of the ion scan test because the government had failed to submit any "evidence concerning the reliability of this particular testing process or the training and qualifications of the tester, two factors which, of course, bear on the reliability and accuracy of the results." Id. at 231. Moreover, the court noted that

> the parties' stipulation merely incorporates the test results without providing any explanation of how the test measures the levels of narcotics on the currency, what the test results showed with respect to those levels and the types of narcotics detected, and why those results were scientifically significant when compared to

the results on other parts of the vehicle, or for that matter, when compared to 'the norm.'  Also, the parties' stipulation does not provide any indication that the test itself was administered properly so as to ensure the reliability of the results.

Id.

It is apparent from the passage quoted above that the Third Circuit did not hold that ion scan evidence is categorically inadmissible under Daubert; indeed, the question before the court was not the admissibility of the ion scan evidence but rather the degree of weight to be assigned to it.  The court's decision was limited to the facts of the case before it and based upon its conclusion that "the documents the government has provided in the record do not provide sufficient information to guide us in evaluating the evidentiary significance of the test results, even though it is the government that bears the initial burden of establishing that it had probable cause to initiate the forfeiture proceeding."  Id.  Thus, the holding was based on the government's failure to provide the with information sufficient to make an informed decision regarding the reliability and probative value of the ion scan results, and not, as Mr. Munoz suggests, on an informed assessment of the test's accuracy or reliability.  The Third Circuit's decision in $10,700.00 is therefore easily distinguishable from this case, in which the government provided substantial evidence, in the form of testimony from Cabell and Radwanski, as to all of the items that the Third Circuit found to be lacking in the government's submission in that case.  Cabell's detailed description of the procedures followed in maintaining the ion spectrometer and in performing scans, and his affirmation that he followed those procedures when performing the test on Mr. Munoz's bag, is sufficient to establish that the test in this case was administered properly.  Moreover, Radwanski's thorough description of the scientific principles underlying the operation of the device and his summary of the studies examining the ion spectrometer's

accuracy establish both the reliability of the test and the scientific significance of the results. Thus, Mr. Munoz has failed to offer any plausible reason why a challenge to the Court's decision to admit the ion scan evidence would have been stronger on appeal than the issues that were actually raised before the Second Circuit, and has therefore failed to establish that Palomares's failure to raise this issue was ineffective assistance.

## III.     Appointment of Counsel

Finally, Mr. Munoz contends that the record of the underlying criminal action establishes his indigence and asks that his present counsel, Ms. Hirsch, be appointed pursuant to the Criminal Justice Act of 1964 ("CJA"), 18 U.S.C. § 3006A(2)(B) to represent him nunc pro tunc to May 17, 2007, the date of the filing of his Section 2255 petition.

Entitlement to court-appointed counsel is not automatic for indigent Section 2255 petitioners, nor is such entitlement grounded in the federal Constitution.  Rather the CJA provides that the Court may, in its discretion, appoint counsel to represent a Section 2255 petitioner "when the interests of justice so require."  In light of the need for further proceedings to resolve the potentially meritorious issues remaining in this action, it may become necessary for CJA counsel to be appointed to represent Mr. Munoz if he is indeed financially eligible. However, the Court cannot grant such an appointment on the basis of the record before it.  If Ms. Hirsch wishes to be appointed to represent Mr. Munoz pursuant to the CJA, she should make such application as is prescribed by the Second Circuit's Amended Plan to Implement the Criminal Justice Act of 1964 (2007), available at http://www.ca2.uscourts.gov/Docs/CJA/CJA_plan.pdf, and on this District's website: http://www.nyed.uscourts.gov/cja/Instructions/instructions.html.  The Court further notes that the

record to which Ms. Hirsch cites is insufficient to establish Mr. Munoz's financial eligibility for

CJA assistance. Mr. Munoz's eligibility will determined not on the basis of his financial

condition as of the date of his sentencing, but on the basis of his financial condition today.

**IV.    A Certificate of Appealability Shall Be Granted**

Pursuant to 28 U.S.C. § 2253(c)(1)(B), a final order in a Section 2255 proceeding is not

appealable unless the district court issues a certificate of appealability. Such a certificate should

be issued "only if the applicant has made a substantial showing of the denial of a constitutional

right," 28 U.S.C. § 2253(c)(2), which requires a showing that "reasonable jurists could debate

whether (or, for that matter, agree that) the petition should have been resolved in a different

manner or that the issues presented were 'adequate to deserve encouragement to proceed

further.'" Slack v. McDaniel, 529 U.S. 473, 484 (2000) (quoting Barefoot v. Estelle, 463 U.S.

880, 893 & n. 4 (1983)). When the issues remaining in this action are ultimately resolved, the

Court shall issue a certificate of appealability as to three of the issues resolved adversely to Mr.

Munoz in this Order: first, whether Mr. Munoz suffered prejudice from Mr. Pizzi's failure to

object to the introduction of Agent Herrera's and Detective Cruz's testimony about the meaning

of the alleged code words; second, whether the Court's failure to adequately advise Mr. Munoz

of his right to court-appointed counsel on appeal if he was unable to afford privately retained

counsel constituted more than harmless error; and third, whether Mr. Palomares's failure to raise

the issue of the admissibility of the ion scan test results, and Cabell's and Radwanski's testimony

regarding that test, constituted ineffective assistance. For the reasons stated above, the Court is

of the opinion that reasonable jurists might disagree whether Mr. Munoz was in fact prejudiced

by the admission of the agents' testimony, whether the Court's failure to explicitly advise Mr.

Munoz of the right to court-appointed counsel on appeal may have prejudiced his interests despite the fact that he ultimately retained counsel and pursued an appeal, or whether, since the Second Circuit has not yet ruled on the admissibility of ion scan tests in narcotics prosecutions, Mr. Palomares should have raised that issue on appeal.

## <u>CONCLUSION</u>

For the reasons stated above, petitioner Cesar Munoz's motion pursuant to 28 U.S.C. § 2255 is hereby DISMISSED IN PART. An evidentiary hearing will be scheduled at which further evidence may be received on Mr. Munoz's remaining allegations of ineffectiveness. When the remaining issues are fully resolved, a certificate of appealability shall be granted as to the issues noted in Discussion Part IV above, as well as any other issues that the Court deems worthy of review.

SO ORDERED.

Dated:      Brooklyn, New York
            July 28, 2008

_____/s/_____

I. Leo Glasser
United States Senior District Judge

Copies of the foregoing memorandum and order were electronically sent to:

Counsel for the Petitioner

Andrea Hirsch
111 Broadway
Suite 1305
New York, NY 10006

Counsel for the Government

Shannon Cassandra Jones
Assistant United States Attorney
Eastern District of New York
271 Cadman Plaza East
Brooklyn, NY 11201-1820