UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------x
CESAR MUNOZ,

        Petitioner,                                       Memorandum and Order
                                                                              07 Civ. 2080

    - against -

UNITED STATES OF AMERICA

        Respondent.
----------------------------------------------------------x
GLASSER, United States District Judge:

On May 17, 2007, petitioner Cesar Munoz ("petitioner" or "Munoz") moved pursuant to 28 U.S.C. § 2255 ("Section 2255") for an order, vacating his conviction and sentence in the underlying criminal action, United States v. Munoz, 04 Crim. 473 (ILG). This Court dismissed all but one of Munoz's claims in an order dated July 28, 2008, familiarity with which is assumed. See Munoz v. United States, No. 07 Civ. 2080 (ILG), 2008 WL 2942861 (E.D.N.Y. July 28, 2008) ("July 28 Order"). The sole remaining issue before the Court is petitioner's claim that trial counsel provided ineffective assistance in failing to consider or properly advise him regarding a guilty plea, refusing to discuss the United States Sentencing Guidelines, and misrepresenting the sentencing range Munoz faced if convicted. The Court held an evidentiary hearing on this matter November 5, 2008 and November 7, 2008 ("the November 2008 hearing" or "the hearing"). For the following reasons, Munoz's petition is DENIED.

## DISCUSSION

Munoz asserts that during the pre-trial phase of his criminal prosecution, his counsel, Michael Pizzi ("Pizzi"): (1) refused to consider a guilty plea; (2) downplayed the

1

strength of the government's case and effectively guaranteed an acquittal; (3) failed to review the United States Sentencing Guidelines with Munoz, and (4) informed Munoz that he faced a maximum sentence of only two to four years when his actual exposure under the Guidelines was 97 to 121 months.

## I.     Legal Standard

To establish a claim of ineffective assistance of counsel, a convicted defendant must show: (1) "that counsel's representation fell below an objective standard of reasonableness;" and (2) "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland v. Washington, 466 U.S. 668, 687–88, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).  It is the petitioner's burden to demonstrate that both prongs of Strickland have been satisfied.  Id. at 688.  In addition, there is a strong presumption that an attorney's performance was reasonable, and courts are highly deferential to the decisions made by an attorney during representation.  See Strickland, 466 U.S. at 689.  A convicted defendant making a claim of ineffective assistance must overcome this presumption by identifying the attorney's specific acts or omissions that fell below an objective standard of reasonableness.  Id. at 687.

"The first prong—constitutional deficiency—is necessarily linked to the practice and expectations of the legal community: 'The proper measure of attorney performance remains simply reasonableness under prevailing professional norms.'" Padilla v. Kentucky, 130 S. Ct. 1473, 1482, 176 L. Ed. 2d 284 (2010) (quoting Strickland, 466 U.S. at 694).  Courts must be "highly deferential" in scrutinizing counsel's performance, and "must indulge a strong presumption that counsel's conduct falls within the wide range of

2

reasonable professional assistance." Id. at 689. Moreover, "'[t]he reasonableness of counsel's performance is to be evaluated from counsel's perspective at the time of the alleged error and in light of all the circumstances.'" Raysor v. United States, 647 F.3d 491, 495 (2d Cir. 2011) (quoting Kimmelman v. Morrison, 477 U.S. 365, 381, 106 S. Ct. 2574, 91 L. Ed. 2d 305 (1986)). Concerning the second prong—the probability that, but for counsel's unprofessional errors, the result would have been different—the Second Circuit generally "requires some objective evidence other than defendant's assertions to establish prejudice." Pham v. United States, 317 F.3d 178, 182 (2d Cir. 2003) (citing United States v. Gordon, 156 F.3d 376, 380–81 (2d Cir. 1998) (per curiam)).

If Munoz's allegations are credited, Pizzi's representation undoubtedly violated "prevailing professional norms." As this Court noted previously:

> There is little question that Mr. Munoz would prevail on his ineffective assistance claim if he is ultimately able to prove that Mr. Pizzi refused to discuss the Sentencing Guidelines range that Munoz would likely face if convicted at trial, substantially understated the likely sentence that Mr. Munoz would face if convicted, refused to assist Mr. Munoz in entering a guilty plea despite his wish to do so, or failed to adequately advise Mr. Munoz of the risks of going to trial.

Munoz, 2008 WL 2942861, at *10 (citations omitted). This is because "'[t]he decision whether to plead guilty or contest a criminal charge is ordinarily the most important single decision in a criminal case.'" United States v. Gordon, 156 F.3d 376, 380 (2d Cir. 1998) (quoting Boria v. Keane, 99 F.3d 492, 496-97 (2d Cir. 1996)).

When advising a client regarding a guilty plea, an attorney must balance two competing obligations. "On the one hand, defense counsel 'must give the client the benefit of counsel's professional advice on this crucial decision' of whether to plead

3

guilty." Purdy v. United States, 208 F.3d 41, 44-45 (2d Cir. 2000) (quoting Boria, 99 F.3d at 497) ("Boria recognizes a lawyer's general duty to advise a defendant concerning acceptance of a plea bargain."); Model Rules of Professional Conduct Rule 1.4(b) (1995) ("A lawyer shall explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation."). This advice must include the terms of any plea offer, Cullen v. United States, 194 F.3d 401, 404 (2d Cir. 1999), and should include the strengths and weaknesses of the case against the defendant, Purdy, 208 F.3d at 45, and the comparative sentencing exposure between a guilty plea and proceeding to trial. Gordon, 156 F.3d at 380 ("'Knowledge of the comparative sentence exposure between standing trial and accepting a plea offer will often be crucial to the decision whether to plead guilty.'" (quoting United States v. Day, 969 F.2d 39, 43 (3d Cir. 1992))); Carrion v. Smith, 644 F. Supp. 2d 452, 467 (S.D.N.Y. 2009) ("When a plea offer is made and there is a reasonable probability that the defendant is uncertain about the sentencing exposure he faces . . . a lawyer unquestionably has a duty to inform his client of the sentencing exposure he faces if he accepts the plea offer and if he does not.").

> On the other hand, counsel must refrain from overbearing a client's will:
>> [T]he ultimate decision whether to plead guilty must be made by the defendant. See Model Rules of Professional Conduct Rule 1.2(a) (1995) ("In a criminal case, the lawyer shall abide by the client's decision, after consultation with the lawyer, as to a plea to be entered. . . ."). And a lawyer must take care not to coerce a client into either accepting or rejecting a plea offer. See Jones [v. Murray], 947 F.2d [1106,] 1111 ("[V]arious [ABA] Standards place[ ] upon counsel an affirmative duty to avoid exerting 'undue influence on the accused's decision' and to 'ensure that the decision . . . is ultimately made by the defendant.'" (quoting Standards for Criminal Justice 4-5.1(b) & 14-3.2(b))).

4

Purdy, 208 F. 3d at 45.  Thus, in advising a client, counsel must "steer[ ] a course between the Scylla of inadequate advice and the Charbydis of coercing a plea." Id.  In light of these competing obligations, "[c]ounsel's conclusion as to how best to advise a client in order to avoid, on the one hand, failing to give advice and, on the other, coercing a plea enjoys a wide range of reasonableness because '[r]epresentation is an art,' and '[t]here are countless ways to provide effective assistance in any given case.'" Id. (quoting Strickland, 466 U.S. at 689-93).

## II.  Discussion

By virtue of the asserted specific claims of ineffectiveness, the determination of the issue is dependent entirely upon the credibility of the witnesses who testified at the hearing.  That determination compels the conclusion that this petition be denied, given the findings of fact and conclusions of law that follow.

Pizzi testified that he received a telephone call from Maribel Lopez ("Ms. Lopez"), the defendant's wife, who informed him that federal agents came to her home to arrest her husband who was in Miami.  She wished to retain him to handle the matter.  He read some newspaper articles about the case which made reference to a money-laundering drug operation relating to Columbian nationals.  The defendant subsequently came to his office to discuss his case.  Mr. Pizzi then had a series of discussions with the Assistant United States Attorney assigned to the case, Suzanne McDermott ("AUSA McDermott"), and Special Agent Rosanna Licitra ("Agent Licitra"), of the Department of Homeland Security, Immigration and Customs Enforcement, who was the case agent assigned to the case.  Tr. 66-69; 154.

5

After learning from them that Munoz was facing a charge of laundering approximately a half million dollars, he discussed with his client those charges and the process: "bail, jail, plead guilty, don't plead guilty, plead guilty don't cooperate, plead guilty cooperate -- and what the various options were." Tr. at 69.  Pizzi then negotiated an agreement with the government that would allow Munoz to fly with him to New York and self-surrender.  A flight to New York was booked, Munoz and Pizzi met at the Miami airport and sat next to each other and talked on the flight to New York.  A proffer session with the government had been scheduled, which Pizzi explained to him. Tr. 70-71.  Upon arriving in New York, they located a hotel in New Jersey where they spent the night and discussed the case.  They continued to discuss the case the following morning during breakfast and their trip to New York.

Upon their arrival in New York, Munoz refused to talk to the government.  He said that even if he did talk to the government, he had nothing to talk about.  Tr. at 74.  He never indicated a desire to plead guilty, notwithstanding that the strengths and weaknesses of the government's case and the risk of going to trial were discussed with him, he insisted on wanting to go to trial, and he not only maintained his innocence, he even denied knowing that he committed a crime.  Tr. at 74-75, 80-83.  Pizzi's testimony was unequivocal and consistent on direct and cross-examination that he gave Munoz his opinion regarding the government's case and advised him early on that it might be in his best interest to agree to a proffer session with the government, plead guilty, and cooperate.  He advised him that if he had information useful to the government, a guilty plea and cooperation would result in the most lenient sentence.  Munoz adamantly refused to meet with the government to cooperate. See Tr. at 73-75; 80-83; 143-144.

6

Having observed Pizzi's demeanor on direct and cross-examination, his direct and forthright responses to questions, free of even a hint of a desire to evade, or avoid or obfuscate, his credibility was manifest. Significant in this regard was the testimony of Agent Licitra which corroborated in every respect Pizzi's testimony. She described Munoz's visit to their office in anticipation of what she believed was an understanding they had of the condition permitting him to self-surrender, cooperate and give them the information they required. See Tr. at 165-168. After his arrival, she clearly explained that he was under arrest, was going to be processed, fingerprinted, and photographed. He took direction well and seemed to understand when spoken to in Spanish and English. As a further condition of permitting him to self-surrender, he was to bring keys to safe deposit boxes which the government believed he had used to conceal the proceeds of money-laundering. When asked for the keys he was to bring as part of their agreement, he said he had changed his mind and asked to speak with Mr. Pizzi.[1] Munoz also refused to participate in a proffer session and one never occurred. Throughout, Agent Licitra testified, Munoz knew exactly what was going on. He had a clear mind and was in control of what he wanted to do. Tr. at 164-168.

---

[1] Agent Licitra described Munoz's change of mind as follows:
> After we did the biographical information, I said, Okay, did you bring the keys that we had discussed? That's when he became a bit arrogant and said, No, I changed my mind. I'm not doing that. I said, What do you mean? We had this agreement. We let you surrender. That was part of the agreement. No. No. I'm not doing that. I want to talk to my attorney. I immediately called Mr. Pizzi on the telephone, as I was very surprised that this was happening. He seemed a bit surprised as well. He said, I don't know what's going on. Let me speak to my client. So, I passed over the phone to Mr. Munoz. They had a conversation. He gave me the phone back . . . . And [Pizzi] said he changed his mind, he doesn't want to cooperate. . . . [Munoz] seemed very much, to me, in control of what he wanted to do. I thought Mr. Pizzi was a little surprised, as much as I was.

Tr. at 167

7

Sharply contrasted with the testimony of Mr. Pizzi was the testimony of Munoz which was evasive, replete with lapses of memory when they served his interest, and beggared belief in its contradiction of common understanding of human behavior. He testified that when he met Mr. Pizzi at his office in Miami, he did not speak English, Mr. Pizzi did not speak Spanish and they never talked about the case. When he and Pizzi flew to New York, they sat next to each other on the plane for three and a half hours and did not exchange a word.[2] They then spent the night at a hotel after arriving in New York. They never spoke about the case then, or the following morning at breakfast, or on their automobile ride to New York. Tr. at 7-9. And thereafter in the courthouse, Mr. Pizzi first spoke with him about the charges, never expressed an opinion about the strength of the government's case; was confident he would win the case; and advised Munoz that if he lost, he would serve only two years. Tr. at 11-21.

On cross-examination, he persisted in testifying that he had no pre-surrender conversations with Pizzi, Pizzi told him that his case was only about money, and he agreed to surrender only because "I was come to see if it was really [about] me or not." Tr. at 24. The blatant falsity of that testimony is exquisitely declared by his admission reported on two prior pages of the transcript that he laundered money, that he transferred a half million dollars from one car to another, that he realized the money came from unlawful activity, and that he knew he was guilty. Tr. at 22-23. The scene Munoz portrays defies imagining: a man, knowing he is guilty of laundering hundreds of

---

[2] In contrast, Pizzi testified that although he does not speak Spanish, he spoke in English with Munoz during the journey and Munoz understood. Tr. at 70-71; 106-07. The court finds this credible and supported by Agent Licitra's testimony, where she observed that although Munoz's first language is Spanish, he understood instructions in English during his surrender. Tr. at 165. He also had no difficulty communicating by telephone with Pizzi about his change of mind during the surrender, although Pizzi was in New York and presumably did not have access to a translator. See Tr. at 167.

thousands of dollars for Colombian criminals and that federal agents have come to his house to arrest him, nevertheless believes it is a case of mistaken identity; he meets with a lawyer who only speaks in English, a language he does not understand, but he does not seek a translator or counsel with whom he can communicate; instead, he flies with that lawyer from Miami to New York, never exchanging a word; he stays overnight in a hotel and drives from New Jersey to New York with his lawyer, still without speaking; and he surrenders himself to federal agents, unaware of the purpose or consequences of his surrender.

His professed ignorance that he would be facing a likely guidelines sentence of 97 to 121 months is belied by his presence at the bail hearings. On May 18, 2004, Mr. Pizzi advised the Court that when he spoke with Munoz in Miami on May 3rd and 4th, he advised him that he was charged in a very serious money laundering case and facing somewhere between ten to twenty years. Transcript of Hearing at 16, United States v. Munoz, No. 04-m-630 (E.D.N.Y. May 18, 2004). At another hearing on June 4, 2004, Munoz was present when the prosecutor advised the Court that the guideline calculation presages a sentencing range of 97 to 121 months. Government's Memorandum of Law, Ex. G at 16. Mr. Pizzi recited those same guidelines numbers in his presentation to the Court. Id. at 27. When asked whether those numbers were recited in his presence on more than one occasion, Munoz did not remember having heard that. Nor did he remember being told by fellow inmates that he faced ten years in prison, notwithstanding his sworn declaration to that effect. Compare Tr. at 26, 28, with Petitioner.'s Memorandum of Law., Ex. V ("1st Munoz Decl.") ¶ 3 (Dkt No. 5-19). His testimony that he never discussed cooperating with Mr. Pizzi and had no knowledge of a

9

scheduled meeting with the government when he arrived in New York, Tr. at 38-39, is belied by the testimony of Mr. Pizzi and Agent Licitra. Related above are the most egregious strands of falsehoods of a tissue of lies with which Mr. Munoz's testimony is replete and drives the Court to discount it in its entirety.

The testimony of petitioner's corroborating witnesses, Teressa Flynn ("Flynn") and Marisol Vicente ("Vicente"), has been considered and must also be discounted. Neither witness was present for any of Pizzi's conversations with Munoz. Flynn testified to a single conversation shortly before the trial between Pizzi and Amaury Lopez, the petitioner's brother-in-law, in which she recalled Pizzi guaranteed he would win the case. Tr. at 59. Vicente testified that she spoke with Pizzi only three or four times during the bail hearings regarding his representation of Munoz. Pizzi was dismissive of her questions, repeatedly assuring her "we're going to win this" and Munoz faced no more than two or three years' incarceration. Tr. at 52-53. Even if credited, their testimony is of minimal corroborative value due to its narrow scope.[3]

Maribel Lopez ("Ms. Lopez"), Munoz's wife, was, by Pizzi's own account, in the best position to observe Pizzi's allegedly deficient performance. Her affidavits corroborate Munoz's claims in all material respects, concluding that "[f]rom soon after

---

[3] It is clear from both Vicente and Pizzi's testimony that Pizzi limited his discussions of the case with Vicente. Id. 51, 52. Pizzi repeatedly emphasized that he avoided discussing cooperation or a plea with anyone other than his client. See, e.g. Tr. at 91-92, 99-100, 110-11, 150-51.
> [F]rom my experience at a law firm that exclusively handled criminal and major narcotic cases, including a lot of cooperators, disclosing information that someone is going to cooperate is irresponsible, could result in the attorney getting charged with obstruction of justice, could result in the client getting killed prior to the debriefing or after it, could result in harm to his family. So, I'm not going to say it never happens, but it's not a good idea. . . If I don't have these detailed discussions with the families about pleas and cooperating, it's because to do so could place my client in jeopardy and it could place the client's family in jeopardy.

Tr. at 91-92.

10

we retained Pizzi, we were unhappy with him." 1st M. Lopez Decl. ¶ 2. However, these statements are fatally undermined by a letter from Lopez to Pizzi dated October 28, 2004, written on behalf of Munoz's family and sent shortly after her husband's conviction. Gov't Ex. 6. In that letter, she praised Pizzi's representation in the strongest possible terms:

> At this time, I would like to express my deepest gratitude for the services you have rendered to my family during this trying time. Although the results were not in your favor, your dedication, commitment and professionalism in this case was evident. Your performance in court was full of confidence and passion. We are thankful for your faith in our case and your perseverance in getting it resolved. We know you did the best you could and realize that sometimes you need a little luck as well. As we move forward in pursuing a positive outcome., [sic] we encourage you to continue in your efforts and conviction in regards to this case. We have faith in you and believe you to be an excellent lawyer. Don't let this recent erroneous decision set you back or discourage you. Once again, we express our sincere appreciation for your labor during what proved to be the most difficult time in our life. You have our vote of confidence and the faith, that with your help, we will reach a positive conclusion in this matter.

Gov't Ex. 6. It is simply inconceivable that Ms. Lopez would write such a letter if Pizzi had been as uncommunicative and unprofessional as Ms. Lopez now alleges.

For the above reasons, the Court finds that Munoz has not demonstrated Pizzi's representation fell below an objective standard of reasonableness. The Court credits Pizzi's account regarding the relevant issues: he discussed the Sentencing Guidelines with Munoz and advised him he could receive as much as 97 to 121 months if convicted; he advised Munoz as to the options of cooperating, pleading guilty, and going to trial; and he weighed the strengths and weaknesses of the Government's case and the evidence against Munoz, leaving to his client the ultimate decision whether to plead.

11

Although Pizzi did not specifically urge Munoz to plead guilty, there is no per se rule that he must do so.  "Counsel need not advise the defendant 'in so many words' to plead guilty or not where counsel's other communications with the defendant reasonably advise him of the relevant considerations." Berry v. Ercole, No. 06 Civ. 6957 (DLC), 2009 WL 1321906, at *12 (S.D.N.Y. May 12, 2009) (quoting Purdy, 208 F.3d at 46.).  The Court of Appeals has been "wary of endorsing any precedent that . . . might suggest a duty on the part of defense counsel to arm-twist a client who maintains his innocence into pleading guilty." United States v. Pitcher, 559 F.3d 120, 125 (2d Cir 2009) (emphasis added) (citation omitted).  The Court concludes that Pizzi adequately advised Munoz of the strengths and weaknesses of the evidence, of the risks of proceeding to trial, and of the benefits of pleading guilty.  Given the facts as the Court has found them, Boria is clearly distinguishable.

For the above reasons, the Court finds that Counsel's performance did not fall below an objective standard of reasonableness.  Because the Court finds that Pizzi's performance was not constitutionally deficient, it is unnecessary to consider the second Strickland prong.  See Leano v. United States, 2010 WL 3516221, at *5 (E.D.N.Y. Aug.31, 2010) ("[F]ederal district courts need not address both components if a petitioner fails to establish either one." (quoting Strickland, 466 U.S. at 697)).

## CONCLUSION

For the reasons stated above, petitioner's motion to vacate his sentence is DENIED.

**SO ORDERED.**

Dated:    Brooklyn, New York
         February 29, 2012

                                                   /s/
                                            I. Leo Glasser
                                            United States District Judge